WAYNE COUNTY EMPLOYEES'
RETIREMENT SYSTEM, for the use and
benefit of the FMI LARGE CAP FUND,

         Plaintiff,

v.

FIDUCIARY MANAGEMENT, INC.,

         Defendant.

Case No. 2:15-CV-01170-JPS

Honorable J. P. Stadtmueller

Magistrate Judge William E. Duffin

## ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT

Defendant Fiduciary Management, Inc. ("FMI"), by its attorneys, respectfully submits its

Answer and Affirmative Defenses to the Complaint of Plaintiff Wayne County Employees'

Retirement System ("WCERS"), as follows:

1.      Plaintiff brings this derivative action against Defendant on behalf of and for the
benefit of the FMI Large Cap Fund (the "Fund") pursuant to Section 36(b) of the Investment
Company Act of 1940 (the "ICA"), 15 U.S.C. § 80a-35(b) (hereinafter, "Section 36(b)").

**ANSWER:**    FMI admits that Plaintiff purports to bring this action on behalf of and for the

benefit of the FMI Large Cap Fund (the "Fund") pursuant to Section 36(b) of the Investment

Company Act of 1940 (the "ICA"), as amended, 15 U.S.C. § 80a-35(b) ("Section 36(b)").

Except as so stated, FMI denies the allegations in paragraph 1 of the Complaint, and specifically

denies that it has violated Section 36(b).

2.      FMI, as the Fund's investment adviser, manages the Fund's investment portfolio,
and receives an annual investment advisory fee from the Fund for providing it with investment
advisory services, as further specified herein.

**ANSWER:**    FMI admits that it is the investment adviser to the Fund, that it provides

investment advisory and other services to the Fund including management of the Fund's

investment portfolio, and that it receives a fee from the Fund for providing such services. Except as so stated, FMI denies the allegations in paragraph 2 of the Complaint.

3.    Under Section 36(b), Defendant owes a fiduciary duty to the Fund with respect to the investment advisory fees paid by the Fund.

**ANSWER**:    FMI admits that pursuant to and as more fully set forth in Section 36(b), it is deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by a registered investment adviser. Except as so stated, FMI denies the allegations in paragraph 3 of the Complaint.

4.    Defendant breached that fiduciary duty by receiving investment advisory fees from the Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendant, and could not have been the product of arm's length bargaining (hereinafter, "excessive" fees).

**ANSWER**:    FMI denies the allegations in paragraph 4 of the Complaint.

5.    Plaintiff brings this action to recover for the Fund the excessive and unlawful investment advisory fees charged in violation of Section 36(b), as well as lost profits and other actual damages caused by the Fund's payment of those fees. Because the conduct complained of herein is continuing in nature, Plaintiff seeks recovery for a period commencing at the earliest date in light of any applicable statute of limitations through the date of final judgment after trial.

**ANSWER**:    FMI admits that Plaintiff purports to bring this action to recover for the claimed purposes and time period alleged in paragraph 5 of the Complaint. Except as so stated, FMI denies the allegations in paragraph 5 of the Complaint, and specifically denies that it has violated or continues to violate Section 36(b), that it has received excessive or unlawful investment advisory fees, that its conduct has caused lost profits or other actual damages to the Fund, and that Plaintiff is entitled to any recovery in this action.

6.    No pre-suit demand on the Fund's Board of Directors is required, as the demand requirement of Rule 23.1 of the Federal Rules of Civil Procedure does not apply to actions brought under Section 36(b).

**ANSWER**:    Paragraph 6 of the Complaint alleges legal conclusions, to which no answer is required. To the extent that an answer may be required, FMI admits that the U.S. Supreme Court

concluded in *Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 542 (1984), that Rule 23.1 does not apply to an action brought by a shareholder under Section 36(b) and that the plaintiff in such an action therefore is not required to make demand upon the fund's directors before initiating suit. Except as so stated, FMI denies the allegations in paragraph 6 of the Complaint.

   7.     The claim asserted herein arises under Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b).

**ANSWER:**     Paragraph 7 of the Complaint alleges legal conclusions, to which no answer is required. To the extent that an answer may be required, FMI admits that in its Complaint, Plaintiff purports to assert a claim arising under Section 36(b). Except as so stated, FMI denies the allegations in paragraph 7 of the Complaint, and specifically denies that it has engaged in any acts giving rise to a claim under Section 36(b) or that the Complaint states a claim upon which relief can be granted under Section 36(b).

   8.     This Court has jurisdiction of the claim pursuant to Sections 36(b)(5) and 44 of the ICA, 15 U.S.C. §§ 80a-35(b)(5) and 80a-43, and 28 U.S.C. § 1331.

**ANSWER:**     Paragraph 8 of the Complaint alleges legal conclusions, to which no answer is required. To the extent that an answer may be required, FMI admits that the Court has jurisdiction over claims asserted under Section 36(b) pursuant to 15 U.S.C. §§ 80a-35(b)(5), 80a-43 and 28 U.S.C. § 1331. Except as so stated, FMI denies the allegations in paragraph 8 of the Complaint, and specifically denies that it has engaged in any acts giving rise to a claim under Section 36(b) or that the Complaint states a claim upon which relief can be granted under Section 36(b).

   9.     Venue is proper in this judicial district pursuant to Section 44 of the ICA, 15 U.S.C. § 80a-43, and 28 U.S.C. § 1391, because Defendant maintains offices in this district, and/or transacts business in this district.

**ANSWER:**     Paragraph 9 of the Complaint alleges legal conclusions, to which no answer is required. To the extent that an answer may be required, FMI admits that it maintains an office,

and transacts business, in this district. Except as so stated, FMI denies the allegations in paragraph 9 of the Complaint, and specifically denies that it has engaged in any acts or transactions giving rise to the purported claim asserted in the Complaint.

10.     Plaintiff is a shareholder in the Fund and has continuously owned shares in the Fund since May 2013. Plaintiff's principal place of business is 28 West Adams, Suite 1990, Detroit, MI 48226.

**ANSWER:**     FMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10 of the Complaint, and therefore denies those allegations.

11.     Defendant Fiduciary Management, Inc. ("FMI"), a corporation organized under Wisconsin law, with principal offices located at 100 East Wisconsin Avenue, Suite 2200, Milwaukee, Wisconsin 52302, is an SEC-registered investment advisor. As of December 31, 2014, FMI had 20 employees, 14 of whom performed investment advisory functions. FMI provides investment advisory services to the Fund, to other captive funds in the FMI Fund Complex, and to non-captive, arm's-length clients. As of December 31, 2014, FMI managed $21.96 billion of assets on a discretionary basis for approximately 1,210 clients, including: (1) $9.62 billion of assets in the Fund; (2) $2.22 billion of assets in two other captive funds in the FMI Fund Complex; and (3) $10.12 billion of assets for arm's-length clients.

**ANSWER:**     FMI admits the allegations in the first sentence of paragraph 11 of the Complaint. FMI admits further that it provides investment advisory and other additional services to the Fund, the FMI Common Stock Fund (the "Common Stock Fund") and the FMI International Fund (the "International Fund") (collectively, the Fund, the Common Stock Fund, and the International Fund are referred to herein as the "FMI Funds"). FMI admits further that it also provides investment advisory services to a variety of other unaffiliated, arm's-length clients. FMI also admits that as of December 31, 2014, it managed approximately $21.96 billion in assets on a discretionary basis for approximately 1,210 accounts, including approximately $9.62 billion in assets in the Fund, approximately $2.22 billion in assets in the Common Stock and International Funds collectively, and approximately $10.12 billion in assets for other clients. Except as so stated, FMI denies the allegations in paragraph 11 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

4

12.     Open-end management investment companies, also known as a "mutual funds," are collective investment vehicles that pool money from investors (raised through sale of shares in the fund) and invest the money in a portfolio of securities. Each share issued by the Fund represents, and may be redeemed for, a *pro rata* interest in the Fund's underlying portfolio of securities (less any fees and other liabilities).

**ANSWER:**     FMI admits that FMI Funds, Inc. (the "Company") is an open-end management

investment company consisting of three portfolios, that the Fund is one such portfolio,

commonly called a mutual fund, and that proceeds from the sale of shares in the Fund to

investors are invested according to the investment strategy of the Fund.  FMI further admits that

Fund shares represent, and may be redeemed for, consideration representing the value of a *pro*

*rata* interest in the Fund's portfolio of securities plus other assets, less liabilities.  FMI lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in

paragraph 12 of the Complaint as to all other open-end management investment companies or

mutual funds, and therefore denies those allegations.  Except as so stated, FMI denies the

allegations in paragraph 12 of the Complaint.

13.     Unlike other companies, a mutual fund has no employees or facilities of its own. Instead, mutual funds contract with and rely on a variety of external service providers to perform the fund's business activities and operations.

**ANSWER:**     FMI lacks knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 13 of the Complaint, which appear to encompass, without limitation,

all extant mutual funds, as well as all "other companies," and therefore denies those allegations.

14.     Chief among these mutual fund service providers is the investment advisor, who is charged with managing the mutual fund's portfolio of securities, including researching potential investments and deciding which securities – in which amounts, and at what times – to purchase for or sell from the portfolio.

**ANSWER:**     FMI admits that it is the chief service provider to the Fund, and that the services it

provides to the Fund include managing the Fund's portfolio of securities, researching potential

investments and deciding which securities, in what amounts and at what times, to purchase for or

5

sell from the Fund's portfolio, as well as numerous other, additional services required for the operation of the Fund. FMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14 of the Complaint as to all other extant mutual funds, investment advisers and other service providers to mutual funds, and therefore denies those allegations.

15.     Other service providers provide mutual funds with the remaining services required for their operation, including (1) a panoply of service providers that provide various administrative, mechanical or "back office" functions, and (2) a board of directors that provides oversight over the fund's various service providers.

        a.      For example, a "transfer agent" provides much of the day-to-day operational services requisite for mutual fund functioning, such as: (1) receiving and processing mutual fund share purchase and sale/redemption requests; (2) transferring shares; (3) preparing shareholder account statements and confirmations; (4) responding to shareholder inquiries concerning account status, portfolio performance, distributions and share price; and (5) providing shareholders with copies of account histories.

        b.      Further mutual fund operations – including provision of custodial, audit, accounting, legal, compliance and marketing services – are separately provided by further third parties (e.g., custodians, auditors, accountants, counsel, distributors), and separately compensated by mutual funds.

        c.      Lastly, operational oversight is provided by a board of directors, who, among other things, evaluate and approve the contracts between mutual funds and their service providers, and the services provided under such contracts.

**<u>ANSWER</u>:**     FMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 of the Complaint, which appear to encompass without limitation all extant mutual funds, investment advisers and other service providers to mutual funds, as well as mutual fund boards, and therefore denies those allegations.

16.     As a practical and historical matter, mutual funds have typically been created by investment advisers, who then provide investment advisory services to such mutual funds in exchange for investment advisory fees. Frequently, persons affiliated with such investment advisers are appointed to serve on such mutual funds' boards of directors, and affiliates of the investment adviser are retained to provide further services to such mutual funds (for example, distribution).

**ANSWER:** FMI admits that mutual funds have typically been created by investment advisers who provide investment advisory and other services to such mutual funds, for which such advisers are paid a fee. FMI also admits that some persons affiliated with investment advisers may be appointed to serve on the board of directors or trustees of the mutual fund established by the adviser, though such boards also include directors or trustees unaffiliated with the investment adviser, and that affiliates of the investment adviser sometimes may be retained to provide further services such as distribution to such mutual funds. Except as so stated, FMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 of the Complaint, and therefore denies those allegations.

17. Consequently, the relationship between investment advisers and mutual funds has been fraught with potential conflicts of interests, and the potential for abuse is inherent in the structure of such investment companies.

**ANSWER:** Paragraph 17 of the Complaint alleges legal conclusions, to which no answer is required. To the extent that an answer may be required, FMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 of the Complaint, which appear to encompass without limitation all extant mutual funds, investment companies, investment company structures, and investment advisers, and therefore denies those allegations. Further answering, FMI states that a majority of the Company's directors are unaffiliated with FMI.

18. For example, prior to regulation (discussed below) that required mutual funds to have independent board members review and approve investment advisory fees, investment advisers could both propose their own fees (wearing their "investment adviser" hat) and ratify such fees (wearing their "board" hat).

**ANSWER:** Paragraph 18 of the Complaint alleges legal conclusions, to which no answer is required. To the extent that an answer may be required, FMI lacks knowledge or information

7

sufficient to form a belief as to the truth of the allegations in paragraph 18 of the Complaint, and

therefore denies those allegations.

19.     Yet even after multiple rounds of legislation and regulation seeking to institute mutual funds boards independent of mutual fund investment advisers, Congress has recognized that such legislation and regulation do not alter the fundamental structural fact that mutual funds do not have an arm's-length relationship with their investment advisers.  As the Senate stated in 1969, in its report accompanying proposed amendments to the ICA, including Section 36(b), enacted in 1970:

> Mutual funds, with rare exception, are not operated by their own employees.  Most funds are formed, sold, and managed by external organizations, that are separately owned and operated.  These separate organizations are usually called investment advisers.  The advisers select the funds' investments and operate their businesses.
>
> . . .
>
> Because of the unique structure of this industry, the relationship between mutual funds and their investment adviser is not the same as that usually existing between buyers and sellers or in conventional corporate relationships.  Since a typical fund is organized by its investment adviser which provides it with almost all management services . . ., a mutual fund cannot, as a practical matter sever its relationship with the adviser.  Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy.

*See* S. Rep. No. 91–184, 1970 U.S.C.C.A.N. 4897 (hereinafter, "Senate Report"), at 4901.

**ANSWER:**     FMI admits that Senate Report No. 90-184, 1970 U.S.C.C.A.N. 4897 (the "Senate

Report"), which speaks for itself as to the content thereof, includes language quoted in part in

paragraph 19 of the Complaint.  FMI denies that paragraph 19 of the Complaint sets forth the

entirety of the Senate Report.  FMI lacks knowledge or information sufficient to form a belief as

to the truth of the allegation in the first sentence of paragraph 19 of the Complaint regarding

what Congress purportedly "recognized."   The remaining allegations in paragraph 19 of the

Complaint allege legal conclusions, to which no answer is required.  To the extent that an answer

may be required, FMI lacks knowledge or information sufficient to form a belief as to the truth

of the remaining allegations in paragraph 19 of the Complaint, and therefore denies those allegations.

20.     The peculiar dependence of mutual funds upon their founding/sponsoring investment advisers makes such funds, in effect, "captive" to their investment advisers. Mutual funds established by investment advisor sponsors are hereinafter referred to as "captive funds."

**<u>ANSWER:</u>**     Paragraph 20 of the Complaint alleges legal conclusions, to which no answer is required. To the extent that an answer may be required, FMI admits that Plaintiff purports to characterize mutual funds established by investment advisers as "captive funds" but denies that the FMI Funds are "captive" to FMI. Except as so stated, FMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 of the Complaint, which appear to encompass without limitation all extant mutual funds and investment advisers, and therefore denies those allegations.

21.     Historically, captive funds' dependence on and/or loyalty to their investment advisors has allowed investment advisors and their affiliates a decided advantage in negotiating the terms of the contractual relationships between them and the captive funds. In essence, because mutual funds cannot (and do not) "walk away" from their investment advisers, mutual funds have less ability to reject or negotiate the terms and conditions proposed and preferred by their investment advisers. Investment advisory fees are one of the principal matters affected by this state of affairs. While it is in the interest of the mutual fund, and mutual fund shareholders, to secure investment advisory fees that are as low as possible, the investment adviser's interests are the very opposite: to secure investment advisory fees as high as possible. Historically, such conflicts of interests have generally been resolved in investment advisers' favor and to captive funds' detriment.

**<u>ANSWER:</u>**     Paragraph 21 of the Complaint alleges legal conclusions, to which no answer is required. To the extent that an answer may be required, FMI denies that it is in the interest of mutual funds, and mutual fund shareholders to secure investment advisory fees that are "as low as possible," to the exclusion of, for example, fund longevity and/or performance. FMI further denies that it is in the interest of investment advisers to secure investment advisory fees that are "as high as possible." FMI also denies that "mutual funds cannot (and do not) 'walk away' from their investment advisers." Except as so stated, FMI lacks knowledge or information sufficient

9

to form a belief as to the truth of the allegations in paragraph 21 of the Complaint, which appear to encompass without limitation all extant mutual funds, "captive" mutual funds (as defined by Plaintiff), investment advisers and shareholders, and therefore denies those allegations.

22. As a result, captive funds have historically paid – and often continue today to pay – relatively high and/or excessive investment advisory fees.

**ANSWER:** Paragraph 22 of the Complaint alleges legal conclusions, to which no answer is required. To the extent that an answer may be required, FMI denies that it has received excessive or unlawful investment advisory fees from the Fund. Except as so stated, FMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 of the Complaint, which appear to encompass without limitation all extant "captive" mutual funds, investment advisers, and investment advisory fee rates, and therefore denies those allegations.

23. In 1940, responding to numerous problems and abuses in the then-lightly regulated mutual fund industry, Congress enacted the ICA in order to create standards of operation and care applicable to investment advisers and their affiliates. In its "Findings and Declaration of Policy" preamble to the ICA, Congress recognized that "investment companies are organized, operated [and] managed . . . in the interest of . . . investment advisers . . . rather than in the interests of [mutual fund shareholders]." 15 U.S.C. § 80a-1(b)(2).

**ANSWER:** FMI admits that Congress enacted the ICA in 1940. FMI admits further that Section 1 of the ICA as enacted in 1940 is entitled "Findings and Declaration of Policy." FMI denies that Plaintiff's partial quotation of 15 U.S.C. § 80a-1(b)(2) is a fair characterization of Section 1(b)(2), which speaks for itself as to the content thereof. The remaining allegations in paragraph 23 of the Complaint allege legal conclusions, to which no answer is required. To the extent that an answer may be required, FMI lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 23 of the Complaint, and therefore denies those allegations.

24.    In order "to mitigate and, so far as it is possible, to eliminate the conditions [] that adversely affect [] the interests of investors" (15 U.S.C§ 80a-1(b)), the ICA, as originally enacted in 1940, sought to bolster the ability of mutual fund boards to act independently of the investment advisers by: (1) requiring that at least 40% of a mutual fund's board consist of persons neither employed by nor affiliated with the investment adviser (15 U.S.C.§ 80a-10); and (2) requiring that such boards review and approve written contracts between the mutual fund and the investment adviser (and other key service providers) (15 U.S.C.§ 80a-16).  In sum, and as originally enacted, the ICA placed mutual fund boards in the role of "independent watchdog," and relied wholly on fund boards to "furnish a check upon the management" of mutual funds by the funds' investment advisers.

**ANSWER:**    FMI admits that Section 1(b) the ICA, as enacted in 1940, which speaks for itself as to the content thereof, contains the excerpted language quoted in part in paragraph 24 of the Complaint, but denies that Plaintiff has quoted Section 1(b) accurately.  FMI admits further that Section 10 of the ICA, as enacted in 1940, contains a provision restricting the percentum of members of the board of directors of a registered investment company that "are investment advisers of, affiliated persons of an investment adviser of, or officers or employees of, such registered company."  FMI denies that Plaintiff's characterization of the ICA as enacted in 1940 as "requiring that such boards review and approve written contracts between the mutual fund and the investment adviser (and other key service providers)" accurately reflects the provisions pertaining to investment advisory and underwriting contracts set forth in the ICA, which speaks for itself as to the content thereof.  The remaining allegations in paragraph 24 of the Complaint allege legal conclusions, to which no answer is required.  To the extent that an answer may be required, FMI lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 24 of the Complaint, and therefore denies those allegations.

25.    Notwithstanding these and other of the ICA's initial provisions, decades of excessive investment advisory fees extracted from captive funds thereafter followed.  The ICA's original regulatory schema, which relied solely on mutual fund boards to police fund fees, proved insufficient.

11

**ANSWER:** Paragraph 25 of the Complaint alleges legal conclusions, to which no answer is required. To the extent that an answer may be required, FMI denies the allegations in paragraph 25 of the Complaint.

26. First, evidence indicated that, notwithstanding the ICA's original regulations concerning mutual fund board duties and independence, the investment advisory fees paid by mutual funds were comparatively high and disproportionate to the services provided.

a. For example, an SEC-commissioned study found that investment advisers often charged mutual funds higher fees than those charged to the advisers' other clients, and that the structure of the industry, even as regulated by the ICA, had proved resistant to efforts to moderate adviser compensation. *See* Wharton School Study of Mutual Funds, H. R. Rep. No. 2274, 87th Cong., 2d Sess., 28-30, 34, 66-67 (1962). The study explicitly concluded that the unaffiliated directors mandated by the ICA were "of restricted value as an instrument for providing effective representation of mutual fund shareholders in dealings between the fund and its investment adviser." *Id*., at 34.

b. Likewise, a subsequent report authored by the SEC itself found that as mutual funds grew in size, the investment advisory fees they paid became increasingly unmoored from the advisory services provided. *See* Securities and Exchange Commission, Public Policy Implications of Investment Company Growth, H. R. Rep. No. 2337, 89th Cong., 2d Sess., 89 (1966) (hereinafter "SEC Report"). Specifically, noting that investment advisers were generally compensated on the basis of a fixed percentage of a fund's assets (rather than on services rendered or actual expenses), the SEC determined that, as a fund's assets grew, this form of payment could produce "unreasonable" fees in light of the economies of scale realized in managing a larger portfolio. SEC Report at 94, 102.

**ANSWER:** FMI admits that House Report No. 2274 of the 87th Congress, 2d Session, contains a report entitled "A Study of Mutual Funds" by Irwin Friend, F. E. Brown, Edward S. Herman and Douglas Vickers, which was prepared for the Securities and Exchange Commission by the Securities Research Unit of the Wharton School of Finance and Commerce (the "Wharton School Report"), and which speaks for itself as to the content thereof. FMI admits further that such report includes language quoted in part in paragraph 26(a) of the Complaint. FMI also admits that House Report No. 2337 of the 89th Congress, 2d Session, contains a Report of the

Securities and Exchange Commission on the Public Policy Implications of Investment Company Growth (the "SEC Report"), which speaks for itself as to the content thereof. The remaining allegations in paragraph 26 of the Complaint allege legal conclusions, to which no answer is required. To the extent that an answer may be required, FMI lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 26 of the Complaint, and therefore denies those allegations. Further answering, FMI states that Section 36(b), as ultimately enacted by Congress, does "not permit a compensation agreement to be reviewed in court for reasonableness." *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 340 (2010).

27. Second, evidence further indicated that where fund shareholders had sought to challenge the propriety of director-approved mutual fund advisory fees, such efforts had failed because of the imposing legal standards employed by courts to evaluate such fees and challenges to them. See SEC Report at 132-43 (noting use of "corporate waste" standard to review fees approved by fund directors, so that only "unconscionable" or "shocking" fees conferred liability). Such standards, in effect, allowed directors' approval of fees – notwithstanding substantial evidence that such fees were frequently excessive – to place such fees beyond, and immune to, legal challenge from fund shareholders. *Id.*

ANSWER: Paragraph 27 of the Complaint alleges legal conclusions, to which no answer is required. To the extent that an answer may be required, FMI admits that the SEC Report, which speaks for itself as to the content thereof, contains a discussion litigation brought in the late 1950s and early 1960s challenging the advisory fees of certain mutual fund advisers as excessive. Except as so stated, FMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 of the Complaint, and therefore denies those allegations.

28. The above-mentioned evidence led directly to amendment of the ICA in 1970, as the Senate explicitly acknowledged in its report accompanying such amendments:

> In total this bill represents a 3-year effort on the part of your committee to deal with the problems described in the 1962 Wharton School of Finance and Commerce study of mutual funds, the 1963 special study of the securities markets made by the Securities and Exchange Commission and the Commission's 1966

13

report on public policy implications of investment company growth.

*See* Senate Report, at 4897-98.

**ANSWER:** FMI admits that the Senate Report, which speaks for itself as to the content thereof, includes language quoted in part in paragraph 28 of the Complaint. FMI denies that paragraph 28 of the Complaint sets forth the entirety of the Senate Report. The remaining allegations in paragraph 28 of the Complaint allege legal conclusions, to which no answer is required. To the extent that an answer may be required, FMI lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 28 of the Complaint, and therefore denies those allegations.

29. In relevant part, the 1970 amendments to the ICA were threefold:

      a. first, strengthening board independence, by rewriting 15 U.S.C. §80a-(10) (now requiring at least 40% of board members to be "uninterested" persons, rather than merely persons unaffiliated with the investment adviser); see also 15 U.S.C. §80a-(2)(a)(19) (defining "interested" persons);

      b. second, strengthening board diligence with respect to evaluation and approval of advisory fees, by rewriting 15 U.S.C. §80a-(15)(c) to add that "It shall be the duty of the directors of a registered investment company to request and evaluate, and the duty of an investment adviser to furnish, such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve as investment adviser of such company."; and

      c. third, easing *extant legal standards facing fund shareholders seeking to challenge fund advisory fees*, by adding and enacting the new Section 36(b), which (1) conferred a fiduciary duty on investment advisers and their affiliates with respect to the payments they received from mutual funds; and (2) provided fund shareholders (as well as the SEC) with a private right of action, against the investment adviser, for breach of such fiduciary duty.

**ANSWER:** FMI admits that in 1970, Congress enacted P.L. 91-547, and that P.L. 91-547 included amendments to Sections 10, 15 and 36 of the ICA, which speak for themselves as to the

content thereof. FMI admits further that the amendment to Section 15(c) contained in P.L. 91-547 contains a portion of language quoted by Plaintiff, but denies that Plaintiff has quoted the amendment to Section 15(c) contained in P.L. 91-547 accurately. The remaining allegations in paragraph 29 of the Complaint allege legal conclusions, to which no answer is required. To the extent that an answer may be required, FMI lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 29 of the Complaint, and therefore denies those allegations.

30. Section 36(b)'s inclusion in the mutual fund regulatory schema indicates Congressional recognition that placing sole reliance on mutual fund boards to guard against excessive mutual fund advisory fees (1) had failed (as had been evidenced during the three decades following passage of the ICA in 1940), and (2) would *continue* to fail, notwithstanding the 1970 amendments strengthening boards' independence and diligence.

**ANSWER:** Paragraph 30 of the Complaint alleges legal conclusions, to which no answer is required. To the extent that an answer may be required, FMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30 of the Complaint, and therefore denies those allegations.

31. And while the ICA as amended in 1970 still relied on fund boards to evaluate and determine fund fees in the first instance, the 1970 amendments, including Section 36(b), demonstrated clear Congressional intent that the extant deference accorded boards' fee determinations be *lessened*.

      a.    First and generally, merely by adding Section 36(b) and its right of action for fund shareholders to challenge fund fees notwithstanding fund directors' approval of such fees, Congress recognized that board review and approval of fees did not *per se* guarantee that the fees approved would not be excessive.

      b.    Second and more specifically, Congress explicitly instructed courts, when evaluating investment advisory fees challenged as excessive: (1) "to consider the approval given by the directors;" (2) to give to such approval "such consideration as the court deems appropriate under the circumstances;" and (3) to employ a sliding scale of deference to such directorial approval based on such circumstances, including the degree to which the fee-setting "deliberations of the directors were a matter of substance or a mere formality:"

The directors of a fund have the initial responsibility for approving management contracts. Section 36(b)(2) therefore instructs the courts to consider the approval given by the directors of the fund to such compensation and provides that their approval shall be given such consideration as the court deems appropriate under all the circumstances. Among other things, the court might wish to evaluate whether the deliberations of the directors were a matter of substance or a mere formality.

*See* Senate Report, at 4910 (emphasis added).

    c.    Third, Congress also explicitly indicated that its intent in enacting Section 36(b) was to *decrease* the legal obstacles facing mutual fund shareholders seeking to challenge excessive fees, and to *lower* the applicable legal standard s used by courts to adjudicate such challenges:

[The ICA's original] provisions did not provide any mechanism by which the fairness of management contracts could be tested in court. Under general rules of law, advisory contracts which are ratified by the shareholders, or in some states approved by a vote of the disinterested directors, may not be upset in the courts except upon a showing of "corporate waste." As one court put it, the fee must "shock the conscience of the court." *Such a rule may not be an improper one when the protections of arm's-length bargaining are present. But in the mutual fund industry where, these marketplace forces are not likely to operate as effectively, your committee has decided that the standard of "corporate waste" is unduly restrictive and recommends that it be changed.*

\* \* \*

Thus, upon a challenge in court to compensation or payments, the ultimate test, even if the compensation or payments are approved by the directors and stockholders, will not be whether it involves a "waste" of corporate assets but will be whether the investment adviser has fulfilled his fiduciary duty to the mutual fund shareholders in determining the fee

*See* Senate Report, at 4901 and 4910 (emphasis added).

16

**ANSWER:** FMI admits that the Senate Report, which speaks for itself as to the content thereof, includes language quoted in part in subparts (b) and (c) of paragraph 31 of the Complaint. FMI denies that paragraph 31 of the Complaint sets forth the entirety of the Senate Report. The remaining allegations in paragraph 31 of the Complaint allege legal conclusions, to which no answer is required. To the extent that an answer may be required, FMI lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 31 of the Complaint, and therefore denies those allegations.

32. Lastly, Congress also and explicitly noted that its addition of Section 36(b) was intended to address the problem of excessive fees generated by "economies of scale" – *i.e.*, that director-approved fund fees continued to be set at high rates notwithstanding (1) that funds had grown substantially in size, and (2) that the costs to provide such funds with advisory services had not grown at the same rate, because of economies of scale in the provision of advisory services (as further explained in Section VI.C, *infra*). Congress made clear its intent that "investors should share equitably, as they do in other areas, in the economies," and that such sharing could be accomplished through fund advisors' "reduc[ing] their effective charges as the funds grows in size" (i.e., "breakpoints," as further explained in Section VI.C, *infra*):

> This bill recognizes that investors should share equitably, as they do in other areas, in the economies available as a result of the growth and general acceptance of mutual funds.
>
> ***
>
> It is noted, however, that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry. In some instances these economies of scale have not been shared with investors. Recently there has been a desirable tendency on the part of some fund managers to reduce their effective charges as the fund grows in size. Accordingly, the best industry practice will provide a guide.

*See* Senate Report, at 4901 and 4902.

**ANSWER:** FMI admits that the Senate Report, which speaks for itself as to the content thereof, contains a portion of language quoted by Plaintiff, but denies Plaintiff has quoted the Senate Report accurately. The remaining allegations in paragraph 32 of the Complaint alleges legal conclusions, to which no answer is required. To the extent that an answer may be required,

FMI lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 32 of the Complaint, and therefore denies those allegations.

33.     FMI serves as investment advisor to the Fund pursuant to an Investment Advisory Agreement between FMI and the FMI Funds, Inc. (the open-ended investment management company housing each of FMI's three captive funds, including the Fund), originally entered into on December 31, 2001 (the "Original IAA") and amended on or about December 17, 2004 (the "Amended IAA" and, together with the Original IAA, the "IAA").

**ANSWER:**     FMI admits that it serves as the investment adviser to the Fund pursuant to an Investment Advisory Agreement between FMI and FMI Funds, Inc. (the "Company") dated December 31, 2001 (the "Original IAA") and an Amendment to Investment Advisory Agreement dated December 17, 2004 (the "Amended IAA," and collectively with the Original IAA, the "IAA").  FMI admits that the Company is an open-ended investment company consisting of three portfolios, including the Fund.  Except as so stated, FMI denies the allegations in paragraph 33 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

34.     The IAA sets forth the investment advisory services that FMI provides to the Fund (further detailed in Section V.B-C, *infra*), and the fees the Fund must pay to FMI for such services (detailed in Section V.A, *infra*).

**ANSWER:**     FMI admits that the IAA, which speaks for itself as to the content thereof, requires FMI to provide investment advisory and other services to the Fund.  FMI admits further that the IAA provides that the Company, through and on behalf of the Fund, will pay FMI an advisory fee each month, at a rate specified in the IAA, in exchange for the services rendered and payments made by FMI.   Except as so stated, FMI denies the allegations in paragraph 34 of the Complaint.

35.     The IAA requires the Fund to pay FMI an investment management fee calculated as a percentage of the Fund's average AUM (payable on a monthly basis, based on average AUM during the month).  *See* Original IAA at paragraph 4 (". . . the Company, through and on behalf of the Fund, shall pay to the Adviser an advisory fee, paid monthly, based on the average net assets of the Fund, as determined by valuations made as of the close of each business day of the month.").

18

**ANSWER:** FMI admits that the IAA, which speaks for itself as to the content thereof, provides that the Company, through and on behalf of the Fund, will pay FMI monthly an advisory fee based on the average net assets of the Fund, as determined by valuations made as of the close of each business day of the month. Except as so stated, FMI denies the allegations in paragraph 35 of the Complaint.

36.   The Fund's current advisory fee rate, unchanged since October 1, 2004, is 0.75% of AUM (on an annual basis). *See* Amended IAA at paragraph 2 (the "advisory fee shall be [] 0.75% per annum [] of the Fund's average net assets, effective as of October 1, 2004.").

**ANSWER:** FMI admits that under the IAA, the current monthly investment advisory fee is equal to 1/12 of 0.75% (0.75% per annum) of the Fund's average net assets, and that this investment advisory fee rate became effective as of October 1, 2004, thereby reducing the advisory fee rate paid by the Fund from 1.0% of assets under management. Except as so stated, FMI denies the allegations in paragraph 36 of the Complaint.

37.   The Fund's rate schedule – a flat 0.75% assessed against all Fund AUM – is unusual, especially in light of the Fund's large size, in that it does not feature any breakpoints (rate reductions that apply at higher AUM ranges), as further discussed in Section VI.C, *infra*.

**ANSWER:** FMI admits that under the IAA, the current monthly investment advisory fee rate is equal to 1/12 of 0.75% (0.75% per annum) of the Fund's average net assets, and that the rate schedule applicable to the Fund does not have breakpoints reducing the advisory fee rate to a level even lower than currently in effect. Except as so stated, FMI denies the allegations in paragraph 37 of the Complaint.

38.   During the Fund's most recently completed fiscal year, ended September 30, 2014, the Fund, paying advisory fees at such 0.75% rate, paid $66,171,584 to FMI in advisory fees. More recently, during the first half of the Fund's fiscal 2015 year (*i.e.*, the six month period ended March 30, 2015 [*sic.*], the Fund, at the same 0.75% rate, paid $35,708,912 to FMI in advisory fees.

**ANSWER:** FMI admits that the annual investment advisory fee rate to be paid by the Company on behalf of the Fund has been .75% of assets under management since the IAA was

19

amended in October 2004 to reduce the fee rate from 1.0% of assets under management. FMI admits further that pursuant to the IAA, the Fund incurred advisory fees of approximately $66,171,584 for investment advisory and other services during the fiscal year ended September 30, 2014, and that the Fund incurred advisory fees of approximately $35,708,912 for investment advisory and other services during the six month period ending March 31, 2015. Except as so stated, FMI denies the allegations in paragraph 38 of the Complaint.

39.     Table 1 below sets forth the actual, annual investment advisory fees paid by the Fund during each fiscal year for the last decade (*i.e.*, each yearly period ending September 30, between 2005 and 2014):

**Table 1**

**<u>Advisory Fees Paid by the Fund:  2005-2014</u>**

| Fiscal Year | Fund AUM (end of year) | Advisory Fees |
|---|---|---|
| 2014 | $      9,217,389,522 | $    66,171,584 |
| 2013 | $      8,122,015,756 | $    53,745,186 |
| 2012 | $      6,167,813,363 | $    38,502,794 |
| 2011 | $      4,008,758,389 | $    29,953,543 |
| 2010 | $      3,318,364,174 | $    19,829,013 |
| 2009 | $      2,051,701,011 | $    11,801,546 |
| 2008 | $      1,140,200,214 | $      5,724,895 |
| 2007 | $        638,875,399 | $      3,129,297 |
| 2006 | $        165,805,509 | $        834,181 |
| 2005 | $          73,903,077 | $        269,099 |

**<u>ANSWER:</u>**     FMI admits that Table 1 of the Complaint sets forth the actual, annual investment advisory fees paid by the Company, through and on behalf of the Fund for each fiscal year from 2005 through 2014. Except as so stated, FMI denies the allegations in paragraph 39 of the Complaint.

40.     As detailed below, the services FMI provides to the Fund, under the IAA and as the Fund's investment advisor, are two-fold. In primary and largest part, they are "Portfolio Selection Services" – *i.e.*, researching potential investments, and deciding which securities to

20

purchase for or sell from the Fund's investment portfolio at which times, in which amounts. In much smaller part, they also include certain "Other Services," which boil down to: (1) maintaining books and records concerning FMI's provision of Portfolio Selection Services, and (2) periodic (quarterly) reporting to Fund shareholders and the Fund's Board concerning the Portfolio Selection Services provided.

**ANSWER:** FMI admits that, pursuant to the IAA and as the Fund's investment adviser, it provides services to the Fund which include researching potential investments; deciding which securities to purchase for or sell from the Fund's investment portfolio, at which times and in which amounts; maintaining books and records; and providing periodic reporting to the Fund's shareholders and the Fund's Board. Except as so stated, FMI denies the allegations in paragraph 40 of the Complaint, and specifically denies that paragraph 40 the Complaint sets forth a complete statement of the services provided by FMI to the Fund.

41. The IAA requires FMI to provide certain investment advisory services to the Fund. In their largest and core part, such services include researching potential investments, deciding which securities to purchase for or sell from the Fund's investment portfolio, and arranging for the execution of purchase and sale orders on behalf of the Fund (hereinafter, "Portfolio Selection Services"). Indeed, under the IAA, these are the *only* services explicitly required of FMI:

> The Company hereby employs the Adviser to manage the investment and reinvestment of the assets of the Fund for the period and on the terms set forth in this Agreement . . .
>
> *****
>
> The Adviser shall supervise and manage the investment portfolio of the Fund, and . . . direct the purchase and sale of investment securities in the day-to-day management of the Fund.

*See* IAA at paragraphs 1 and 2.

**ANSWER:** FMI admits that the IAA, which speaks for itself as to the content thereof, requires FMI to provide investment advisory services, including those set forth in language quoted in part in paragraph 41 of the Complaint, and that among such services are the researching of potential investments, determining which securities to purchase for or sell from the Fund's investment portfolio, and arranging for the execution of purchase and sale orders on

21

behalf of the Fund.  Except as so stated, FMI denies the allegations in paragraph 41 of the

Complaint, and specifically denies that the quoted language constitutes a complete recitation of

the services FMI provides to the Fund.

42.     The Fund's Prospectus and Statement of Additional Information, filed with the SEC on or
about January 27, 2015 (hereinafter, "Prospectus" and "SAI"), proffer a similar description of
FMI's role and services:

### MANAGEMENT OF THE FUNDS

Fiduciary Management, Inc. (the "Adviser") is the investment
adviser to each Fund . . .

The Adviser has been in business since 1980 and has been the
Funds' only investment adviser. As the investment adviser to each
Fund, the Adviser manages the investment portfolio for such Fund.
The Adviser makes the decisions to buy and sell the investments of
each Fund.

* * *

Pursuant to an investment advisory agreement between each Fund
and the Adviser (each, an "Advisory Agreement" and collectively,
the "Advisory Agreements"), the Adviser furnishes continuous
investment advisory services to the Funds.  The Adviser supervises
and manages the investment portfolio of the Funds and, subject to
such policies as the Board of Directors may determine, directs the
purchase or sale of investment securities in the day-to-day
management of each Fund's investment portfolio.

See, respectively, Prospectus at 16 and SAI at 33-34.

**ANSWER:**     FMI admits the Fund's Prospectus dated January 30, 2015 ("Prospectus") and

Statement of Additional Information dated January 30, 2015 ("SAI") were filed with the SEC on

or about January 27, 2015.  FMI admits that the Prospectus, which speaks for itself as to the

content thereof, contains the heading and immediately following two paragraphs containing

language quoted in part in paragraph 42 of the Complaint.  FMI admits further that the SAI,

which speaks for itself as to the content thereof, contains the final paragraph quoted in part in

paragraph 42 of the Complaint.  FMI denies that the above language constitutes a complete

recitation of the services it provides to the Fund. FMI further denies that paragraph 42 of the Complaint sets forth the entirety of the Prospectus or SAI. Except as so stated, FMI denies the allegations in paragraph 42 of the Complaint.

43. Fund-related filings with the SEC further detail the Portfolio Selection Services FMI provides to the Fund, describing both their ends (the Fund's stated "investment objective," which the Portfolio Selection Services endeavor to achieve) and their means (including the "principal investment strategies" employed for the Fund, as well as further detail concerning how, and by whom, the Portfolio Selection Strategies are developed and implemented).

**ANSWER:** FMI admits that various documents filed with the SEC pertaining to the Fund, which speak for themselves as to the content thereof, include language detailing the Fund's investment objective and/or the Fund's investment strategies, including how and by whom such strategies are developed and implemented. Except as so stated, FMI denies the allegations in paragraph 43 of the Complaint.

44. The Fund's "investment objective" is "long-term capital appreciation." *See* Prospectus at 3, 16. More specifically, as stated in the Fund's most recent annual report:

> The investment objective of the Large Cap Fund is to seek long-term capital appreciation by investing mainly in a limited number of large capitalization value stocks.

*See* Form N-CSR filed with the SEC on November 3, 2014 (for fiscal year ended September 30, 2014) (hereinafter, "Annual Report"), at 36.

**ANSWER:** FMI admits the allegations in paragraph 44 of the Complaint.

45. FMI seeks this [*sic.*] fulfill this objective through "principal investment strategies" that focus investment on "a limited number of large capitalization (namely, companies with more than $5 billion market capitalization at the time of initial purchase) value stocks," issued by U.S. corporations (although up to 30% of the Fund's net assets may be invested in securities of foreign issuers). See Prospectus at 3-4; SAI at 6-7.

**ANSWER:** FMI admits that the Prospectus and SAI, which speak for themselves as to the content thereof, include language quoted in part in paragraph 45 of the Complaint. FMI admits further that the Fund's "principal investment strategies" as described in the Prospectus include investment in a limited number of large capitalization (namely, companies with more than $5

23

billion market capitalization at the time of initial purchase) value stocks of companies listed on a

national securities exchange or on a national securities association, including foreign securities

listed on a national securities exchange or on a national securities association.  Except as so

stated, FMI denies the allegations in paragraph 45 of the Complaint.

46.     Consequently, the investments made by FMI for the Fund are, principally:

> a.      Equities… (as opposed to debt, bonds or asset-backed securities);
>
> b.      Issued by U.S. corporations… (as opposed to non-U.S. corporations, although up to 30% of Fund assets can be securities issued by non-U.S. issuers);
>
> c.      With large market capitalizations, exceeding $5 billion… (as opposed to smaller "mid cap" or "small cap" corporations);
>
> d.      Featuring "value" characteristics… (as opposed to "growth," and as further described by FMI below); and
>
> e.      Of a "limited number."

**ANSWER:**     FMI admits that the Fund invests principally in a limited number of large

capitalization (namely, companies with more than $5 billion market capitalization at the time of

initial purchase) value stocks of companies traded on a national securities exchange or on a

national securities association, including foreign securities listed on a national securities

exchange or on a national securities association.  Except as so stated, FMI denies the allegations

in paragraph 46 of the Complaint.

47.     While the first four of the above-listed investment criteria are common (the Fund can be
categorized, along with many others featuring similar investment foci, as a domestic large cap
value fund), the fifth – the "limited number" of the Fund's investments, is less so.  Unlike many
other mutual funds, which may invest in hundreds of different securities, FMI manages the
Fund's investments so as to "concentrate its investment on fewer companies than a diversified
mutual fund" and, specifically, to hold only "approximately 20-30 stocks."[1]  Table 10 below so
details (showing total number of different investments held by the Fund each year during the prior
decade).

---

[1] As stated by FMI on its website: *see* http://www.fiduciarymgt.com/fmifunds/fmihx/.

**ANSWER:** FMI admits that the Fund, which is registered as a non-diversified fund under the ICA, is characterized by Bloomberg as a U.S. Large-Cap Equity Value fund. FMI admits further that the Fund's assets are invested principally in a limited number of large capitalization (namely, companies with more than $5 billion market capitalization at the time of initial purchase) value stocks of companies listed on a national securities exchange or on a national securities association, including foreign securities traded on a national securities exchange or on a national securities association. FMI admits that its website, and specifically http://www.fiduciarymgt.com/fmifunds/fmihx/, which speaks for itself as to the content thereof, includes the phrases quoted in part in paragraph 47 of the Complaint. Further answering, FMI adopts and incorporates its answer to paragraph 148 of the Complaint as if fully set forth herein. Except as so stated, FMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 47 of the Complaint, and therefore denies those allegations.

48. In implementing this investment objective and principal investment strategy, FMI employs the following investment "philosophy" to research, evaluate, select, purchase and sell particular securities:

> FMI uses fundamental analysis to look for stocks of good businesses that are selling at value prices in an effort to achieve above average performance with below average risk. We believe good businesses have some or all of the following characteristics:
> • A strong, defendable market niche or products and services niche that is difficult to replicate
> • A high degree of relative recurring revenue
> • Modestly priced products or services
> • Attractive return-on-investment economics (namely, where return on investment exceeds a company's cost of capital over a three to five year period)
> • Above-average growth or improving profitability prospects
>
> FMI considers valuation:
> • On both an absolute and relative to the market basis
> • Utilizing both historical and prospective analysis
>
> In reviewing companies, FMI applies the characteristics identified above on a case-by-case basis as the order of importance varies

depending on the type of business or industry and the company being reviewed.

FMI will generally sell a portfolio security when we believe:
• The security has achieved its value potential
• Such sale is necessary for portfolio diversification
• Changing fundamentals signal a deteriorating value potential
• Other securities have a better value potential

Our research process is geared towards finding companies that have a good business model, and that are trading at an attractive valuation with a management team that thinks and acts like an owner of the business.

*See* FMI February 13, 2015 Form ADV Part 2A (hereinafter, "Form ADV"), at 7; *see also* Prospectus at 4 (same).

**ANSWER:** FMI admits that its Form ADV Part 2A – Disclosure Brochure dated February 13, 2015 ("Form ADV") and the Prospectus, which speak for themselves as to the content thereof, include language quoted in part in paragraph 48 of the Complaint, but denies that Plaintiff has quoted either the Form ADV or the Prospectus accurately. FMI admits further that its investment approach to researching, evaluating, selecting, purchasing and selling particular securities includes fundamental analysis as described in the excerpted language quoted in part in paragraph 48 of the Complaint. Except as so stated, FMI denies the allegations in paragraph 48 of the Complaint.

49.    In providing its advisory services to the Fund, FMI employs "team-based" approach pursuant to which such advisory services are developed and delivered through a "Portfolio Management Committee" ("PMC"):

[The] Fund's investment decisions are made by a Portfolio Management Committee ("PMC"). The investment process employed by the PMC is team-based utilizing primarily in-house, fundamental research, and the PMC as a whole, not any individual PMC members, is primarily responsible for the day-to-day management of [the] Fund's portfolio.

*See* Prospectus at 7; SAI at 35.

26

**ANSWER:** FMI admits that it employs a team-based investment process, and that investment decisions pertaining to the Fund are made by a Portfolio Management Committee ("PMC"). FMI admits further that the SAI, which speaks for itself as to the content thereof, includes language quoted in part in paragraph 49 of the Complaint, but denies that Plaintiff has quoted the SAI accurately. Except as so stated, FMI denies the allegations in paragraph 49 of the Complaint.

50. The PMC is currently comprised of the following nine (9) FMI personnel:

### The Portfolio Management Committee

| PMC Member | Title with Adviser | Years with Adviser |
|---|---|---|
| Patrick J. English, CFA | Chief Executive Officer and Chief Investment Officer | 28 |
| John S. Brandser | President, Chief Operating Officer and Chief Compliance Officer | 20 |
| Andy P. Ramer, CFA | Director of Research and Research Analyst | 12 |
| Jonathan T. Bloom, CFA | Research Analyst | 5 |
| Matthew J. Goetzinger, CFA | Research Analyst | 10 |
| Robert M. Helf, CFA | Research Analyst | 17 |
| Karl T. Poehls, CFA | Research Analyst | 7 |
| Daniel G. Sievers, CFA | Research Analyst | 6 |
| Matthew T. Sullivan | Research Analyst | 2 |

*See* Prospectus at 6.

**ANSWER:** FMI admits that the individuals listed in paragraph 50 of the Complaint have the job titles listed therein and currently serve on FMI's PMC. Except as so stated, FMI denies the allegations in paragraph 50 of the Complaint.

51. Although not explicitly specified under the IAA, FMI may also provide the Fund with various further services in connection with "supervis[ing] and manag[ing] the investment portfolio of the Fund." These other services boil down to (1) maintaining books and records with respect to the Portfolio Selection Services provided; and (2) periodic reporting (to the Fund's Board, in Fund SEC filings and other Fund-related communications) concerning the

27

Fund's performance in light of the Portfolio Selection Services provided (hereinafter, "Other Services").

ANSWER:   FMI admits that it provides substantial services to the Fund (not all of which are explicitly specified in the IAA), which services include supervising and managing the investment portfolio of the Fund, maintaining books and records with respect to services provided to the Fund, and providing periodic reporting, including reporting to the Fund's Board, reporting in Fund SEC filings and reporting in other Fund-related communications.  FMI denies that the foregoing services constitute a complete recitation of the services it provides to the Fund.  Except as so stated, FMI denies the allegations in paragraph 51 of the Complaint.

52.    As further discussed at Section VI.G infra, the most explicit statement of such Other Services is that provided in the Fund's Semi-Annual Report on Form N-CSRS (for the 6-month period ended March 31, 2015), filed with the SEC on April 21, 2015 (hereinafter, the "Semi-Annual Report"), which purports to describe the process employed by the Fund's Board to evaluate and approve the Fund's advisory fees – including the Board's review of a report "describing the portfolio management, shareholder communication and servicing, prospective shareholder assistance, and regulatory compliance services provided by the Adviser to the Funds."  *See* Semi-Annual Report, at 38-39.

**ANSWER:**   FMI admits that the Fund's Form N-CSRS Semiannual Report for the 6-month period ended March 31, 2015, filed with the SEC on April 21, 2015 ("Semiannual Report"), which speaks for itself as to the content thereof, includes a description of certain services provided by FMI to the Fund.  FMI admits further that the Semiannual Report includes a discussion summarizing in part information that was considered by the Directors in evaluating the advisory fee rate to be paid by the Company on behalf of the Fund, which includes language quoted in part in paragraph 52 of the Complaint.  FMI denies that the Semiannual Report is or purports to set forth a complete recitation of the services provided by FMI to the Fund or of the information considered by the Directors for purposes of evaluating the advisory fee rate to be paid by the Company on behalf of the Fund.  Except as so stated, FMI denies the allegations in paragraph 52 of the Complaint.

53.     As further discussed in Section VI.G *infra*, the above-mentioned report's description of the services provided by FMI appears misleading or counterfactual in substantial part:

  a.    For example, although the above-mentioned report purports to indicate that FMI provided "prospective shareholder assistance," this is simply impossible: as the Fund has been *closed* to new shareholders since June 2013, there are no new "prospective shareholder[s]" to assist.

  b.    Likewise, although the above-mentioned report purports to indicate that FMI provided "regulatory compliance services," Fund SEC filings make clear: (1) that although FMI employed a Chief Compliance Officer to provide compliance-related services, the Chief Compliance Officer's salary and expenses were *separately paid for* by the Fund (and the other captive funds in the FMI Complex);[2] and (2) other service providers – for example, the Fund's administrator and transfer agent – provided the Fund with most of its regulatory compliance requirements, as detailed below in Section V.C, *infra*.

  c.    Similarly, although the above-mentioned report purports to indicate that FMI provided "shareholder [] servicing," such servicing was in fact provided by another service provider – the Fund's transfer agent and administrator, as detailed below in Section V.C, *infra*.

**ANSWER:**   FMI admits that it provides substantial services to the Fund, which include prospective shareholder assistance, regulatory compliance services and shareholder servicing. FMI denies that the foregoing services constitute a complete recitation of the services it provides to the Fund.  FMI admits further that the Large Cap Fund closed to new investors, with certain specified exceptions, as of June 30, 2013; that FMI employs its own chief compliance officer, who provides compliance-related services for the Fund and who is compensated by FMI for such services; and that the Fund retains certain third-party service providers, including a transfer agent and an administrator.  FMI also admits, as disclosed in the Annual Report referenced in footnote 2 to paragraph 53 of the Complaint, that the FMI Funds are responsible for paying their proportionate share of the compensation, benefits and expenses of the Funds' Chief Compliance Officer (but not FMI's chief compliance officer), and that for administrative convenience, FMI

_____

[2] *See* Annual Report at 38 ("The Funds are responsible for paying their proportionate share of the compensation, benefits and expenses of the Funds' Chief Compliance Officer. For administrative convenience, FMI initially makes these payments and is later reimbursed by the Funds.").

initially makes these payments and is later reimbursed by the Funds.  Except as so stated, FMI

denies the allegations in paragraph 53 of the Complaint, and specifically denies that the

Semiannual Report is misleading or counterfactual and that the FMI Funds are "captive" to FMI.

54.    Consequently, the "Other Services" actually provided by FMI to the Fund largely reduce
to "shareholder communication" – namely, periodic reporting to Fund shareholders, in Fund SEC
filings, concerning FMI's Portfolio Selection Services and the performance of the Fund's
portfolio (and similar periodic reporting to the Board).  Indeed, the Board appears to have
concluded as much, singling out FMI's provision of reports to Fund shareholders for particular
praise. *See* Semi-Annual Report at 38 ("In particular, the Directors concluded that the Adviser
was preparing reports to shareholders in addition to those required by law").

**ANSWER:**    FMI admits that the Semiannual Report, which speaks for itself as to the content

thereof, reflects that the Directors, in evaluating the advisory fee rate to be paid by the Company

on behalf of the Fund, concluded that FMI was providing essential services to the Fund,

including preparing reports to shareholders in addition to those required by law and providing

services to the Fund that were in addition to the services investment advisers typically provided

to non-mutual fund clients.  FMI denies that the Semiannual Report includes or purports to

include a complete recitation of the services provided by FMI to the Fund, and denies that the

preparation of reports to Fund shareholders in addition to those required by law is the only

service referenced or "singled out" in the Semiannual Report.  Except as so stated, FMI denies

the allegations in paragraph 54 of the Complaint.

55.    Specifically, FMI's "shareholder communications" with respect to the Fund consists
primarily of "Shareholder Letters" provided in the Fund's Annual Reports (for every yearly
period ending September 30) and Semi-Annual Reports (for every 6 month period ended March
31) filed with the SEC on Forms N-CSR and N-CSRS, as well as in Quarterly Reports (for every
quarter ended June 30 and December 31) that FMI maintains on its website. In these Shareholder
Letters, issued on quarterly basis, FMI proffers commentary on general developments and trends
in the wider economy and markets, on FMI's Portfolio Selection Services for the Fund, and on
the Fund's consequent performance.

**ANSWER:**    FMI admits that it prepares and includes a shareholder letter in the FMI Funds'

annual reports for each yearly period ending September 30, in the FMI Funds' semiannual

reports for each six month period ending March 31, and in the FMI Funds' quarterly reports for each quarter ending June 30 and December 31. FMI admits that the FMI Funds' annual reports and reports are filed with the SEC on Forms N-CSR and N-CSRS, and that it maintains copies of the FMI Funds' annual, semiannual, and quarterly reports on its website. FMI admits that its shareholder letters in the FMI Funds' annual, semiannual and quarterly reports, which speak for themselves as to the content thereof, contain commentary on a variety of topics including developments and trends in the economy and the markets, FMI's selection of Fund holdings, various Fund investments, and the Fund's performance. FMI denies that preparation of the foregoing shareholder letters constitutes a complete recitation of the shareholder communication services that FMI provides to the Fund. Except as so stated, FMI denies the allegations in paragraph 55 of the Complaint.

56. FMI also provides similar communications with similar frequency to the Fund's Board, which meets four times per year (see SAI at 26). At Board meetings, the Board inter alia "receives and reviews reports related to the performance and operations of the Funds" and "meets with representatives of the various service providers, including the Adviser . . . to review and discuss the activities of the Funds and to provide direction with respect thereto." *See* SAI at 28.

**ANSWER:** FMI admits that it provides extensive communications to the Fund's Board, and that the Directors receive copies of the FMI Funds' annual, semiannual and quarterly reports. FMI admits further that the Company's Board holds four Board meetings annually, at which the Board receives and reviews reports and meets with representatives of FMI and other service providers, as described in the SAI referenced in paragraph 56 of the Complaint. FMI also admits that the SAI, which speaks for itself as to the content thereof, includes language quoted in part in paragraph 56 of the Complaint. Except as so stated, FMI denies the allegations in paragraph 56 of the Complaint.

57. The limited nature of the particular services that FMI provided to the Fund under the IAA are further revealed through specification of what they are not – *i.e.*, services the Fund obtained

from other service providers, pursuant to separate contracts with such providers and/or separately paid for by the Fund.

**ANSWER**:   FMI denies the allegations in paragraph 57 of the Complaint, and specifically denies that the services it provided to the Fund pursuant to the IAA were of a "limited nature."

58.   Indeed, the IAA itself adopts this strategy in its lengthy recitation of expenses and services that fall outside of the IAA:

> The expenses of the Fund's operations borne by the Fund include by way of illustration and not limitation, director's fees paid to those directors who are not officers of the Company, the costs of preparing and printing its registration statements required under the Securities Act of 1933 and the Act (and amendments thereto), the expense of registering its shares with the Securities and Exchange Commission and in the various states, payments made pursuant to the Service and Distribution Plan, the printing and distribution cost of prospectuses mailed to existing shareholders, the cost of share certificates (if any), director and officer liability insurance, reports to shareholders, reports to government authorities and proxy statements, interest charges, reimbursement payments to securities lenders for dividend and interest payments on securities sold short, taxes, legal expenses, salaries of administrative and clerical personnel, association membership dues, auditing and accounting services, insurance premiums, brokerage and other expenses associated with the execution of portfolio securities transactions, fees and expenses of the custodian of the Fund's assets, expenses of calculating the net asset value and repurchasing and redeeming shares, charges and expenses of dividend disbursing agents, registrars and stock transfer agents and the cost of keeping all necessary shareholder records and accounts.

Original IAA at paragraph 3; *see* also SAI at 34 (same).[3]

---

[3]  Specifically, the SAI states that "[e]ach Fund pays all of its expenses not assumed by the Adviser pursuant to its Advisory Agreement or the administration agreement, including, but not limited to, the professional costs of preparing and the cost of printing its registration statements required under the Securities Act and the 1940 Act and any amendments thereto, the expense of registering its shares with the SEC and in the various states, the printing and distribution cost of prospectuses mailed to existing shareholders, director and officer liability insurance, reports to shareholders, reports to government authorities and proxy statements, interest charges, and brokerage commissions and expenses in connection with portfolio transactions.  Each Fund also pays the fees of directors who are not interested persons of the Adviser or officers or employees of the Funds, salaries of administrative and clerical personnel, association membership dues, auditing and accounting services, fees and expenses of any custodian or trustees having custody of the Funds' assets, expenses of repurchasing and redeeming shares, printing and mailing expenses, charges and expenses of dividend disbursing agents, registrars and stock transfer agents, including the cost of keeping all necessary shareholder records and accounts and handling any problems related thereto."  *See* SAI at 34.

**ANSWER:** FMI admits that the Original IAA, which speaks for itself as to the content thereof, includes language quoted in part in paragraph 58 of the Complaint. FMI admits further that the SAI, which speaks for itself as to the content thereof, includes language quoted in part in Footnote 3 to paragraph 58 of the Complaint. Except as so stated, FMI denies the allegations in paragraph 58 of the Complaint.

59.     The Fund's SEC filings provide certain disclosures concerning these services, their providers, and their cost to the Fund. These include:

      a.      administrative, accounting, transfer agent and dividend disbursing agent services (provided by US Bancorp Fund Services, LLC ("USBFS"), as the Fund's Administrator, Transfer Agent, Accountant, and Dividend Disbursing Agent, pursuant to multiple separate agreements, including a Fund Administration Servicing Agreement, a Transfer Agent Servicing Agreement; and a Fund Accounting Servicing Agreement);

      b.      securities custody services (provided by U.S. Bank, N.A., as custodian, pursuant to a Custody Agreement);

      c.      distribution services (provided by Rafferty Capital Markets, LLC, as distributor, per a separate Distribution Agreement);[4]

      d.      audit services (provided by PriceWaterhouseCoopers LLP, and separately compensated by the Fund);

      e.      legal services (provided by Foley & Lardner LLP, and separately compensated by the Fund);

      f.      the services of independent Fund Directors (separately compensated by the Fund); and

      g.      various costs and expenses arising from the Fund's operations, including (1) printing and mailing costs associated with shareholder communications and SEC filings, (2) "professional fees" and "registration fees," and (3) sundry "other expenses" (all of which are separately compensated by the Fund).

**ANSWER:** FMI admits that the Company files various documents containing disclosures with the SEC, which speak for themselves as to the content thereof. FMI admits that the annual and

---

[4] As the Fund is closed to new investors, the Distributor does not currently engage in distribution activities and the Fund does not currently pay any distribution-related fees.

semiannual reports for the FMI Funds, which speak for themselves as to the content thereof, are filed with the SEC and contain statements of operations reflecting expenses of the Fund. FMI admits further that the foregoing reports include identification of U.S. Bancorp Fund Services, LLC ("USBFS") as Administrator, Accountant, Transfer Agent and Dividend Disbursing Agent for the Fund; U.S. Bank, N.A. ("US Bank") as Custodian; PriceWaterhouseCoopers LLP ("PWC") as Independent Registered Public Accounting Firm; Rafferty Capital Markets, LLC ("Rafferty") as Distributor; and Foley & Lardner LLP ("Foley") as Legal Counsel. FMI also admits that the Fund is closed to new investors, subject to certain exceptions, that Rafferty does not currently engage in distribution activities, and that the Fund does not currently pay any distribution-related fees. Except as so stated, FMI denies the allegations in paragraph 59 of the Complaint.

60.    Table 2 below sets forth all fees and expenses paid by the Fund during the Fund's most-recently completed fiscal year, ended September 30, 2014:

**Table 2**

**Fund Fees / Expenses (Year Ended September 30, 2014)**

| Type of Fee/Expense | Amount Paid | % of Total Fees / Expenses | Service Provider |
|---|---|---|---|
| Management Fees | $ 66,171,584 | 79.59% | FMI |
| Transfer Agent Fees | $ 11,664,399 | 14.03% | USBFS |
| Administration and Accounting Services | $ 3,502,601 | 4.21% | USBFS |
| Printing / Postage Expenses | $ 891,495 | 1.07% | expenses |
| Custodian Fees | $ 330,354 | 0.40% | U.S. Bank, N.A. |
| Registration Fees | $ 217,184 | 0.26% | expenses |
| Professional Fees | $ 63,356 | 0.08% | expenses |
| Board Fees | $ 48,400 | 0.06% | Board |
| Other Expenses | $ 247,903 | 0.30% | expenses |
| Net Expenses | $ 83,137,276 | 100.00% | n/a |

**ANSWER:** FMI admits that Table 2 reflects the general categories, approximate amounts and percentages of the total expenses paid by the Fund for the fiscal year ending September 30, 2014. FMI admits further that it is the investment adviser to the Fund, that USBFS is the Transfer Agent, Administrator, Accountant and Dividend Disbursing Agent to the Fund, and that US Bank, N.A. is the Custodian to the Fund. Except as so stated, FMI denies the allegations in paragraph 60 of the Complaint.

61. As indicated immediately above, USBFS provided multiple sets of services to the Fund by virtue of its roles as the Fund's Administrator, Transfer Agent, Accountant, and Dividend Disbursing Agent. Fund SEC filings contain a brief summary of the services provided by USBFS in only the first of these four roles (Administrator):

> USBFS serves as administrator to the Funds. In connection with its duties as administrator, USBFS prepares and maintains the books, accounts and other documents required by the 1940 Act, calculates each Fund's net asset value, responds to shareholder inquiries, prepares each Fund's financial statements, prepares reports and filings with the SEC and with state Blue Sky authorities, furnishes statistical and research data, clerical, accounting and bookkeeping services and stationery and office supplies, keeps and maintains each Fund's financial accounts and records and generally assists in all aspects of the Funds' operations. For these services, USBFS receives an asset-based fee.

*See* SAI at 37.

**ANSWER:** FMI admits that USBFS provides services to the Fund pursuant to a Fund Accounting Servicing Agreement, a Fund Administration Servicing Agreement and a Transfer Agent Servicing Agreement, which speak for themselves as to the content thereof. FMI admits further that the SAI, which speaks for itself as to the content thereof, includes, under the heading "**Administrator**," language quoted in part in paragraph 61 of the Complaint. Except as so stated, FMI denies the allegations in paragraph 61 of the Complaint.

62. However, the true extent of the services provided to the Fund by USBFS is substantially greater, and is set forth in the Fund Administration Servicing Agreement, Transfer Agent Servicing Agreement, and Fund Accounting Servicing Agreement.

<u>ANSWER</u>**:**   FMI admits that USBFS provides services to the Fund pursuant to a Fund Accounting Servicing Agreement, a Fund Administration Servicing Agreement and a Transfer Agent Servicing Agreement, which speak for themselves as to the content thereof.  Except as so stated, FMI denies the allegations in paragraph 62 of the Complaint.

63.    For example, as the Fund's Administrator and pursuant to an October 1, 2009 Fund Administration Servicing Agreement between USBFS and the Fund, USBFS must "provide the following administration services to the Fund:"

    A.    General Fund Management:

        (1)    Act as liaison among Fund service providers.

        (2)    Supply:
            a.    Corporate secretarial services.
            b.    Office facilities (which may be in USBFS's, or an affiliate's own offices).
            c.    Non-investment-related statistical and research data as needed.

        (3)    Coordinate the Company's board of directors (the "Board of Directors" or the "Directors") communications, such as:

            a.    Prepare meeting agendas and resolutions, with the assistance of Fund counsel.
            b.    Prepare reports for the Board of Directors based on financial and administrative data.
            c.    Evaluate independent auditor.
            d.    Secure and monitor fidelity bond and director and officer liability coverage, and make the necessary Securities and Exchange Commission (the "SEC") filings relating thereto.
            e.    Recommend dividend declarations to the Board of Directors and prepare and distribute to appropriate parties notices announcing declaration of dividends and other distributions to shareholders.
            f.    Attend Board of Directors meetings and present materials for Director's review at such meetings, if requested.

        (4)    Audits:
            a.    Prepare appropriate schedules and assist independent auditors.
            b.    Provide information to the SEC and facilitate audit process.
            c.    Provide office facilities.

        (5)    Assist in overall operations of the Fund.

        (6)    Pay Fund expenses upon written authorization from the Company.

36

(7) Keep the Company's governing documents, including its charter, bylaws and minute books, but only to the extent such documents are provided to USBFS by the Company or its representatives for safe keeping.

B. Compliance:

(1) Regulatory Compliance:

    a. Monitor compliance with the 1940 Act requirements, including
        (i) Asset diversification tests.
        (ii) Total return and SEC yield calculations.
        (iii) Maintenance of books and records under Rule 31a-3.

    b. Monitor Fund's compliance with the policies and investment limitations as set forth in its prospectus (the "Prospectus") and statement of additional information (the "SAI").

    c. Perform its duties hereunder in compliance with all applicable laws and regulations and provide any sub-certifications reasonably requested by the Company in connection with any certification required of the Company pursuant to the Sarbanes-Oxley Act of 2002 (the "SOX Act") or any rules or regulations promulgated by the SEC thereunder, provided the same shall not be deemed to change USBFS's standard of care as set forth herein.

    d. Monitor applicable regulatory and operational service issues, and update Board of Directors periodically.

(2) Blue Sky Compliance:

    a. Prepare and file with the appropriate state securities authorities any and all required compliance filings relating to the qualification of the securities of the Fund so as to enable the Fund to make a continuous offering of its shares in all states.

    b. Monitor status and maintain registrations in each state.

    c. Provide updates regarding material developments in state securities regulation.

(3) SEC Registration and Reporting:

    a. Assist Fund counsel in annual update of the Prospectus and SAI and in preparation of proxy statements as needed.

    b. Prepare and file annual and semiannual shareholder reports, Form N-SAR, Form N-CSR, and Form N-Q filings and Rule 24f-2 notices. As requested by the Company, prepare and file Form N-PX filings.

37

       c.       Coordinate the printing, filing and mailing of Prospectuses and shareholder reports, and amendments and supplements thereto.

       d.       File fidelity bond under Rule 17g-1.

       e.       Monitor sales of Fund shares and ensure that such shares are properly registered or qualified, as applicable, with the SEC and the appropriate state authorities.

(4)    IRS Compliance:

       a.       Monitor the Fund's status as a regulated investment company under Subchapter M of the Internal Revenue Code of 1986, as amended (the "Code"), including review of the following:

           (i)     Asset diversification requirements.
           (ii)    Qualifying income requirements.
           (iii)   Distribution requirements.

       b.       Calculate required distributions (including excise tax distributions).

       c.       Provide documentation of applicable annual updates of tax technical information impacting required FIN 48 Financial Statement footnote disclosure in Annual and Semi-Annual Reports, and discuss any applicable changes/updates to FIN 48 reporting requirements when requested.

       d.       Review all applicable documentation to ensure that all compliance requirements are met with respect to FIN 48 reporting disclosures made on behalf of the Fund.

C.    Financial Reporting:

(1)    Provide financial data required by the Prospectus and SAI.

(2)    Prepare financial reports for officers, shareholders, tax authorities, performance reporting companies, the Board of Directors, the SEC, and independent accountants.

(3)    Supervise the Fund's custodian and fund accountants in the maintenance of the Fund's general ledger and in the preparation of the Fund's financial statements, including oversight of expense accruals and payments, the determination of net asset value and the declaration and payment of dividends and other distributions to shareholders.

(4)    Compute the yield, total return, expense ratio and portfolio turnover rate of each class of the Fund.

38

       (5)     Monitor the expense accruals and notify the Company's management of any proposed adjustments.

       (6)     Prepare annual financial statements, which include, without limitation, the following items:

             a. Schedule of Investments.
             b. Statement of Assets and Liabilities.
             c. Statement of Operations.
             d. Statement of Changes in Net Assets.
             e. Cash Statement.
             f. Schedule of Capital Gains and Losses.

       (7)     Prepare quarterly broker security transaction summaries.

  D.     Tax Reporting may include, but not limited to the following:

       (1)     Prepare and file on a timely basis appropriate federal and state tax returns including, without limitation, Forms 1120-RIC and 8613.

       (2)     Review wash sale adjustments and other applicable book/tax adjustment including PFICs, potential tax adjustments due to modification of terms of debt instruments, and any adjustments relating to derivative securities.

       (3)     Prepare state income breakdowns where relevant.

       (4)     Estimate tax character of REIT distributions.

       (5)     Review on timely basis Forms 1099-MISC for payments to independent Directors and other service providers.

       (6)     Review shareholder tax reporting information relating to 1099-Div Statements.

       (7)     Review necessary tax disclosures and information included in shareholder financial reports.

  E.     Tax Consulting may include, but not limited to the following:

       (1) Discuss any tax issues or questions relating to the IRS Compliance and Tax Reporting matters listed in B.(4) and D. above.

*See* October 1, 2009 Fund Administration Servicing Agreement, at paragraph 2.

**ANSWER:**    FMI admits that USBFS provides services to the Fund pursuant to an October 1,

2009 Fund Administration Servicing Agreement, as amended ("Administration Agreement"),

which speaks for itself as to the content thereof, and that the foregoing Administration

Agreement includes at paragraph 2 language quoted in part in paragraph 63 of the Complaint.

Except as so stated, FMI denies the allegations in paragraph 63 of the Complaint.

64.     Similarly, as the Fund's Transfer Agent and pursuant to a December 17, 2003 Fund Transfer Agent Servicing Agreement between USBFS and the Fund, USBFS was required to provide services as follows:

> **2.     Services and Duties of USBFS**
>
> USBFS shall perform all of the customary services of a transfer agent and dividend disbursing agent for the Funds, and as relevant, agent in connection with accumulation, open account or similar plans (including without limitation any periodic investment plan or periodic withdrawal program), including but not limited to:
>
> A.     Receive and process all orders for the purchase, exchange, and/or redemption of shares in accordance with Rule 22c-1 of the Investment Company Act of 1940 ("the 1940 Act").
>
> B.     Process purchase orders with prompt delivery, where appropriate, of payment and supporting documentation to the Company's custodian, and issue the appropriate number of uncertificated shares with such uncertificated shares being held in the appropriate shareholder account.
>
> C.     Arrange for issuance of shares obtained through transfers of funds from Fund shareholders' accounts at financial institutions and arrange for the exchange of shares for shares of other eligible investment companies, when permitted by the Fund's current prospectus ("Prospectus").
>
> D.     Process redemption requests received in good order and, where relevant, deliver appropriate documentation to the Company's custodian
>
> E.     Pay monies upon receipt from the Company's custodian, where relevant, in accordance with the instructions of redeeming shareholders.
>
> F.     Process transfers of shares in accordance with the shareholder's instructions.
>
> G.     Process exchanges between Funds and/or classes of shares of Funds both within the same family of funds and with a First American Money Market Fund, if applicable.
>
> H.     Prepare and transmit payments for dividends and distributions declared by the Company with respect to the Fund, after deducting any amount required to be withheld by any applicable laws, rules and regulations and in accordance with shareholder instructions.

I.     Make changes to shareholder records, including, but not limited to, address changes in plans (e.g., systematic withdrawal, automatic investment, dividend reinvestment).

J.     Record the issuance of shares of the Fund and maintain, pursuant to Rule 17Ad-10(e) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), a record of the total number of shares of the Fund which are authorized, issued and outstanding.

K.     Prepare shareholder meeting lists and, if applicable, mail, receive and tabulate proxies.

L.     Mail shareholder reports and Prospectuses to current shareholders.

M.     Prepare and file U.S. Treasury Department Forms 1099 and other appropriate information returns required with respect to dividends and distributions for all shareholders.

N.     Provide shareholder account information upon request and prepare and mail confirmations and statements of account to shareholders for all purchases, redemptions and other confirmable transactions as agreed upon with the Company.

O.     Mail requests for shareholders' certifications under penalties of perjury and pay on a timely basis to the appropriate federal authorities any taxes to be withheld on dividends and distributions paid by the Company, all as required by applicable federal tax laws and regulations.

P.     Provide a Blue Sky system that will enable the Company to monitor the total number of shares of the Fund sold in each state.  In addition, the Company or its agent, including USBFS, shall identify to USBFS in writing those transactions and assets to be treated as exempt from the Blue Sky reporting for each state. The responsibility of USBFS for the Company's Blue Sky state registration status is solely limited to the initial compliance by the Company and the reporting of such transactions to the Company or its agent.

Q.     Answer correspondence from shareholders, securities brokers and others relating to USBFS's duties hereunder and such other correspondence as may from time to time be mutually agreed upon between USBFS and the Company.

R.     Reimburse the Fund each month for all material losses resulting from "as of" processing errors for which USBFS is responsible in accordance with the "as of" processing guidelines set forth on Exhibit C hereto.

*See* December 17, 2003 Fund Transfer Agent Servicing Agreement, at paragraph 2.

**ANSWER:** FMI admits that USBFS provides services to the Fund pursuant to a December 17, 2003 Transfer Agent Servicing Agreement, as amended (Transfer Agent Agreement"), which speaks for itself as to the content thereof, and that the Transfer Agent Agreement includes at paragraph 2 language quoted in part in paragraph 64 of the Complaint. Except as so stated, FMI denies the allegations in paragraph 64 of the Complaint.

65. Likewise and lastly, as the Fund's Accountant, and pursuant to an October 1, 2009 Fund Accounting Servicing Agreement between USBFS and the Fund, USBFS was required to "provide the following accounting services to the Fund:"

> **2. Services and Duties of USBFS**
>
> USBFS shall provide the following accounting services to the Fund:
>
> A. Portfolio Accounting Services:
>
> (1) Maintain portfolio records on a trade date+1 basis using security trade information communicated from the Fund's investment adviser.
>
> (2) For each valuation date, obtain prices from a pricing source approved by the board of directors of the Company (the "Board of Directors") and apply those prices to the portfolio positions. For those securities where market quotations are not readily available, the Board of Directors shall approve, in good faith, procedures for determining the fair value for such securities.
>
> (3) Identify interest and dividend accrual balances as of each valuation date and calculate gross earnings on investments for each accounting period.
>
> (4) Determine gain/loss on security sales and identify them as short-term or long-term; account for periodic distributions of gains or losses to shareholders and maintain undistributed gain or loss balances as of each valuation date.
>
> (5) On a daily basis, reconcile cash of the Fund with the Fund's custodian.
>
> (6) Transmit a copy of the portfolio valuation to the Fund's investment adviser daily.
>
> (7) Review the impact of current day's activity on a per share basis, and review changes in market value.
>
> B. Expense Accrual and Payment Services:

(1)     For each valuation date, calculate the expense accrual amounts as directed by the Company as to methodology, rate or dollar amount.

(2)     Process and record payments for Fund expenses upon receipt of written authorization from the Company.

(3)     Account for Fund expenditures and maintain expense accrual balances at the level of accounting detail, as agreed upon by USBFS and the Company.

(4)     Provide expense accrual and payment reporting.

C.     Fund Valuation and Financial Reporting Services:

(1)     Account for Fund share purchases, sales, exchanges, transfers, dividend reinvestments, and other Fund share activity as reported by the Fund's transfer agent on a timely basis.

(2)     Apply equalization accounting as directed by the Company.

(3)     Determine net investment income (earnings) for the Fund as of each valuation date. Account for periodic distributions of earnings to shareholders and maintain undistributed net investment income balances as of each valuation date.

(4)     Maintain a general ledger and other accounts, books, and financial records for the Fund in the form as agreed upon.

(5)     Determine the net asset value of the Fund according to the accounting policies and procedures set forth in the Fund's current prospectus.

(6)     Calculate per share net asset value, per share net earnings, and other per share amounts reflective of Fund operations at such time as required by the nature and characteristics of the Fund.

(7)     Communicate to the Company, at an agreed upon time, the per share net asset value for each valuation date.

(8)     Prepare monthly reports that document the adequacy of accounting detail to support month-end ledger balances.

(9)     Prepare monthly security transactions listings.

D.     Tax Accounting Services:

(1)     Maintain accounting records for the investment portfolio of the Fund to support the tax reporting required for "regulated investment companies" under the Internal Revenue Code of 1986, as amended (the "Code").

43

(2)     Maintain tax lot detail for the Fund's investment portfolio.

(3)     Calculate taxable gain/loss on security sales using the tax lot relief method designated by the Company.

(4)     Provide the necessary financial information to calculate the taxable components of income and capital gains distributions to support tax reporting to the shareholders.

E.     Compliance Control Services:

(1)     Support reporting to regulatory bodies and support financial statement preparation by making the Fund's accounting records available to the Company, the Securities and Exchange Commission (the "SEC"), and the independent accountants.

(2)     Maintain accounting records according to the 1940 Act and regulations provided thereunder.

(3)     Perform its duties hereunder in compliance with all applicable laws and regulations and provide any sub-certifications reasonably requested by the Company in connection with any certification required of the Company pursuant to the Sarbanes-Oxley Act of 2002 (the "SOX Act") or any rules or regulations promulgated by the SEC thereunder, provided the same shall not be deemed to change USBFS's standard of care as set forth herein.

(4)     Cooperate with the Company's independent accountants and take all reasonable action in the performance of its obligations under this Agreement to ensure that the necessary information is made available to such accountants for the expression of their opinion on the Fund's financial statements without any qualification as to the scope of their examination.

*See* October 1, 2009 Fund Accounting Servicing Agreement, at paragraph 2.

**ANSWER:**     FMI admits that USBFS provides services to the Fund pursuant to an October 1, 2009 Fund Accounting Servicing Agreement, as amended ("Accounting Agreement"), which speaks for itself as to the content thereof, and that the foregoing Fund Accounting Servicing Agreement includes at paragraph 2 language quoted in part in paragraph 65 of the Complaint. Except as so stated, FMI denies the allegations in paragraph 65 of the Complaint.

66.     In sum, the Fund's above-detailed agreements with USBFS indicate that USBFS provides the Fund with effectively all "back office" functions (including accounting and bookkeeping),

44

administrative functions, *shareholder*-facing functions and regulatory/compliance-related functions. Moreover, the same agreements also indicate that USBFS (rather than FMI) was responsible, in substantial part, for preparing the Fund's SEC filings.

**ANSWER:**    FMI admits that USBFS provides services to the Fund pursuant to the Accounting

Agreement, the Administration Agreement and the Transfer Agent Agreement (collectively, the

"USBFS Agreements"), which speak for themselves as to the content thereof.  Except as so

stated, FMI denies the allegations in paragraph 66 of the Complaint.

67.    The above-detailed agreements, as well as Table 2 above, concretize and illuminate the highly *limited and particular nature* of the investment advisory services that FMI provided to the Fund pursuant to IAA. Among other things, they indicate that the IAA did not confer on FMI any substantial duties that were not explicitly stated therein (as most such imaginable such duties were in fact supplied by USBFS or expensed separately to the Fund), with the sole above-discussed exception concerning FMI's period reporting on Fund performance to Fund shareholders and the Fund's Board. Specifically, they make clear that services FMI provided were limited to (1) Portfolio Selection Services, and (2) Other Services, consisting mostly of periodic reporting to shareholders and the Board concerning FMI's Portfolio Selection Services.

**ANSWER:**    FMI denies the allegations in paragraph 67 of the Complaint.

68.    Since the ICA was amended through Section 36(b), judicial standards have evolved to determine whether or not investment advisory fees were excessive and/or breached fiduciary duties.  These standards, known as the "*Gartenberg* factors," are addressed *seriatim* in Sections VI.B-G below.

**ANSWER:**    Paragraph 68 of the Complaint alleges legal conclusions, to which no answer is

required.  To the extent that an answer may be required, FMI admits that in analyzing claims

brought under Section 36(b), courts may refer to certain factors, known as the "*Gartenberg*

factors," as interpreted and limited by the United States Supreme Court in *Jones v. Harris*

*Associates L.P.*, 559 U.S. 335 (2010), and by the Seventh Circuit in *Jones v. Harris Associates*

*L.P.*, 611 Fed. App'x 359 (7th Cir. 2015).  FMI admits that Plaintiff has attempted to include

allegations in its Complaint which purport to address these factors.  Except as so stated, FMI

denies the allegations in paragraph 68 of the Complaint.

69.    FMI serves as investment adviser to the Fund.

**ANSWER:**     FMI admits the allegations in paragraph 69 of the Complaint.

70.     FMI also provides investment advisory services to two further captive funds (collectively, with the Fund, the "FMI Fund Complex"). Table 3 below lists all funds in the FMI Fund Complex.

**Table 3**

**The FMI Fund Complex**

| Fund / Series | Trust/Sponsor | $ AUM* | Strategy | Start |
|---|---|---|---|---|
| FMI Large Cap Fund | FMI Funds, Inc. | 9,625 | Equity; Domestic; Large Cap Value | 2001 |
| FMI Common Stock Fund | FMI Funds, Inc. | 1,440 | Equity; Domestic; Small/Mid Cap Value | 1981 |
| FMI International Fund | FMI Funds, Inc. | 779 | Equity; Foreign; Large Cap Value | 2010 |
| **TOTAL FMI FUND COMPLEX** | | **11,884** | | |

\* ($ millions; as of Dec. 31, 2014)

**ANSWER:**     FMI admits that it provides investment advisory and other services to the Common Stock Fund and the International Fund, each of which are a share series issued by the Company. FMI admits that as of December 31, 2014, it managed approximately $11.884 billion in assets held by the FMI Funds, comprised of approximately $9.625 billion in assets in the Fund, approximately $1.44 billion in assets in the Common Stock Fund, and approximately $779 million in assets in the International Fund. FMI admits further that the Fund invests mainly in a limited number of large capitalization (namely, companies with more than $5 billion market capitalization at the time of initial purchase) value stocks of companies listed or traded on a national securities exchange or on a national securities association, including foreign securities traded on a national securities exchange or on a national securities association; that the Common Stock Fund invests in mainly small- to medium-capitalization companies (namely, companies with less than $7 billion market capitalization at the time of initial purchase) listed or traded on a

46

national securities exchange or on a national securities association; and that the International Fund invests mainly in a limited number of large capitalization (namely, companies with more than $5 billion market capitalization at the time of initial purchase) value stocks of foreign companies (also referred to as non-U.S. companies). FMI admits that the inception of the Fund was in 2001, that the inception of the International Fund was in 2010, and that the inception of the Common Stock Fund, previously a series of FMI Mutual Funds, Inc., was in 1981. Except as so stated, FMI denies the allegations in paragraph 70 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

71.    FMI also provides investment advisory services to arm's-length clients, including registered investment companies such as mutual funds, unregistered investment companies, and private accounts.

**ANSWER**:    FMI admits the allegations in paragraph 71 of the Complaint.

72.    As detailed herein, the investment advisory services that FMI provides to its captive funds, including the Fund, and to its arm's-length clients, are substantially similar – and, to a large extent, substantially identical. *See* Section VI.B.1, *infra*. The fees FMI charges to its captive funds, however, are materially higher than those charged to arm's-length clients receiving substantially identical services (*id.*) – and the disparity is *highest* in the case of the Fund (*see* Section VI.B.1, *infra*).

**ANSWER**:    FMI admits that the investment advisory fee rates payable to FMI for the services it provides to other clients are lower than the advisory fee rate payable to FMI for the more expansive services it provides to the Fund and to the other FMI Funds. Except as so stated, FMI denies the allegations in paragraph 72 of the Complaint, and specifically denies that the services it provides to other clients are "substantially similar," much less "identical," to the services it provides to the Fund and that the FMI Funds are "captive" to FMI.

73.    As of December 31, 2014, FMI managed $21.96 billion of assets on a discretionary basis for approximately 1,210 clients. Three clients, FMI's captive funds, alone accounted for $11.84 billion of such assets, representing 53.9% of FMI's total assets under management ("AUM"). The remaining $10.12 billion of FMI AUM were split among the remaining 1,207 arm's-length clients.

47

**ANSWER:** FMI admits that as December 31, 2014, it managed approximately $21.96 billion in assets on a discretionary basis for approximately 1,210 accounts, including approximately $11.84 billion in assets in the three FMI Funds, collectively, and approximately $10.12 billion in assets for approximately 1,207 other client accounts. Except as so stated, FMI denies the allegations in paragraph 73 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

74. The Fund is and has long been the single largest investment vehicle managed by FMI, and, given its size and high fees, the single largest source of Defendant's investment advisory income. At year-end 2014, the Fund's $9.62 billion of net assets accounted, by themselves, for 81.3% of all AUM in the FMI Fund Complex, and 43.8% of *all* FMI AUM. Although FMI is a private company and does not publish its financial results or financial statements, all available evidence, as detailed in Section VI.E, indicates: (1) that the Fund's share of FMI's revenues (*i.e.*, advisory fee income) is even greater than its share of FMI's AUM (indicating that Fund fees are higher than those charged on other FMI AUM); and (2) that the Fund's share of FMI's profits (*i.e.*, advisory fee income minus costs incurred to provide advisory services) is yet higher still.

**ANSWER:** FMI admits that the Fund is the largest source of its investment advisory income. FMI admits further that as of December 31, 2014, it managed approximately $21.96 billion in assets on a discretionary basis for approximately 1,210 accounts, including approximately $9.62 billion in assets in the Fund, and approximately $2.22 billion in assets in the remaining FMI Funds collectively. FMI admits that the Fund's $9.62 billion in assets as of December 31, 2014, constituted approximately 81.3% of all assets under management in the FMI Funds as of that date and approximately 43.8% of all assets under management by FMI. FMI admits that it is a privately-held company and that its financial statements are not made public. Except as so stated, FMI denies the allegations in paragraph 74 of the Complaint.

75. Consequently:

        a. while FMI's AUM are almost evenly split between captive funds and arm's length clients (accounting, respectively, for 53.9% and 46.1% of FMI AUM), FMI's advisory fee income – given the higher fees charged to captive funds than to arm's-length clients – is principally derived from its captive funds.

b.   as the Fund is by far the largest in the FMI Fund Complex and accounts by itself for 81.3% of all captive fund AUM, the higher investment advisory fees that FMI can extract from captive funds are in substantial part those extracted from the Fund in particular.

**ANSWER:**   FMI admits that as of December 31, 2014, approximately 53.9% of the total assets managed by FMI consisted of assets in the FMI Funds, and approximately 46.1% of the total assets managed by FMI consisted of assets in other client accounts.  FMI admits further that for the period ended December 31, 2014, the fees payable to FMI by the FMI Funds collectively for investment advisory and other services were greater than the investment advisory fees payable to FMI from its other client accounts.  FMI admits that the Fund is larger than the Common Stock Fund and the International Fund, and that as of December 31, 2014, the Fund held approximately 81.3% of the assets in the FMI Funds.  Except as so stated, FMI denies the allegations in paragraph 75 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

76.   FMI's dependence on the Fund as the single largest source and driver of investment advisory fees and profits – together with the fact that any reductions to the rates charged to the Fund would have an outsize effect on FMI's fee income and profits – has made FMI particularly focused on maintaining Fund advisory fees at excessive levels.

**ANSWER:**   FMI denies the allegations in paragraph 76 of the Complaint, and specifically denies that it has received investment advisory fees that are excessive or otherwise unlawful.

77.   Comparison of the advisory fees paid to FMI by the Fund with (1) the advisory fees paid by certain/particular of FMI's arm's-length institutional clients, and (2) the advisory fees paid by similar mutual funds, are *apt*, in light of the similar and/or substantially identical services FMI provided to such arm's-length institutional clients (*see* Section VI.B.1, *infra*) or of the comparable services provided to such other, similar mutual funds (*see* Section VI.B.2, *infra*).

**ANSWER:**   Paragraph 77 of the Complaint alleges legal conclusions, to which no answer is required.  To the extent that an answer may be required, FMI admits that the advisory fees paid to FMI by the Fund compare favorably with advisory fees paid by other mutual funds employing a similar investment strategy.  Except as so stated, FMI denies the allegations in paragraph 77 of the Complaint.

49

78. Such apt comparisons uniformly indicate that the Fund, notwithstanding its receipt of similar or substantially identical investment advisory services, paid substantially higher fees. Put conversely, the higher fees paid by the Fund to FMI do not appear to arise from, and cannot be explained by, any greater or further services that FMI provided to the Fund.

**ANSWER:** FMI denies the allegations in paragraph 78 of the Complaint.

79. According to its most recent Form ADV, FMI, as of December 31, 2014, provided investment advisory services for over 1,200 clients/accounts. Most of these are "managed accounts" for individual investor clients, who are provided with FMI-designed portfolios through managed account programs operated by multiple broker-dealers. Notwithstanding the large *number* of these managed accounts, their *size* is quite small. The lion's share of FMI AUM derive from two other sources: (1) the three captive funds in the FMI Fund Complex, which account for 53.9% of all FMI AUM; and (2) arm's-length *institutional* clients.

**ANSWER:** FMI admits its Form ADV discloses that as of December 31, 2014, it managed assets for approximately 1,210 accounts, approximately 1,207 of which were accounts for clients other than the FMI Funds, including high net worth individuals, advisers, and institutional investors, including registered investment companies, private investment funds, financial institutions, charitable institutions, endowment funds and foundations, municipalities, corporations, corporate pension and profit-sharing plans, and Taft-Hartley plans. FMI admits further that collectively, the total assets under management for the FMI Funds was approximately 53.9% of the total assets under management by FMI as of December 31, 2014. Except as so stated, FMI denies the allegations in paragraph 79 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

80. FMI's arm's-length institutional clients include, per FMI, "registered investment companies, private investment funds, financial institutions, charitable institutions, endowment funds and foundations, municipalities, corporations, corporate pension and profit-sharing plans, and Taft-Hartley plans." *See* Form ADV, at 6.

**ANSWER:** FMI admits that its Form ADV, which speaks for itself as to the content thereof, includes language quoted in part in paragraph 80 of the Complaint describing FMI institutional clients. Except as so stated, FMI denies the allegations in paragraph 80 of the Complaint.

50

81.     Although the identities of most such clients are matters within the peculiar knowledge and exclusive control of FMI, and are not publicly available, Plaintiff's counsel's investigation has identified multiple current and former FMI institutional clients, as well as the investment advisory fees these (and other) FMI institutional clients paid to FMI for investment advisory services. As set forth below, such publicly-available information shows:

      a.    FMI extracted higher investment advisory fees from the Fund than from arm's-length institutional clients; even where

      b.    The investment advisory services FMI provided to such arm's-length clients were substantively similar – *and in some cases effectively identical* – to those FMI provided to the Fund.

**ANSWER:**  FMI admits that it does not make its client list publically available.  Except as so stated, FMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 81 of the Complaint, and therefore denies those allegations.  FMI denies the allegations in the second sentence of paragraph 81 of the Complaint.

82.     Based upon the foregoing and upon information and belief, discovery concerning FMI's other arm's-length institutional clients, the investment advisory services they received and the advisory fees they were charged will produce further evidence demonstrating the same.

**ANSWER:**  FMI denies the allegations in paragraph 82 of the Complaint.

83.     FMI, in its Form ADV, explains that it offers to its clients, *including its captive funds*, only "four equity investment strategies" – and emphasizes that "[w]e limit our investment management services to these four equity strategies"  *See* Form ADV at 4. Table 4 below lists these four investment strategies, together with FMI's summary descriptions of them:

**Table 4**

**<u>FMI's Four Investment Strategies</u>**

| Strategy | Description |
|---|---|
| Large Cap Equity | Invests mainly in a limited number of large capitalization (namely, companies with more than $5 billion market capitalization) value stocks |
| Small Cap Equity | Invests mainly in small to medium capitalization (namely, companies with less than $7 billion market capitalization) value stocks |
| All Cap Equity | Invests mainly in small to large capitalization value stocks |
| International Equity | Invests mainly in a limited number of large capitalization (namely, companies with more than $5 billion market capitalization) foreign companies |

*See* Form ADV at 4, 6-7.

**<u>ANSWER</u>:** FMI admits that its Form ADV, which speaks for itself as to the content thereof, includes language quoted in part in paragraph 83 of the Complaint and language in the Description column of Table 4 set forth therein. Except as so stated, FMI denies the allegations in paragraph 83 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

84.    As FMI offers its four investment strategies to its captive funds and to its arm's-length clients, these four strategies correspond directly to those employed by FMI in managing its three captive funds. Table 5 below, comparing (1) the investment strategies described in FMI's Form ADV, and (2) the captive funds' "principal investment strategies" described in the captive funds' Prospectus, makes these correspondences clear:

**Table 5**

**FMI's Four Investment Strategies and Three Captive Funds**

| Strategy | Description | Captive Fund | Stated Principal Investment Strategy |
|---|---|---|---|
| Large Cap Equity | Invests mainly in a limited number of large capitalization (namely, companies with more than $5 billion market capitalization) value | FMI Large Cap Fund | The Fund invests mainly in a limited number of large capitalization (namely, companies with more than $5 billion market capitalization at the time of initial purchase ) value stocks (Prospectus, at 3) |
| Small Cap Equity | Invests mainly in small to medium capitalization (namely, companies with less than $7 billion market capitalization) value stocks | FMI Common Stock Fund | The Fund invests mainly in small- to medium-capitalization companies (namely, companies with less than $ 7 billion market capitalization at the time of initial purchase)... that are selling at value prices... (Prospectus, at 7-8) |
| All Cap Equity | Invests mainly in small to large capitalization value | combines above funds | combination of above two funds |
| International Equity | Invests mainly in a limited number of large capitalization (namely, companies more than $5 billion market capitalization) foreign companies | FMI International Fund | The Fund invests mainly in a limited number of large capitalization (namely, companies with more than $5 billion market capitalization at the time of initial purchase) value stocks of foreign companies (also referred to as non-U.S. companies). (Prospectus, at 11) |

**ANSWER:** FMI admits that it offers four equity investment strategies. FMI further admits that its Form ADV, which speaks for itself as to the content thereof, includes language quoted in part in the Description column in Table 5 of paragraph 84 of the Complaint. FMI also admits that the Prospectus, which speaks for itself as to the content thereof, includes language quoted in part in the Stated Principal Investment Strategy column for the rows denoted FMI Large Cap

Fund, FMI Common Stock Fund, and FMI International Fund in Table 5 of paragraph 84 of the Complaint. Except as so stated, FMI denies the allegations in paragraph 84 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

85.     The above correspondences are not happenstance or coincidence, but rather reflect the fact that the "investment strategies" FMI employs for its arm's-length clients (for example, an institution procuring FMI's "Large Cap Equity" investment advisory services) are substantially the same as those FMI employs for its captive funds (for example, the Fund).

**ANSWER:**    FMI admits that the Fund employs an investment strategy similar to that of FMI's Large-Cap Equity strategy, that the Common Stock Fund employs an investment strategy similar to that of FMI's Small-Cap Equity Strategy, and that the International Fund employs an investment strategy similar to that of FMI's International Equity strategy. Except as so stated, FMI denies the allegations in paragraph 85 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

86.     Indeed, FMI itself states – plainly and repeatedly – that the investment strategies are not merely substantially the same, but *exactly the same*.

   a.     For example, in its Form ADV, FMI states:

          *FMI purchases the same securities for all clients utilizing given investment style of FMI*, and endeavors to select securities which have sufficient liquidity to fill positions for all clients.

                              * * *

          There is no traditional portfolio manager role at FMI as *all portfolios in the strategy hold the companies at the same weight*. . . When the Portfolio Management Committee makes a decision to purchase or sell a security it is executed for all client portfolios (with the strategy) in an equitable manner. There is no discretion given to an investment team member on any specific client portfolio …
          (Form ADV at 11, emphasis added)

   b.     Likewise, on its website, at separate pages describing the Large Cap Equity, Small Cap Equity, and International Equity strategies that FMI offers to "INSTITUTIONAL INVESTORS," FMI notes:

We also manage a mutual fund that mirrors this strategy.[5]

**ANSWER:** FMI admits that its Form ADV, which speaks for itself as to the content thereof, includes language quoted in part in subpart (a) of paragraph 86 of the Complaint, describing FMI's purchases of securities. FMI admits further that the three website links identified in footnote 5 to subpart (b) of paragraph 86 of the Complaint, which speak for themselves as to the content thereof, include language quoted in part in subpart (b) of paragraph 86 of the Complaint. Except as so stated, FMI denies the allegations in paragraph 86 of the Complaint.

87. Extensive and particularized facts further (and everywhere) confirm FMI's above-detailed representations that the investment strategies provided to (1) each of its captive funds and (2) its arm's-length clients for the corresponding investment strategy, are exactly the same.

**ANSWER:** FMI denies the allegations in paragraph 87 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

88. For example, comparison of the FMI-authored, most recent "Quarterly Snapshot" reports for the Fund and for the Large Cap Equity Strategy (for the quarter ended June 30, 2015),[6] reveals, *inter alia*:

    a.    The **same FMI personnel** were responsible for providing investment advisory services to the Fund and to institutional clients of FMI's Large Cap Equity Strategy:

| FMI Large Cap Fund[7] | Large Cap Equity Strategy |
|---|---|
| **Portfolio Management Committee** | **Portfolio Management Committee** |
| Jonathan T. Bloom | Jonathan T. Bloom |
| John S. Brandser | John S. Brandser |
| Patrick J. English | Patrick J. English |
| Mathew J. Goetzinger | Mathew J. Goetzinger |

---

[5] *See* http://www.fiduciarymgt.com/institutional-investors/large-cap-equity-composite/, http://www.fiduciarymgt.com/institutional-investors/small-cap-equity-composite/, and http://www.fiduciarymgt.com/institutional-investors/international-equity-composite/.

[6] Available, respectively, at: http://www.fiduciarymgt.com/fmifunds/fmihx/fmihx-snapshot/ and http://www.fiduciarymgt.com/institutional-investors/large-cap-equity-composite/.

[7] The Quarterly Snapshot for the Fund did not list the individual members of the Portfolio Management Committee; however, Fund SEC filings, such as the Fund's Prospectus, do (*see e.g.* Prospectus at 6).

55

| | |
|---|---|
| Robert M. Helf | Robert M. Helf |
| Karl T. Poehls | Karl T. Poehls |
| Andy P. Ramer | Andy P. Ramer |
| Daniel G. Sievers | Daniel G. Sievers |
| Mathew T. Sullivan | Mathew T. Sullivan |

b.     The **same investment strategy** was deployed in selecting investments for the Fund and for institutional clients of FMI's Large Cap Equity Strategy:

| FMI Large Cap Fund | Large Cap Equity Strategy |
|---|---|
| **Investment Objective / Strategy** | **Investment Philosophy / Process** |
| The Fund seeks to buy good businesses at value prices. Some of the characteristics of good businesses may include high recurring revenue and attractive returns on invested capital. A strong orientation to low absolute or relative valuation is key to the execution of the investment strategy. The FMI Large Cap Fund holds approximately 20-30 stocks, with most major industry groups represented... | Purchase durable business franchises that are selling at a discount to their intrinsic value… Some of the characteristics of good businesses include strong recurring revenue and attractive returns on invested capital. We have a strong orientation to low absolute or relative valuation, which are key to execution of our investment strategy... The portfolio generally consists of 20-30 companies and is well-diversified across sectors. |

c.     The **same number of positions** – 26 – was held in the portfolios for the Fund and for institutional clients of FMI's Large Cap Equity Strategy:

d.     The **same top ten holdings** featured in both the Fund's portfolio and the portfolios for institutional clients of FMI's Large Cap Equity Strategy

| FMI Large Cap Fund | | Large Cap Equity Strategy | |
|---|---|---|---|
| **Top 10 Portfolio Holdings** | | **Top 10 Portfolio Holdings** | |
| Bank of New York Mellon | 5.10% | Bank of New York Mellon | 5.00% |
| Accenture | 4.90% | Accenture | 4.90% |
| Potash Corp. | 4.90% | Potash Corp. | 4.90% |

56

| Berkshire Hathaway | 4.60% | Berkshire Hathaway | 4.70% |
| UnitedHealth Group | 4.60% | UnitedHealth Group | 4.60% |
| Comcast Corp. | 4.60% | Comcast Corp. | 4.60% |
| Honeywell Int'l | 4.60% | Honeywell Int'l | 4.50% |
| PACCAR | 3.60% | PACCAR | 3.70% |
| Progressive Corp. | 3.60% | Progressive Corp. | 3.60% |
| Danone | 3.60% | Danone | 3.60% |

e.      The **same overall "portfolio characteristics" and "portfolio valuations"** were shared, in identical fashion, by the Fund's portfolio and the portfolios for institutional clients of FMI's Large Cap Equity Strategy:

| FMI Large Cap Fund | | Large Cap Equity Strategy | |
| --- | --- | --- | --- |
| **Portfolio Characteristics** | | **Portfolio Characteristics** | |
| P/E Ratio (trailing 1 year) | 18.0x | P/E Ratio (trailing 1 year) | 18.0x |
| FY1 P/E Ratio | 17.3x | FY1 P/E Ratio | 17.3x |
| P/S Ratio | 1.9x | P/S Ratio | 1.9x |
| P/B Ratio | 3.8x | P/B Ratio | 3.8x |
| EV/EBITDA Ratio | 7.7x | EV/EBITDA Ratio | 7.7x |
| Number of Holdings | 26 | Number of Holdings | 26 |

f.      As a result of all the foregoing, the Fund's portfolio and the portfolios for institutional clients of FMI's Large Cap Equity Strategy featured **substantially similar investment performance during 1, 3, 5 and 10 year periods**:[8]

| FMI Large Cap Fund | | Large Cap Equity Strategy | |
| --- | --- | --- | --- |
| **Performance** | | **Performance (Gross)** | |
| 1 year | 5.71% | 1 year | 6.77% |
| 3 year | 16.44% | 3 year | 17.64% |
| 5 year | 15.43% | 5 year | 16.57% |
| 10 year | 9.18% | 10 year | 10.95% |

---

[8] A primary reason that the investment performance as reported in FMI's Quarterly Snapshots was merely substantially similar, rather than effectively identical, appears to be that FMI reported performance for its Large Cap Equity strategy on a *gross* basis: *i.e.*, without taking into account FMI's fees.

**ANSWER:** FMI admits that it prepared and posted on its website a Quarterly Review as of June 30, 2015 for the FMI Large Cap Equity strategy and for the FMI Large Cap Fund, referred to as "Quarterly Snapshots," which speak for themselves as to the content thereof. FMI admits further that the Fund Quarterly Snapshot as of June 30, 2015 and the Large Cap Equity Quarterly Snapshot as of June 30, 2015 include language quoted in part in the tables in subparts (b), (d) and (e) of paragraph 88 of the Complaint; language quoted in part in the Large Cap Equity Strategy column in the table in subpart (a) of paragraph 88 of the Complaint; language quoted in the FMI Large Cap Fund column and the rows denoted "1 year," "3 year," and "5 year" performance for the Large Cap Equity Strategy column in the table in subpart (f) of paragraph 88 of the Complaint, but denies that Plaintiff has quoted the Quarterly Snapshots accurately. FMI admits that the Prospectus includes language quoted in part in the FMI Large Cap Fund column in subpart (a) of paragraph 88 of the Complaint, but denies that Plaintiff has quoted the Prospectus accurately. FMI also admits that the Fund Quarterly Snapshot as of June 30, 2015 and the Large Cap Equity Quarterly Snapshot as of June 30, 2015 both identify the "Number of holdings" as 26. FMI admits further that the difference between the stated 1 year, 3 year, and 5 year performance of the Fund and the stated 1 year, 3 year, and 5 year performance of the Large Cap Equity Strategy set forth in the applicable Quarterly Snapshots as of June 30, 2015 is attributable in part to the fact that performance for the Large Cap Equity Strategy is set forth on a gross basis. Except as so stated, FMI denies the allegations in paragraph 88 of the Complaint.

89. Similar comparisons (a) for *prior periods* (*e.g.*, for quarterly periods prior to the quarter ending June 30, 2015), and (b) for FMI's *other corresponding captive funds and investment strategies* (*e.g.*, for the FMI Common Stock Fund and FMI's Small Cap Equity strategy) yield similar results.

**ANSWER:** FMI denies the allegations in paragraph 89 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

58

90.     In sum, the foregoing indicate that the Portfolio Selection Services that FMI provided to the Fund and to institutional clients of FMI's Large Cap Equity Strategy were not merely similar, but *identical*. The same FMI personnel provided the Fund and to [*sic.*] institutional clients of FMI's Large Cap Equity Strategy with identical investments and identical portfolios, managed by identical personnel using identical investment strategies, and yielding all-but identical results.

**ANSWER:**     FMI denies the allegations in paragraph 90 of the Complaint.

91.     Furthermore, in addition to identical Portfolio Selection Services, it appears that FMI also provided the Fund and arm's-length institutional clients of FMI's Large Cap Equity Strategy with substantially similar Other Services.

**ANSWER:**     FMI denies the allegations in paragraph 91 of the Complaint.

92.     As detailed above, the Other Services that FMI provided to Fund largely boiled down to quarterly reporting to Fund shareholders and the Fund's Board on the Fund's performance (*i.e.*, on FMI's provision of Portfolio Selection Services). *See* Section V.B.2, *supra*.

**ANSWER:**     FMI denies the allegations in paragraph 92 of the Complaint.

93.     As FMI explained in its Form ADV, FMI provides *similar quarterly reporting to institutional clients of FMI's various investment strategies*:

>         FMI furnishes quarterly written reports to all clients (monthly, if required) containing a list of holdings with current market value and cost basis, gains and losses, income and investment results.

Form ADV, at 11.

**ANSWER:**     FMI admits that it provides quarterly reports to shareholders of the FMI Funds and to its other clients.  FMI admits that its Form ADV, which speaks for itself as to the content thereof, includes language quoted in part in paragraph 93 of the Complaint.  Except as so stated, FMI denies the allegations in paragraph 93 of the Complaint.

94.     Indeed, given as demonstrated above that captive funds (such as the Fund) and institutional clients of FMI's investment strategies (such as the Large Cap Equity strategy) received identical Portfolio Selection Services (*i.e.*, all-but identical investments that performed all-but identically), it can be surmised that the quarterly reporting provided to captive funds and arm's-length institutional clients was likewise substantially identical.

**ANSWER:**     FMI admits that it provides quarterly reports to shareholders of the FMI Funds and to its other clients, which speak for themselves as to the content thereof.  Except as so stated,

FMI denies the allegations in paragraph 94 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

95.     And in fact, the quarterly reporting provided to captive funds and arm's-length institutional clients *was substantially identical*.

> a.     In particular, FMI's quarterly reporting to Fund shareholders was accomplished primarily in the form of a letter to shareholders, discussing recent economic and market developments, the Fund's recent performance, and analysis and examples of FMI's provision of Portfolio Selection Services (the "Shareholder Letters"), which led off the Fund's annual and semi-annual reports filed with the SEC, as well as the Fund's quarterly reports maintained on FMI's website.
>
> b.     To institutional clients of FMI's investment strategies (such as the Large Cap Equity strategy), FMI provided *word-for-word identical quarterly letters*, that FMI termed "Investment Strategy Outlook Letters."[9]

**ANSWER:**     FMI admits that it provides quarterly Shareholder Letters, which speak for themselves as to the content thereof, to Fund shareholders discussing in part economic and market developments, Fund performance and Fund investments.  FMI admits further that it provides quarterly Investment Strategy Outlook letters to clients invested in FMI's Large Cap Equity strategy, which speak for themselves as to the content thereof.  FMI also admits that more than ten years of copies of its Large Cap Equity Investment Strategy Outlook Letters are available on its website at http://www.fiduciarymgt.com/instutition-investors/iso-letters/large-cap-equity-iso-letters/.   Except as so stated, FMI denies the allegations in paragraph 95 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

96.     In sum, there is extensive indication that the investment advisory services that FMI provided to the Fund – and for avoidance of doubt, *all* such services, including both Portfolio Selection Services and Other Services – were in all meaningful respects identical to the investment advisory services provided to arm's-length institutional clients of FMI's Large Cap Equity strategy.

**ANSWER:**     FMI denies the allegations in paragraph 96 of the Complaint.

---

[9] More than a decade of such quarterly letters to recipients of FMI's Large Cap Equity strategy is available at: http://www.fiduciarymgt.com/institutional-investors/iso-letters/large-cap-equity-iso-letters/.

97.     However, the Fund paid substantially more to receive such services than did FMI's arm's-length institutional clients.

**ANSWER:**     FMI denies the allegations in paragraph 97 of the Complaint.

98.     FMI offers its four investment strategies to arm's-length institutional clients in the form of "separately managed accounts."  *See* Form ADV at 5-6. For arm's-length institutional clients who receive FMI's Large Cap Equity strategy, FMI employs the following "standard fee schedule:"

<strong>FMI "Standard Fee Schedule"</strong>

<strong>Separate Accounts, Large Cap Equity Investment Strategy</strong>

| AUM | Fees |
|---|---|
| First $25 million | 0.65% |
| $25-$50 million | 0.55% |
| $50-$100 million | 0.45% |
| Above $100 million | 0.40% |

*See* Form ADV at 5.

**ANSWER:**     FMI admits that it offers four equity investment strategies to its clients.  FMI admits further that the table in paragraph 98 of the Complaint quotes a portion of the fee schedule for certain of its clients set forth in Form ADV, but denies that Plaintiff has quoted the Form ADV accurately.  Except as so stated, FMI denies the allegations of paragraph 98 of the Complaint.

99.     Were FMI to provide its advisory services to the Fund at the same "standard" rate charged to arm's-length institutional clients, the Fund would pay significantly smaller sums to FMI than it currently does under its captive fund fee schedule.  For example, using the Fund's $9.217 billion AUM as of December 31, 2014 for illustrative purposes: (1) the Fund, under FMI's "standard" separate account schedule for arm's-length institutional clients of FMI's Large Cap Equity advisory services, would pay $36.995 million in annual investment advisory fees, amounting to a blended rate of 0.40%, for FMI's services; while (2) the Fund, under its captive fund fee schedule, would pay a further $29.2 million more in fees, or $66.172 million, at a 0.75% rate, for FMI's services.

**ANSWER:** FMI denies the allegations in paragraph 99 of the Complaint, and specifically denies that the advisory and other services it provides to the Fund can properly or fairly be characterized as the same as the services it provides to its other clients and that the FMI Funds are "captive" to FMI.

100. The Fund therefore pays investment advisory fees that are 78.87% greater than those charged as "standard" matter to arm's-length institutional clients, notwithstanding that the investment advisory services provided to the Fund are identical those provided to the arm's-length institutional clients.

**ANSWER:** FMI denies the allegations in paragraph 100 of the Complaint, and specifically denies that the advisory and other services it provides to the Fund are identical to the services it provides to its other clients.

101. The Fund's overpayment may be even more extreme than indicated by FMI's "standard" fee schedule for institutional accounts. As FMI acknowledges in its Form ADV, certain of its institutional clients may not actually be paying the "standard" fees displayed in the Form ADV, but rather fees lower than those adverted as "standard." *See* Form ADV at 5 and 6. Indeed, examination of FMI's services and fees with respect to specific such clients, as detailed immediately below, so confirms. *See e.g.* Table 9 and ¶¶ 118-21, *infra* (arm's-length institutional client paying advisory fees to FMI lower than FMI's stated "standard" fees).

**ANSWER:** FMI admits that the standard fee rates for the limited services provided by FMI to clients invested in FMI's Large Cap Equity strategy are lower than the fee rate applicable to the Fund for the more extensive services provided by FMI to the Fund. FMI admits that the Form ADV discloses that certain of its clients receiving such limited services may pay fees at rates lower than the standard fee rate. Except as so stated, FMI denies the allegations in paragraph 101 of the Complaint, and specifically denies that it performs the same services for its other clients that it performs for the Fund.

102. FMI has disclosed that, in addition to providing investment advisory services to its 3 captive funds, FMI also provides investment advisory services to 3 *non*-captive (i.e., arm's-length) registered investment companies, in which, as of September 30, 2014, FMI managed $787 million. *See* SAI at 35-36.

**ANSWER:** FMI admits that the SAI, which speaks for itself as to the content thereof, discloses that FMI manages accounts for three registered investment companies and that as of September 30, 2014, the total assets for the foregoing accounts were $787 million. Except as so stated, FMI denies the allegations in paragraph 102 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

103. Plaintiff's counsel's investigation has determined the identity of each of these three arm's-length, registered investment company clients of FMI, as well as: (1) the contracts pursuant to which FMI provides those clients with investment advisory services; (2) the investment advisory services provided; and (3) the fees charged.

**ANSWER:** FMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 103 of the Complaint regarding Plaintiff's counsel's "investigation," and therefore denies those allegations.

104. Summarized in Table 6 below and further detailed in the following paragraphs, comparisons involving these particular arm's-length FMI clients:

    a    confirm the prior comparison (to the "standard" fees FMI charges to arm's-length institutional clients for receipt of FMI's Large Cap Equity investment strategy), by serving, in two of the three cases, as particular and concrete examples of such clients receiving such services; and

    b.    indicate, again, that while FMI provided the Fund and particular arm's-length institutional clients with substantially identical investment advisory services, the investment advisory fees paid by the Fund for such services were substantially higher than the fees paid by FMI's arm's-length institutional clients.

**Table 6**

**FMI's Provision of Investment Advisory Services
to Non-Captive Registered Investment Companies**

| **Registered Investment Company** | Northwestern Mutual Fund Series, Inc. | The Vantagepoint Funds | Litman Gregory Funds Trust |
|---|---|---|---|

| Fund / Portfolio | Large Cap Blend Portfolio | Vantagepoint Growth & Income Fund | Litman Gregory Masters Equity Fund |
|---|---|---|---|
| Investment Adviser | Mason Street Advisors, LLC | VantagePoint Investment Advisers, LLC | Litman Gregory Fund Advisors, LLC |
| Fund / Portfolio Net Assets (as of 12/31/2014) | $167 million | $1.72 billion | $420 million |
| Number of Subadvisors | 1 | 3 | 7 |
| Allocation to FMI (%) | 100% | 33.33% | 15% |
| Allocation to FMI ($) | $167 million | $566 million | $63 million |
| FMI Strategy Provided | Large Cap Equity | Large Cap Equity | All Cap Equity |
| FMI Fees | $0 - 25 million AUM - 0.65% $25-50 million AUM - 0.55% $50-100 million AUM - 0.45% AUM > $100 million - 0.40% | AUM < $100 million - 0.32% AUM > $100 million – 0.28% | not disclosed |

**FMI Subadvisory Agreements**

| Date | August 9, 2012 | January 16, 2009 | May 17, 2013 |
|---|---|---|---|
| Portfolio Selection Services | "the Sub-Adviser shall supervise, manage and direct the investment of the Portfolio's assets. . .  The Sub-Adviser will conduct a continual program of evaluation, investment, sale and reinvestment of the assets in the Portfolio by determining the securities and other investments that shall be purchased, entered into, sold, closed or exchanged, when these transactions should be executed, and what portion of the Portfolio should be held in the various securities and other investments in which it may invest, and what portion of the Portfolio should be held uninvested in cash." | "[The Investment Adviser] hereby grants Subadviser complete, unlimited and unrestricted discretion and authority to supervise and direct the investment of the Account and to select portfolio securities with respect to the Account including the power to acquire (by purchase, exchange, subscription or otherwise), to hold and to dispose (by sale, exchange or otherwise)." | "the Sub-Advisor shall: (i) furnish the Fund with advice and recommendations with respect to the investment of the Sub-Advisor's Allocated Portion of the Fund's assets; (ii) effect the purchase and sale of portfolio securities for the Sub-Advisor's Allocated Portion; (iii) determine that portion of the Sub-Advisor's Allocated Portion that will remain uninvested, if any; (iv) manage and oversee the investments of the Sub-Advisor's Allocated Portion . . ." |

Case 2:15-cv-01170-JPS   Filed 11/30/15   Page 64 of 153   Document 18

| Other Services | Books/Records; Reporting; Compliance | Books/Records; Reporting; Compliance | Books/Records; Reporting; Compliance |

**ANSWER:** FMI admits that it performs certain limited services for Northwestern Mutual Series Fund, Inc.'s Large Cap Blend Portfolio (the "Northwestern Large Cap Blend Portfolio") pursuant to an Investment Sub-Advisory Agreement with Mason Street Advisors, LLC dated August 9, 2012 (the "Northwestern Subadvisory Agreement"), which speaks for itself as to the content thereof; that it performs certain limited services for The Vantagepoint Funds' Growth & Income Fund (the "Vantagepoint Growth & Income Fund") pursuant to an Investment Subadvisory Agreement with Vantagepoint Investment Advisers, LLC dated January 16, 2009 (the "Vantagepoint Subadvisory Agreement"), which speaks for itself as to the content thereof; and that it performs certain limited services for the Litman Gregory Funds Trust's Litman Gregory Masters Equity Fund (the "Litman Gregory Masters Equity Fund") pursuant to an Investment Sub-Advisory Agreement with Litman Gregory Fund Advisors, LLC dated May 17, 2013 (the "Litman Gregory Subadvisory Agreement"), which speaks for itself as to the content thereof. FMI admits that the fee schedules set forth in the Northwestern Subadvisory Agreement and the Vantagepoint Subadvisory Agreement are set forth in the "FMI Fees" portion of Table 6 of paragraph 104 of the Complaint. FMI admits that the Northwestern Subadvisory Agreement, the Vantagepoint Subadvisory Agreement and the Litman Gregory Subadvisory Agreement include language quoted in part in the "Portfolio Selection Services" portion of Table 6 of paragraph 104 of the Complaint. FMI admits that it serves as the sole subadviser for the Northwestern Large Cap Blend portfolio, and that it has served as one of multiple subadvisers to the Vantagepoint Growth & Income Fund and the Litman Gregory Masters Equity Fund. FMI admits that the assets under management in the Northwestern Large Cap Blend portfolio as of December 31, 2014 were approximately $167 million and that the portion of the approximately $420 million in

65

assets under management in the Litman Gregory Masters Equity Fund that FMI managed as of December 31, 2014 was approximately $63 million. FMI admits that the target allocation of fund assets under management to FMI for the Litman Gregory Masters Equity Fund is 15%. Except as so stated, FMI denies the allegations in paragraph 104 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

105. The three non-captive registered investment companies to whom FMI provided investment advisory services on an arm's-length basis were: (1) Northwestern Mutual Fund Series, Inc. ("Northwestern"); (2) The Vantagepoint Funds ("Vantagepoint"); and (3) Litman Gregory Funds Trust ("Litman Gregory"). Each of these companies (a) offered multiple, discrete funds or portfolios featuring different investment objectives or strategies, but (b) featured a single "investment adviser" for all such funds/portfolios: for Northwestern, Mason Street Advisors LLC ("MSA"); for Vantagepoint, Vantagepoint Investment Advisers, LLC ("VIA"); and for Litman Gregory, Litman Gregory Fund Advisors, LLC ("LGFA"). In each case, these investment advisors retained different "sub-advisors," including FMI, to provide specified investment advisory services (as detailed below) to the different funds or portfolios. Relevant here are those funds/portfolios (a) offered by Northwestern, Vantagepoint and Litman Gregory, where (b) the respective investment advisers (MSA, VIA and LFGA [*sic.*]) retained FMI as a subadvisor to provide specified investment advisory services: namely (c) Northwestern's Large Cap Blend Portfolio, Vantagepoint's Growth & Income Fund, and Litman Gregory's Masters Equity Fund. Because, as detailed below, the first two of these funds (the Northwestern Large Cap Blend Portfolio and Vantagepoint Growth & Income Fund) received from FMI the same investment strategy as FMI supplied to the Fund (Large Cap Equity), the focus hereinafter is on them specifically.

**ANSWER:** FMI admits that it provides certain limited services to the Northwestern Large Cap Blend Portfolio pursuant to the Northwestern Subadvisory Agreement; that it provides certain limited services to the Vantagepoint Growth & Income Fund pursuant to the Vantagepoint Subadvisory Agreement; and that it provides certain limited services to the Litman Gregory Masters Equity Fund pursuant to the Litman Gregory Subadvisory Agreement. FMI admits that Plaintiff purports to focus the allegations of the Complaint on the services rendered by FMI to the Northwestern Large Cap Blend Portfolio and the Vantagepoint Growth & Income Fund. FMI denies that the services it provides and payments it receives pursuant to the Northwestern Subadvisory Agreement or the Vantagepoint Subadvisory Agreement are relevant

66

to Plaintiff's Section 36(b) claim pertaining to the Fund. FMI further denies that the FMI Funds are "captive" to FMI. Except as so stated, FMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 105 of the Complaint, and therefore denies those allegations.

106. That FMI provided investment advisory services to the Northwestern Large Cap Blend Portfolio and the Vantagepoint Growth & Income Fund as a subadvisor, rather than as an investment adviser, is, as detailed below, merely a difference in nomenclature. In substance, as detailed below, the services that FMI provided as subadvisor to the Northwestern Large Cap Blend Portfolio and the Vantagepoint Growth & Income Fund (hereinafter, the "Subadvised Funds") were substantially identical to those it provided as investment adviser to the Fund. (Indeed, as also detailed below, the subadvisory contracts that FMI signed with respect to the Subadvised Funds required *more* services of FMI – particularly, more Other Services – than did the IAA).

**ANSWER:** FMI denies the allegations in paragraph 106 of the Complaint.

107. First, as both Northwestern's and Vantagepoint's SEC filings make clear, the primary role of their respective investment advisers, MSA and VIA, was to retain subadvisors to provide Portfolio Selection Services to various funds/portfolios, to monitor the performance of such subadvisors, and to periodically report to their boards of directors on such performance. As a result, in such advisor/subadvisor structures, the subadvisor functioned (as further detailed and confirmed below) like a normal investment advisor, and the advisor occupied a role much like that normally occupied by a fund's board of directors (*i.e.*, retaining and overseeing the fund's various service providers).

> ### a. Northwestern.
>
> THE INVESTMENT ADVISER AND SUB-ADVISERS
>
> **The Investment Adviser**
>
> The investment adviser for each Portfolio is Mason Street Advisors, LLC, a wholly owned subsidiary of Northwestern Mutual . . .
>
> As investment adviser, Mason Street Advisors manages the operations of the Fund and provides investment advice and recommendations regarding the purchase and sale of securities for those Portfolios that do not employ a sub-adviser. For those Portfolios that employ a sub-adviser, Mason Street Advisors oversees and evaluates the activities of the sub-advisers, including investment performance, investment operations and processes. Pursuant to its advisory agreement with the Fund, Mason Street Advisors also provides or procures the management of the Fund's administrative affairs, including mutual fund accounting services,

legal services, investment operations services and corporate and
regulatory reporting, oversees the Fund's service providers and
provides overall risk management for the Fund, including
investment, operational and financial risk.

The Sub-Advisers

Each of the following sub-advisers has been retained by Mason
Street Advisors and the Fund pursuant to an investment
subadvisory agreement to provide investment advice and, in
general, to conduct the management investment program of one or
more Portfolios, subject to the general control of the Board of
Directors of the Fund and Mason Street Advisors . . .

*See* Northwestern Prospectus and Statement of Additional Information on Form 485BPOS, filed
with the SEC on April 30, 2015 (hereinafter, respectively "Northwestern Prospectus" and
"Northwestern SAI"), at 107 (emphasis added).

### b. Vantagepoint.

As investment adviser to the Funds, VIA supervises and directs
each Fund's investments and continually monitors the performance
of the subadvisers. *The subadvisers are retained with the
assistance of VIA, and day-to-day discretionary responsibility for
security and brokerage selection as well as portfolio management
rests with the subadvisers.*

\*\*\*

**Investment Subadvisers**. . . . [T]he assets of each Fund are
managed by one or more subadvisers. Subadvisers are retained to
manage all or a particular portion of a Fund's assets under the
terms of written investment subadvisory contracts with VIA and
the Trust on the behalf of the applicable Fund. Under these
contracts, each subadviser agrees to exercise investment
management discretion over the assets of the Fund allocated to it in
a manner consistent with the Fund's investment policies . . .

\*\*\*

VIA provides investment advisory services to each of the Funds []
pursuant to Master Investment Advisory Agreements (each an
"Advisory Agreement"). The advisory services include Fund
design, establishment of Fund investment objectives and strategies,
selection and management of subadvisers (as applicable), and
performance monitoring. VIA furnishes periodic reports to the
Trust's Board regarding the investment strategy and performance
of each Fund . . .

68

VIA supervises and directs each Fund's investments and continually monitors the performance of the subadvisers. Currently, all Funds [] have one or more subadvisers. Pursuant to Board approval, the subadvisers are retained with the assistance of VIA, and day-to-day discretionary security and brokerage selection and portfolio management rests with the subadvisers. . .

From time to time VIA may recommend to the Board that a subadviser be terminated and replaced with another subadviser or an additional subadviser be hired.

***

**SUBADVISERS**

*The day-to-day investment management of certain Funds' assets rests with one or more subadvisers retained with the assistance of VIA. The responsibility for overseeing subadvisers rests with VIA.*

*See*, respectively Vantagepoint Prospectus and Statement of Additional Information on Form 485APOS, filed with the SEC on June 26, 2015 (hereinafter, respectively "Vantagepoint Prospectus" and "Vantagepoint SAI"), at: 157, 3-4, 67 and 73 (emphasis added).

**ANSWER:** FMI admits that the amendment to the Registration Statement filed with the SEC by Northwestern Mutual Series Fund, Inc. on or about April 30, 2015 (the "Northwestern Registration Statement"), which speaks for itself as to the content thereof, includes language quoted in part in subpart (a) of paragraph 107 of the Complaint. FMI admits further that the amendment to the Registration Statement filed with the SEC by The Vantagepoint Funds on or about June 26, 2015 (the "Vantagepoint Registration Statement"), which speaks for itself as to the content thereof, includes language quoted in part in subpart (b) of paragraph 107 of the Complaint. Except as so stated, FMI denies the allegations in paragraph 107 of the Complaint.

108. Second, the subadvisory contracts further confirm what is in any event clear in the above-detailed excerpts from Northwestern's and Vantagepoint's SEC filings: namely (1) that FMI, as a subadvisor, was retained to provide Portfolio Selection Services, and (2) that the scope of such services (as well as the language describing them) was identical to the scope (and language) of the Portfolio Selection Services required of FMI under the IAA and as the Fund's investment adviser.

69

### a. Northwestern Subadvisory Contract – Portfolio Selection Services.

WHEREAS, the Adviser desires to retain the Sub-Adviser to provide investment advisory services to the Portfolio, and the Sub-Adviser is willing to render such investment advisory services.

NOW, THEREFORE, intending to be legally bound, the parties hereto agree as follows:

\*\*\*

2. Services. Subject to supervision and oversight by the Adviser and the Board, the Sub-Adviser shall supervise, manage and direct the investment of the Portfolio's assets . . . The Sub-Adviser will conduct a continual program of evaluation, investment, sale and reinvestment of the assets in the Portfolio by determining the securities and other investments that shall be purchased, entered into, sold, closed or exchanged, when these transactions should be executed, and what portion of the Portfolio should be held in the various securities and other investments in which it may invest, and what portion of the Portfolio should be held uninvested in cash. The Adviser hereby delegates to the Sub-Adviser the authority to invest and reinvest assets in the Portfolio (including the authority to place purchase and sale orders on behalf of the Portfolio) at such times and in such manner as the Sub-Adviser deems advisable . . .

\*\*\*

3. Duties of Adviser.

(a) The Adviser shall [] oversee and review the Sub-Adviser's performance of its duties under this Agreement. . .

*See* August 9, 2012 Investment Subadvisory Agreement between MSA and FMI (hereinafter, "Northwestern Subadvisory Contract"), at preamble and paragraphs 2-3.

### b. Vantagepoint Subadvisory Contract – Portfolio Selection Services.

WHEREAS, [VIA] is party to a Master Investment Advisory Agreement with The Vantagepoint Funds for management of the investment operations of The Vantagepoint Funds including the establishment and operation of investment portfolios for The Vantagepoint Funds and entering into contracts with subadvisers to assist in managing the investment of The Vantagepoint Funds' property;

70

WHEREAS, [VIA] and Subadviser wish to enter into a subadvisory agreement pursuant to which Subadviser will provide such assistance to [VIA].

AGREEMENTS:
In consideration for the performance by Subadviser as Investment Subadviser of certain assets held by The Vantagepoint Funds, [VIA] authorizes Subadviser to manage certain of the securities and other assets of The Vantagepoint Funds as follows:

1. ACCOUNT
The account with respect to which Subadviser shall perform its services shall consist of those assets of the Vantagepoint Growth & Income Fund (the "Fund") which [VIA] determines to assign to an account with Subadviser . . .

2. APPOINTMENT STATUS, POWERS OF [VIA] AND SUBADVISER
(a) Purchase and Sale. [VIA] hereby appoints Subadviser to manage the Account . . . [VIA] hereby grants Subadviser complete, unlimited and unrestricted discretion and authority to supervise and direct the investment of the Account and to select portfolio securities with respect to the Account including the power to acquire (by purchase, exchange, subscription or otherwise), to hold and to dispose (by sale, exchange or otherwise). . .

*See* January 16, 2009 Investment Subadvisory Agreement between VIA and FMI (hereinafter, "Vantagepoint Subadvisory Contract"), at preamble and paragraphs 1-2.

**ANSWER**:    FMI admits that it was retained to perform certain limited subadvisory services for the Northwestern Large Cap Blend Portfolio pursuant to the Northwestern Subadvisory Agreement, which speaks for itself as to the content thereof.  FMI admits that the Northwestern Subadvisory Agreement includes language quoted in part in subpart (a) of paragraph 108 of the Complaint.  FMI admits that it was retained to perform certain limited subadvisory services for the Vantagepoint Growth & Income Fund pursuant to the Vantagepoint Subadvisory Agreement, which speaks for itself as to the content thereof.  FMI admits that the Vantagepoint Subadvisory Contract includes language quoted in part in subpart (b) of paragraph 108 of the Complaint.  Except as so stated, FMI denies the allegations in paragraph 108 of the Complaint.

71

109.    Third, importantly, the Northwestern Subadvisory Contract and the Vantagepoint Subadvisory Contract further indicate a matter that is not clear in Northwestern's and Vantagepoint's SEC filings: namely, that in addition to the above-mentioned and below-detailed Portfolio Selection Services required of FMI, extensive Other Services were also required of FMI. Indeed, the Other Services required of FMI by these subadvisory contracts – imposing various obligations with respect to maintaining books and records, performing compliance-related functions, and periodic and/or at-will reporting requirements – were not less, but rather more, onerous than those required of FMI under the IAA and as investment adviser to the Fund.

### a. Northwestern Subadvisory Contract – Other Services.

In performing its duties hereunder, the Sub-Adviser:

*** 

(e) Shall make available to the Board and the Adviser at reasonable times and at its expense its portfolio managers and other appropriate personnel, either in person or, at the mutual convenience of the Adviser and the Sub-Adviser, by telephone, in order to review the investment policies, performance and other investment related information regarding the Portfolio and to consult with the Board and the Adviser regarding the Portfolio's investment affairs, including economic, statistical and investment matters related to the Sub-Adviser's duties hereunder, and will provide periodic reports to the Adviser relating to the investment strategies it employs as well as the Sub-Adviser's duties hereunder. The Sub-Adviser will provide the Board such other periodic and special reports as the Board may reasonably request.

(g) Shall provide the Adviser and/or the Portfolio's Chief Compliance Officer with such compliance reports as may be requested from time to time. . .

(j) Shall (i) assist in the preparation of disclosures regarding factors that have affected the Portfolio's performance, including the relevant market conditions and the investment strategies and techniques used by the Sub-Adviser, for each period as requested by the Adviser; and (ii) review draft reports to shareholders and other documents provided or available to it and provide comments on a timely basis. In addition, the Sub-Adviser and each officer and portfolio manager thereof designated by the Adviser will provide on a timely basis such certifications or sub-certifications as the Adviser may reasonably request in order to support and facilitate certifications required to be provided by the Portfolio's Principal Executive Officer and Principal Accounting Officer

(k) Shall be responsible for the preparation and filing of Form 13F on behalf of the Portfolio, unless otherwise directed by the Adviser.

7. Books and Records. The Sub-Adviser shall keep the Portfolio's books and records required to be maintained with respect to the services provided by the Sub-Adviser pursuant to Section 2 of this Agreement and shall timely furnish to the Adviser all information relating to the Sub-Adviser's services under this Agreement needed by the Adviser to keep the other books and records of the Portfolio required by Rule 31a-l under the 1940 Act

*See* Northwestern Subadvisory Contract, at paragraphs 2 and 7.

**b. Vantagepoint Subadvisory Contract – Other Services.**

6. RECORD KEEPING AND REPORTING

(a) Records. Subadviser will maintain proper and complete records relating to the furnishing of services under this Agreement, including records with respect to the acquisition, holding and disposition of securities for [VIA] in accordance with applicable laws and rules and such reasonable instructions as shall be provided to Subadviser by [VIA] from time to time. All records maintained pursuant to this Agreement shall be subject to examination by [VIA] and by persons authorized by it during normal business hours upon reasonable notice. . .

(b) Quarterly Valuation Reports. Subadviser shall use its best efforts to provide to [VIA] within ten (10) business days after the end of each calendar quarter a statement of the fair market value of the Account as of the close of such quarter together with an itemized list of the assets in the Account, as that information is reported on Subadviser's record keeping system.

(c) Reconciliations. On a daily basis, reports of the Account's portfolio holdings will be made available to Subadviser and Subadviser shall report as promptly as possible on the same business day to the Custodian and to [VIA] any discrepancies between the prices assigned to the securities in the Account and the prices that Subadviser believes should be assigned to them. On an ongoing basis, Subadviser shall monitor market developments for significant events occurring after the close of the primary markets for particular securities held by the Account that may materially affect their value, and shall promptly notify [VIA] of any such event that comes to Subadviser's attention. In addition, Subadviser shall respond promptly to any request from [VIA] for information

73

needed to assist The Vantagepoint Funds in the valuation of any Account security, and to provide to [VIA] such information as is in Subadviser's possession. On a monthly basis, Subadviser shall reconcile security and cash positions, and market values to the Custodian's records and report discrepancies to [VIA] within ten (10) business days after the end of the month . . .

(e) Reports. Subadviser shall furnish [VIA] and the Board of Directors of The Vantagepoint Funds such periodic and special reports and non-proprietary or non-confidential information as shall be reasonably necessary to evaluate the terms of any subadvisory agreement between [VIA] and Subadviser with respect to the assets of the Fund including but not limited to: (i) a quarterly report and attestation to the Board of Directors of The Vantagepoint Funds regarding activities and practices relating to transactions entered into in accordance with Rules 10f-3, 17a-7, 17e-1 under the 1940 Act, the purchase or holding of any Rule 144A securities or any other technically restricted and/or potentially illiquid securities in the Account, any soft dollar transactions entered into by the Subadviser, and whether the Subadviser violated the restrictions imposed on it by the Fund's prospectus and statement of additional information; (ii) information relating to the use of brokers; and (iii) information relating to regulatory and/or law enforcement inquiries or actions.

(f) Other Reports on Request. Subadviser shall provide to [VIA] promptly upon reasonable request any information available in the records maintained by Subadviser relating to the Account.

10. COMPLIANCE POLICIES AND PROCEDURES
The Subadviser shall promptly provide The Vantagepoint Funds' Chief Compliance Officer ("CCO"), upon request, copies of its policies and procedures for compliance by the Subadviser and the Fund with the Federal Securities Laws as defined in Rule 38a-1 under the 1940 Act and promptly provide the CCO with copies of any material changes to those policies and procedures. The Subadviser shall fully cooperate with the CCO as to facilitate the CCO's performance of his/her responsibilities under Rule 38a-1 to review, evaluate and report to The Vantagepoint Funds' Board of Directors on the operation of the Subadviser's compliance policies and procedures and shall promptly report to the CCO any "Material Compliance Matter" as defined by Rule 38a-1(e)(2). At least annually, the Subadviser shall provide a certification to the CCO to the effect that the Subadviser has in place and has implemented policies and procedures that are reasonably designed to ensure compliance by the Fund and the Subadviser with the Federal Securities Laws.

74

*See* Vantagepoint Subadvisory Contract, at paragraphs 7 and 10.

**ANSWER**:    FMI admits that the Northwestern Subadvisory Agreement, which speaks for itself as to the content thereof, includes language quoted in part in subpart (a) of paragraph 109 of the Complaint.  FMI admits that the Vantagepoint Subadvisory Agreement, which speaks for itself as to the content thereof, includes language quoted in part in subpart (b) of paragraph 109 of the Complaint.  Except as so stated, FMI denies the allegations in paragraph 109 of the Complaint.

110.    Fourth, the Portfolio Selection Services that FMI provided to the Subadvised Funds under its respective subadvisory contracts were not merely similar in broad scope to those provided by FMI under the IAA and as investment adviser to the Fund (per ¶¶ 41-42, supra), but were in fact exactly identical, as scrutiny of Northwestern's and Vantagepoint's SEC filings confirms.

**ANSWER**:    FMI denies the allegations in paragraph 110 of the Complaint.

111.    For example, the FMI personnel responsible for providing investment advisory services to the Fund (nine members of the PMC, per ¶¶ 49-50 supra) were essentially the same as those providing investment advisory services to Northwestern (8 of the same FMI personnel) and Vantagepoint (4 of the same FMI personnel).

a.        **Northwestern.**

Large Cap Blend Portfolio – Summary

PORTFOLIO MANAGEMENT

Investment Adviser: Mason Street Advisors, LLC

Sub-Adviser: Fiduciary Management, Inc. (FMI)

Portfolio Managers: FMI's investment decisions are made by a Portfolio Management Committee (PMC). The investment process employed by the PMC is team based, and the PMC as a whole, not any individual member, is primarily responsible for the day-to-day management of the Portfolio. PMC members include:

*Patrick J. English*, CFA, Chief Executive Officer and Chief Investment Officer, who has been with FMI for 28 years.
*John S. Brandser*, President, Chief Operating Officer and Chief Compliance Officer, who has been with FMI for 20 years.
*Andy P. Ramer*, CFA, Director of Research, who has been with FMI for 12 years.
*Jonathan T. Bloom*, CFA, Research Analyst, who has been with FMI for 5 years.

75

> *Matthew J. Goetzinger*, CFA, Research Analyst, who has been with FMI for 10 years.
> *Robert M. Helf*, CFA, Research Analyst, who has been with FMI for 17 years.
> *Karl T. Poehls*, CFA, Research Analyst, who has been with FMI for 7 years.
> *Daniel G. Sievers*, CFA, Research Analyst, who has been with FMI for 6 years.

*See* Northwestern Prospectus, at 12; Northwestern SAI at 108-09 (same).

> b. **Vantagepoint**. Vantagepoint's SEC filings provide more cursory information concerning the identities of portfolio management personnel, perhaps because three different subadvisors, rather than one, were employed to manage the Vantagepoint Growth & Income Fund. In any event, Vantagepoint SEC filings listed as many as 4 FMI personnel involved in providing advisory services: Ted Kellner; Patrick English; John Brandser; and Andy Ramer. See e.g. March 2, 2012 Form 485APOS filed by Vantagepoint with the SEC, at 11 and 92. As it appears that Vantagepoint's practice was to list only the most senior personnel at any given subadvisor, the absence of FMI's more junior personnel from the listing does not mean that they were absent from this assignment.

**ANSWER:**   FMI admits that investment decisions for the Northwestern Large Cap Blend Portfolio and for the Vantagepoint Growth & Income Fund were made by a Portfolio Management Committee, and that for the year ending December 31, 2014, the members of the Portfolio Management Committee for the Northwestern Large Cap Blend Portfolio consisted of Patrick English, John Brandser, Andy Ramer, Jonathan Bloom, Matthew Goetzinger, Robert Helf, Karl Poehls and Daniel Sievers.  FMI admits further that Ted Kellner, Patrick English, John Brandser and Andy Ramer are identified in Vantagepoint SEC filings as being involved in making investment decisions for the Vantagepoint Growth & Income Fund for the year ending December 31, 2011.  Except as so stated, FMI denies the allegations in paragraph 111 of the Complaint.

112.   More particularly, the investment objectives and principal investment strategies for the Subadvised Funds were, in relevant part,[10] substantially similar not only to each other, but to

---

[10] The comparison is more intricate for the Vantagepoint Growth & Income Fund because that fund featured, in addition to FMI and its investment strategy, two other investment advisers and their own, different investment strategies. Notwithstanding, as detailed herein, disclosures in Vantagepoint SEC filings clearly indicate that the strategy employed by FMI in managing its portion of the Vantagepoint Growth & Income Fund was substantially identical to the Fund's and to FMI's Large Cap Equity strategy (specifically, describing a strategy that involved investing in U.S. large cap value stocks).

76

those of the Fund and FMI's Large Cap Equity strategy. Indeed, in Northwestern's case, the stated principal investment strategies were effectively word-for-word identical to those of the Fund and FMI's Large Cap Equity strategy (each describing design of portfolio of 20-30 primarily U.S. large cap value stocks).

### a. Northwestern.

**PRINCIPAL INVESTMENT STRATEGIES**

Normally, the Portfolio invests at least 80% of its net assets (plus any borrowings for investment purposes), in equity securities of large capitalization companies listed or traded on U.S. securities exchanges. The Portfolio defines large capitalization companies as those with a market capitalization in excess of $5 billion, at the time of investment. . . The Portfolio employs a focused investment strategy, typically investing in a core group of 20-30 large capitalization common stocks and ADRs.

The Portfolio uses fundamental analysis to look for stocks of good businesses that are selling at value prices. The Portfolio believes good businesses have some or all of the following characteristics: a strong, defendable market or products and services niche; a high degree of recurring revenue; modestly priced products or services; attractive return-on-investment and above average growth or improving profitability prospects.

The adviser will generally sell a security held by the Portfolio when it believes the security has achieved its value potential, when such sale is necessary for diversification of the Portfolio, when changing fundamentals signal a deteriorating value potential or when other securities have a better value potential.

*See* Northwestern Prospectus, at 10.

**Portfolio Overview**

Mason Street Advisors, LLC ("Mason Street Advisors"), the investment adviser for the Large Cap Blend Portfolio (the "Portfolio"), has engaged Fiduciary Management, Inc. ("FMI") to act as sub-adviser for the Portfolio. Normally, the Portfolio invests in equity securities of large capitalization companies listed or traded on U.S. securities exchanges or U.S. securities associations. In selecting investments, greater consideration is given to potential appreciation and future dividends than to current income. The Portfolio uses fundamental analysis to look for stocks of good businesses that are selling at value prices. The Portfolio employs a focused investment strategy, typically investing in a core group of 20-30 large capitalization stocks and ADRs.

*See* Northwestern Annual Report on Form N-CSR, filed with the SEC on March 9, 2015 (hereinafter, "Northwestern Annual Report"), at 10. See also Northwestern's webpage for the Large Cap Blend portfolio, which states as the portfolio's "Objective/Focus:" "Invests primarily in a core group of 20-30 equity securities and American Depositary Receipts (ADRs). Seeks stocks of good businesses selling at value prices. The objective is to seek long-term growth of capital and income."[11]

> b.      **Vantagepoint.**

> **Investments, Risks, and Performance**
> Principal Investment Strategies: The Fund invests, under normal circumstances, primarily in U.S. common stocks that the Fund's subadvisers believe offer the potential for capital appreciation or that may provide current income by paying dividends.  Strategies used by the Fund's subadvisers include: (1) focusing on large-capitalization U.S. companies whose common stocks are believed to offer potential for price appreciation because of undervaluation, earnings growth, or both; and (2) emphasizing U.S. stocks that may pay dividends.

*See* Vantagepoint Prospectus, at 14-15 (emphasis added to highlight description of FMI's strategy).

> **Investment Objective** – To offer long-term capital growth and current income.

> **Principal Investment Strategies** — The Fund invests, under normal circumstances, primarily in U.S. common stocks that the Fund's subadvisers believe offer the potential for capital appreciation or that may provide current income by paying dividends. Strategies used by the Fund's subadvisers include: (1) *focusing on large-capitalization U.S. companies whose common stocks are believed to offer potential for price appreciation because of undervaluation*, earnings growth, or both; and (2) emphasizing U.S. stocks that may pay dividends.

\*\*\*

> **Subadvisers and Portfolio Managers**
> The Fund incorporates complementary portfolio management approaches. Information relating to individual subadvisers has been provided by the respective subadviser.  Each subadviser's specific strategy is described below.

> Fiduciary Management, Inc. [] *employs a large-cap blend strategy*. FMI generally seeks to employ what it believes to be a business

---

[11]  Available at: https://www.northwesternmutual.com/products-and-services/annuities/fund-information/large-capblend- fund.

owner's approach to investing by seeking to evaluate a potential investment as if it were an outright purchase of the company. This includes a detailed analysis of the economics of the business, the return on invested capital, and the qualities of the management team.

*See* Vantagepoint SAI, at 124-25 (emphasis added to highlight description of *FMI's* strategy).

**ANSWER:**    FMI admits that the Northwestern Summary Prospectus filed with the SEC on or about May 1, 2015, which speaks for itself as to the content thereof, includes language quoted in part in the first three paragraphs of subpart (a) of paragraph 112 of the Complaint. FMI admits further that the Northwestern Annual Report on Form N-CSR, filed with the SEC on or about March 9, 2015, which speaks for itself as to the content thereof, includes language quoted in part in the fourth paragraph of subpart (a) of paragraph 112 of the Complaint. FMI admits that the Vantagepoint Subadvisory Agreement, which speaks for itself as to the content thereof, includes language quoted in part in the first three paragraphs of subpart (b) of paragraph 112 of the Complaint. FMI admits that the Vantagepoint Registration Statement, which speaks for itself as to the content thereof, includes language quoted in part in the fourth and fifth paragraphs of subpart (b) of paragraph 112 of the Complaint. FMI further admits that it is only one of three subadvisers to the Vantagepoint Growth & Income Fund. Except as so stated, FMI denies the allegations in paragraph 112 of the Complaint.

113.    More particularly still, the Portfolio Selection Services that FMI provided to the Subadvised Funds were not merely substantially identical to, but were in fact exactly identical to, the Portfolio Selection Services that FMI provided to the Fund. Specifically, scrutiny of the investments held in the Subadvised Funds' portfolios indicates that FMI provided them with (1) exactly the same investments, (2) in exactly the same relative proportions as FMI provided to the Fund (and, more generally, as FMI provided to all captive and arm's-length recipients of its Large Cap Equity Strategy – see ¶¶ 86-90, supra).

**ANSWER:**    FMI denies the allegations in paragraph 113 of the Complaint, specifically denies that the FMI Funds are "captive" to FMI.

79

114. For example, as detailed in Table 7 below, the Fund and the Northwestern Large Cap Blend portfolio each held identically-constructed portfolios, featuring exactly (and only) the same 25 stocks in the same relative proportions:

## Table 7
## FMI Provided Subadvised Funds with Exactly the Same Investments Provided to the Fund - I

| FMI Large Cap Fund<br>Holdings as of Dec. 31, 2014 | | | Northwestern Large Cap Blend portfolio<br>Holdings as of Dec. 31, 2014 | | |
|---|---|---|---|---|---|
| **Stock** | **Value ($)\*** | **% of Total** | **Stock** | **Value ($)\*** | **% of Total** |
| Potash Corp. | $ 547,990 | 5.69% | Potash Corp. | $ 9,483 | 5.68% |
| UnitedHealth Group | $ 540,933 | 5.62% | UnitedHealth Group | $ 9,379 | 5.62% |
| Accenture PLC | $ 528,715 | 5.49% | Accenture PLC | $ 9,036 | 5.41% |
| Berkshire Hathaway | $ 501,050 | 5.21% | Berkshire Hathaway | $ 8,652 | 5.18% |
| Bank of New York Mellon Corp. | $ 482,580 | 5.01% | The Bank of New York Mellon Corp. | $ 8,321 | 4.98% |
| Amerisource-Bergen Corp. | $ 431,866 | 4.49% | Amerisource-Bergen Corp. | $ 7,436 | 4.45% |
| American Express Co. | $ 358,576 | 3.73% | Devon Energy Corp. | $ 6,255 | 3.75% |
| Danone SA | $ 356,991 | 3.71% | American Express Co. | $ 6,236 | 3.74% |
| Devon Energy Corp. | $ 351,957 | 3.66% | Danone SA | $ 6,134 | 3.67% |
| The Progressive Corp. | $ 346,821 | 3.60% | The Progressive Corp. | $ 5,943 | 3.56% |
| Microsoft Corp. | $ 342,569 | 3.56% | Microsoft Corp. | $ 5,938 | 3.56% |
| Honeywell Int'l | $ 342,426 | 3.56% | Honeywell Int'l | $ 5,875 | 3.52% |
| PACCAR | $ 340,519 | 3.54% | Schlumberger | $ 5,838 | 3.50% |
| Schlumberger | $ 334,380 | 3.47% | PACCAR | $ 5,790 | 3.47% |
| Comerica | $ 322,493 | 3.35% | Comerica | $ 5,576 | 3.34% |
| Ross Stores | $ 321,898 | 3.34% | Ross Stores | $ 5,557 | 3.33% |
| Omnicom Group | $ 317,154 | 3.30% | Omnicom Group | $ 5,342 | 3.20% |
| 3M Co. | $ 302,349 | 3.14% | Comcast Corp. | $ 5,241 | 3.14% |

80

| Comcast Corp. | $ | 300,202 | 3.12% | 3M Co. | $ | 5,221 | 3.13% |
|---|---|---|---|---|---|---|---|
| Nestle SA | $ | 299,095 | 3.11% | Nestle SA | $ | 5,174 | 3.10% |
| TE Connectivity | $ | 291,266 | 3.03% | TE Connectivity | $ | 5,055 | 3.03% |
| Expeditors In'l of Washington | $ | 271,006 | 2.82% | Expeditors Int'l of Washington | $ | 4,664 | 2.79% |
| eBay | $ | 257,984 | 2.68% | eBay | $ | 4,446 | 2.66% |
| Unilever PLC | $ | 211,994 | 2.20% | Unilever plc, | $ | 3,685 | 2.21% |
| Cintas Corp. | $ | 201,748 | 2.10% | Cintas Corp. | $ | 3,506 | 2.10% |
| Total Stocks | $ | 8,904,563 | 92.52% | Total Stocks | $ | 153,873 | 92.17% |
| Other | $ | 720,078 | 7.48% | Other | $ | 13,075 | 7.83% |
| Net Assets | $ | 9,624,641 | 100.00 | Net Assets | $ | 166,948 | 100.0% |

\* All figures in $ (000's)

**ANSWER:**   FMI admits that Table 7 in paragraph 114 of the Complaint reflects the schedule of investments, the approximate value of the particular investment and the approximate proportion of the particular investment to the total for Fund assets under management and for Northwestern Large Cap Blend Portfolio assets under management by FMI, respectively, as of December 31, 2014.  Except as so stated, FMI denies the allegations in paragraph 114 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

115.    Likewise, as detailed in Table 8 below, the Vantagepoint Growth & Income Fund, as of December 31, 2014, held exactly the same 25 stocks that comprised the entire portfolios of the Fund and the Northwestern Large Cap Blend portfolio. However, because the Vantagepoint Growth & Income Fund utilized the services of 3 different subadvisers (including FMI), each allocated a third of the portfolio, the portfolio in its entirety cannot be compared to that of the Fund. Instead, restricting comparison to only the 25 stocks constituting the entire portfolios of the Fund and the Northwestern Large Cap Blend portfolio – i.e., stocks known definitively to have been selected by FMI – reveals, again, that FMI provided the Vantagepoint Growth & Income Fund with exactly the same stocks in the same relative proportions as provided to the Fund.[12]

---

[12] Differences in the relative weighting of 2 of the 25 stocks –Microsoft and Ross Stores – is likely due to the possibility that these two stocks were also purchased by the Vantagepoint Growth & Income Fund's other subadvisors, thereby boosting the relative weight of these 2 stocks (versus the portfolio of the Fund and the Northwestern Large Cap blend portfolio, selected purely by FMI).  The constant and slightly-larger weighting of all positions in the Vantagepoint Growth & Income Fund is merely an artifact of the different calculation method that had to be used for the Vantagepoint Growth & Income Fund: individual positions were compared to the total value of all 25 stocks (rather than, as in calculations for the Fund and the Northwestern Large Cap Value portfolio, to the total value of the portfolio). Because the latter two portfolios consisted: (1) of the same 25

**Table 8**

**FMI Provided Subadvised Funds with Exactly the Same Investments
Provided to the Fund - II**

| FMI Large Cap Fund Holdings as of Dec. 31, 2014 | | | Vantage Growth & Income Fund Holdings as of Dec. 31, 2014 | | |
|---|---|---|---|---|---|
| **Stock** | **Value ($)\*** | **% of Total** | **Stock** | **Value ($)\*** | **% of Total** |
| Potash Corp. | $ 547,990 | 5.69% | Microsoft Corp. | $ 36,593 | 6.37% |
| UnitedHealth Group | $ 540,933 | 5.62% | UnitedHealth Group | $ 35,083 | 6.11% |
| Accenture PLC | $ 528,715 | 5.49% | Potash Corp. | $ 33,992 | 5.92% |
| Berkshire Hathaway | $ 501,050 | 5.21% | Accenture PLC | $ 32,221 | 5.61% |
| Bank of New York Mellon Corp. | $ 482,580 | 5.01% | Berkshire Hathaway | $ 31,013 | 5.40% |
| Amerisource-Bergen Corp. | $ 431,866 | 4.49% | The Bank of New York Mellon Corp. | $ 29,533 | 5.14% |
| American Express Co. | $ 358,576 | 3.73% | Amerisource-Bergen Corp. | $ 28,459 | 4.95% |
| Danone SA | $ 356,991 | 3.71% | American Express Co. | $ 24,374 | 4.24% |
| Devon Energy Corp. | $ 351,957 | 3.66% | Ross Stores | $ 22,231 | 3.87% |
| The Progressive Corp. | $ 346,821 | 3.60% | Danone SA | $ 22,165 | 3.86% |
| Microsoft Corp. | $ 342,569 | 3.56% | Honeywell Int'l | $ 22,165 | 3.86% |
| Honeywell Int'l | $ 342,426 | 3.56% | Devon Energy Corp. | $ 21,785 | 3.79% |
| PACCAR | $ 340,519 | 3.54% | The Progressive Corp. | $ 21,292 | 3.71% |

stocks, which in each case constituted 92% of the total portfolio; and (2) additional short-term investments in liquid debt securities, constituting the remainder of the portfolio, weightings derived from comparing individual positions to the total portfolio produce slightly lower figures than weightings derived solely from comparison of individual stock positions to the sum total of all stock positions.

Case 2:15-cv-01170-JPS   Filed 11/30/15   Page 82 of 153   Document 18

| | | | | | |
|---|---|---|---|---|---|
| Schlumberger | $ 334,380 | 3.47% | PACCAR | $ 20,639 | 3.59% |
| Comerica | $ 322,493 | 3.35% | Schlumberger Ltd. | $ 20,622 | 3.59% |
| Ross Stores | $ 321,898 | 3.34% | Comerica | $ 19,865 | 3.46% |
| Omnicom Group | $ 317,154 | 3.30% | Omnicom Group | $ 19,636 | 3.42% |
| 3M Co. | $ 302,349 | 3.14% | 3M Co. | $ 19,447 | 3.38% |
| Comcast Corp. | $ 300,202 | 3.12% | Comcast Corp. | $ 18,763 | 3.27% |
| Nestle SA | $ 299,095 | 3.11% | Nestle SA | $ 18,484 | 3.22% |
| TE Connectivity | $ 291,266 | 3.03% | TE Connectivity | $ 17,993 | 3.13% |
| Expeditors In'l of Washington | $ 271,006 | 2.82% | Expeditors Int'l of Washington | $ 16,642 | 2.90% |
| eBay | $ 257,984 | 2.68% | eBay | $ 15,782 | 2.75% |
| Unilever PLC | $ 211,994 | 2.20% | Unilever plc | $ 13,281 | 2.31% |
| Cintas Corp. | $ 201,748 | 2.10% | Cintas Corp. | $ 12,562 | 2.19% |
| Total Stocks | $ 8,904,563 | 92.52% | Total of 25 stocks ** | $ 574,622 | 100.00% |
| Other | $ 720,078 | 7.48% | | | |
| Net Assets | $ 9,624,641 | 100.00% | | | |

* All figures in $ (000's)

** Because the Vantagepoint portfolio also featured two further subadvisors and numerous further investments presumably selected by those subadvisors, analysis was limited only to the 25 stocks demonstrated to have been FMI selections.

**ANSWER:** FMI admits that the Vantagepoint Growth & Income Fund is subadvised by three different subadvisers (one of which is FMI), each of which is allocated approximately one-third of the portfolio, that the portfolio of the Vantagepoint Growth & Income Fund cannot be compared to that of the Fund, and that as a consequence, the Vantagepoint Growth & Income Fund and the Fund are not comparable investment products. FMI admits that Table 8 in paragraph 115 of the Complaint reflects the schedule of investments, the approximate value of the particular investment and the approximate proportion of the particular investment to the total for Fund assets under management as of December 31, 2014. FMI admits further that Table 8 in paragraph 115 of the Complaint reflects a portion of the schedule of investments, and the

approximate value of the particular investment, of the Vantagepoint Growth & Income Fund Schedule of Investments as of December 31, 2014 set forth in The Vantagepoint Funds' Annual Report in Form N-CSR filed with the SEC on or about March 9, 2015. FMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in footnote 12 of paragraph 115 of the Complaint, and therefore denies those allegations. Except as so stated, FMI denies the allegations in paragraph 115 of the Complaint.

116.   Lastly, and unsurprisingly given that FMI provided the Subadvised Funds with exactly the same investments it provided to the Fund, the performance generated by FMI's provision of services to the Fund and to the Subadvised Funds was effectively identical. For example, for the calendar year ended December 31, 2014, the Fund "was up by 12.36%," while the Northwestern Large Cap Blend portfolio gained 12.58%.[13] That the Northwestern Large Cap Blend portfolio performed slightly better than the Fund (12.58% vs. 12.36%) is likely attributable to the fact that although both received identical services and investments from FMI, the Fund paid higher fees for such services, thereby decreasing Fund returns.

**ANSWER**:   FMI admits that for the calendar year ended December 31, 2014, the Fund was up by 12.36%, as reported in the FMI Large Cap Fund Quarterly Report for the quarter ended December 31, 2014. FMI admits further that the Northwestern Large Cap Blend Portfolio for which it serves as a subadviser reported average annual total returns of 12.58% for the 1 year period ended December 31, 2014, as reported in the Northwestern Annual Report on Form N-CSR filed with the SEC on or about March 9, 2015. Except as so stated, FMI denies the allegations in paragraph 116 of the Complaint, and specifically denies that the services it provided to the Fund were "effectively identical" to the services it provided as subadviser to the Northwestern Large Cap Blend Portfolio.

117.   In sum, the above-detailed facts – taken from (1) the subadvisory contracts that FMI signed concerning the Northwestern Large Cap Blend portfolio and the Vantagepoint Growth & Income Fund; and (2) Northwestern's and Vantagepoint's SEC filings – indicate: (a) that the Portfolio Selection Services that FMI provided as subadvisor were exactly identical to the

---

[13] See, respectively, FMI Large Cap Fund quarterly report for quarter ended December 31, 2014, at p. 2 (available at: http://www.fiduciarymgt.com/fmifunds/fmihx/fmihx-shareholder-reports/), and Northwestern Annual Report on Form N-CSR, filed with the SEC on March 9, 2015, at 12.

Portfolio Selection Services that FMI provided to the Fund; and (b) that the Other Services required of FMI as a subadvisor were at least equal to, if not more onerous than, the Other Services FMI provided to the Fund.

      a.    With respect to Portfolio Selection Services: the same FMI personnel provided services to the Northwestern Large Cap Blend portfolio and the Vantagepoint Growth & Income Fund as to the Fund; the services provided featured identical investment objectives and investment strategies; the actual investments provided were in every and all respects exactly identical; and the investment performance that resulted from such services was also effectively identical (except for differences imposed by the differing fees charged for such services).

      b.    With respect to Other Services, FMI's subadvisory contracts imposed substantial books and records, compliance, and reporting obligations on FMI – far in excess of those imposed by the IAA, and by all appearances in excess of the actual Other Services provided by FMI to the Fund (which, besides maintaining books and records, boiled down largely to quarterly reporting to Fund shareholders and the Fund's Board).

**<u>ANSWER</u>:**    FMI admits that members of the Portfolio Management Committee that have made investment decisions and performed day-to-day portfolio management with respect to the Fund have made investment decisions and performed day-to-day portfolio management with respect to FMI's service as a subadviser to the Northwestern Large Cap Blend portfolio and the Vantagepoint Growth & Income Fund, utilizing similar principal investment strategies and with similar investment objectives. Except as so stated, FMI denies the allegations in paragraph 117 of the Complaint, and specifically denies that the services provided by FMI as a subadviser were "at least equal to, if not more onerous than," the services provided by FMI to the Fund.

118.    Notwithstanding the substantially identical investment advisory services provided to the Fund and to the Subadvised Funds – making the comparison an apt, apples-to-apples one – the fees FMI charged the Fund were materially higher than those charged the Subadvised Funds, as Table 9 below demonstrates:

85

# Table 9

## FMI'S Differing Fees for Identical Services

| | FMI Large Cap Fund | FMI Large Cap Equity Strategy | Northwestern Large Cap Blend Portfolio | Vantagepoint Growth & Income Fund |
|---|---|---|---|---|
| **Status** | Captive | Arm's-length | Arm's-Length | Arm's-Length |
| **AUM FMI Managed** | $9.624 billion | n/a | $167 million | $566.5 million |
| **FMI Strategy Provided** | Large Cap Equity | Large Cap Equity | Large Cap Equity | Large Cap Equity |
| **Portfolio Selection Services** | 20-30 Large Cap Value Stocks | same as Fund | same as Fund | same as Fund |
| **Other Services** | none stated in IAA; quarterly reporting to shareholders and Board | n/a | Books/Records; Reporting; Compliance | Books/Records; Reporting; Compliance |
| **FMI Fees** | all AUM - 0.75% | $0 - 25 million AUM - 0.65% $25-50 million AUM - 0.55% $50-100 million AUM - 0.45% AUM > $100 million - 0.40% | | AUM < $100 million - 0.32% AUM >$100 million - 0.28% |
| **Fees Payable @ $9.624 billion AUM** | $72,180,000 | $38,621,000 | | $26,987,200 |
| **Discount to Captive Fund Rates ($)** | n/a | $33,559,000 | | $45,192,800 |
| **Captive Fund Rate Excess Indicated (%)** | n/a | 86.89% | | 167.46% |

**ANSWER:**    FMI admits that as of December 31, 2014, the assets under management in the Fund were approximately $9.624 billion; the assets under management by FMI in the Northwestern Large Cap Blend Portfolio were approximately $167 million; the assets under management in the Fund, the Northwestern Large Cap Blend Portfolio, that portion of the Vantagepoint Growth & Income Fund portfolio allocated to FMI, and FMI's accounts for other

clients invested in the Large Cap Equity were invested based on similar principal investment strategies; the positions in each tended to range from 20-30 stocks; and the FMI Fees column in Table 9 of paragraph 118 of the Complaint identifies the fee schedules then in place with respect to the identified client. Except as so stated, FMI denies the allegations in paragraph 118 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI, that the investment advisory and other services FMI provided to the Fund may properly or fairly be characterized as identical or even comparable to the services FMI provided to other clients invested in the Large-Cap Equity strategy, including those it provided as subadviser to the Northwestern Large Cap Blend Portfolio and the Vantagepoint Growth & Income Fund, and that the comparison drawn in paragraph 118 of the Complaint is an "apt" or "apples-to-apples one . . . ."

119.    As indicated in Table 9 above, the investment advisory rate charged to the Fund is substantially higher than the rate (for the same services) that FMI charges to its arm's-length institutional clients *generally* (*i.e.*, recipients of FMI's Large Cap equity strategy) and *particularly* (*i.e.*, the two Subadvised Funds). Indeed, that the rates FMI charges to the Northwestern Large Cap Blend portfolio are exactly identical to the "standard" rates FMI charges to institutional clients for its Large Cap Equity strategy indicates that the Northwestern Large Cap Blend portfolio is a particular, concrete example of such standard institutional clients.

**ANSWER:**    FMI denies the allegations in paragraph 119 of the Complaint, and specifically denies that comparison of FMI's services as investment adviser to the Fund may properly or fairly be compared to FMI's services on behalf of institutional clients invested in FMI's Large Cap Equity strategy, or to FMI's services as subadviser to other funds.

120.    Specifically, the Fund's fee rate (0.75% on all AUM, with no breakpoints), substantially exceeds the rates (for the same services) charged to arm's-length clients, which feature breakpoints that function to reduce blended rates to as low as 0.40% (in the case of FMI's "standard" arm's-length rates generally and Northwestern Large Cap Blend's rates specifically), or even as low as 0.28% (in the case of the Vantagepoint Growth & Income Fund).

**ANSWER:**    FMI denies the allegations in paragraph 120 of the Complaint, and specifically denies that the services provided by FMI to the Fund may properly or fairly be compared to the

87

services provided by FMI to the Northwestern Large Cap Blend Portfolio, the Vantagepoint Growth & Income Fund or other clients invested in FMI's Large Cap Equity strategy.

121. To illustrate, where the Fund, assuming AUM of $9.264 billion (*i.e.*, Fund AUM as of December 31, 2014) stayed constant over the course of one year, would pay an annual fee of $72.18 million under its operative rate schedule, but:

    a.    under the "standard" rate schedule for arm's length clients of FMI's Large Cap Equity strategy, which schedule was in effect for the Northwestern Large Cap Blend portfolio, the Fund would have paid only $38.621 million – indicating

        i.    an overall, blended rate of 0.40%,

        ii.    a discount of $33.559 million to the fees payable under the Fund's operative rates, and,

        iii.    conversely that the fees the Fund paid exceeded by 86.89% those paid by FMI's standard arm's-length clients, including Northwestern Large Cap Blend portfolio.

    b.    under the yet-lower rate schedule in effect for the Vantagepoint Growth & Income Fund, the Fund would have paid only $26.987 million – indicating

        i.    an overall, blended rate of 0.28%,

        ii.    a discount of $45.193 million to the fees payable under the Fund's operative rates, and,

        iii.    conversely that the fees the Fund paid exceeded by 167.46% those paid by particular FMI arm's-length clients, such as the Vantagepoint Growth & Income Fund, which managed to negotiate rates even more favorable than FMI's "standard" rates.

**<u>ANSWER</u>:**    FMI denies the allegations in paragraph 121 of the Complaint, and specifically denies that comparison of FMI's services as investment adviser to the Fund may properly or fairly be compared to FMI's services as subadviser to the Northwestern Large Cap Blend Portfolio and the Vantagepoint Growth & Income Fund.

122. In sum, the above facts indicate: (1) that the fees paid by the Fund represent a mark-up of 86%-167% over the fees FMI charged to arm's-length institutional clients provided with substantially identical services; and (2) that the additional fees paid by the Fund cannot be attributed to any additional services provided to the Fund but not to FMI's arm's-length institutional clients.

**ANSWER:**     FMI denies the allegations in paragraph 122 of the Complaint.

123.     Comparison of Fund advisory fees with the advisory fees paid by comparable mutual funds pursuing comparable interest strategies further indicates that the advisory fees extracted from the Fund are excessive.

**ANSWER:**     FMI denies the allegations in paragraph 123 of the Complaint, and specifically

denies that it has received advisory fees that are excessive or unlawful.

124.     To conduct such a comparison, Plaintiff's counsel analyzed data obtained from the Bloomberg Professional service, distributed by Bloomberg Finance L.P. ("Bloomberg"), which, among other things, maintains data on more than 7,000 U.S.-domiciled mutual funds, in order to find those funds most comparable to the Fund.

**ANSWER:**     FMI lacks knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 124 of the Complaint, and therefore denies those allegations.

125.     The Fund is categorized, by Bloomberg (and FMI), as a U.S. equity large-cap value fund.

**ANSWER:**     FMI admits that Bloomberg categorizes the Fund as a U.S. equity large-cap value

fund.  FMI admits further that the Fund invests mainly in a limited number of large capitalization

(namely, companies with more than $5 billion market capitalization at the time of initial

purchase) value stocks of companies listed or traded on a national securities exchange or on a

national securities association, including foreign securities traded on a national securities

exchange or on a national securities association.  Except as so stated, FMI denies the allegations

in paragraph 125 of the Complaint.

126.     There are 258 mutual funds so-categorized by Bloomberg (including the Fund). The average investment advisory fee paid by those funds is 0.62%. The 0.75% advisory fee currently extracted from the Fund by FMI significantly exceeds this average: FMI's fee is 21.0% greater than this category average.

**ANSWER:**     FMI denies the allegations in paragraph 126 of the Complaint.

127.     A more precise and apt comparison, however, is to compare the Fund to its *closest* peers: namely, the subset of U.S. equity large cap value funds whose large size ($1 billion of net assets or more) more closely approximates that of the Fund, and allows for significant economies of scale in provision of investment advisory services (as further detailed in Section VI.C, *infra*).

**ANSWER:**    FMI admits that the advisory fee for the Fund may be evaluated in part by comparison to its peers.  FMI denies that Plaintiff's purported parameters appropriately identify peers for comparison.  Except as so stated, FMI denies the allegations in paragraph 127 of the Complaint.

128.    Of the aforementioned 258 U.S. large cap value funds, 93 have assets of $1 billion or more. The average investment advisory fee among these 93 larger funds is 0.53% (i.e., lower than the 0.62% average discussed in the prior paragraph, which included advisory fees charged to smaller funds operating in the absence of economies of scale). The 0.75% fee currently extracted from the Fund by FMI significantly exceeds this more apt 0.53% average: FMI's fee is 41.5% larger than the average investment advisory fee charged to U.S. large-cap value funds of similar size.

**ANSWER:**    FMI denies the allegations in paragraph 128 of the Complaint.

129.    Indeed, among the 93 $1 billion+ U.S. large cap value funds, *only 8 pay investment advisory fees higher than those paid by the Fund*. This places the Fund not in the middle of similar funds' advisory fee distribution, but rather at the extreme high end of the fee distribution – approximately at the 90th percentile.

**ANSWER:**    FMI denies the allegations in paragraph 129 of the Complaint.

130.    The above comparisons constitute further *prima facie* evidence that the Fund's advisory fees are excessive, as they are far above the average investment advisory fees paid by similar funds, and in fact are so far above the average to make the Fund an outlier on the advisory fee scale.

**ANSWER:**    FMI denies the allegations in paragraph 130 of the Complaint, and specifically denies that it has received advisory fees that are excessive or otherwise unlawful.

131.    While the above comparison indicates that Fund advisory fees are excessive, it tends to understate the measure to which such fees are excessive. This is because many of the comparator mutual funds are likewise captive funds with respect to their investment advisers, and thus subject to like extraction of inflated advisory fees. Hence, the degree to which Fund advisory fees are excessive may be even greater than indicated by the above comparison (as many comparator fund advisory fees may also be excessive).

**ANSWER:**    FMI denies the allegations in paragraph 131 of the Complaint, and specifically denies that it has received advisory fees that are excessive or otherwise unlawful and that the FMI Funds are "captive" to FMI.

90

132.    As further detailed in the immediately following Section VI.C below, the Fund's advisory fee rate has remained constant – at a flat 0.75% rate assessed against Fund AUM – since October 2004. However, during the same 2005-2014 period, the Fund's size grew nearly 125-fold, from below $100 million AUM in 2005 to more than $9 billion AUM by 2014.

**ANSWER:**    FMI admits that the annual investment advisory fee rate paid by the Company on

behalf of the Fund has been .75% of assets under management since the IAA was amended to

reduce the management fee from 1.0% of assets under management in October 2004.   FMI

admits that Fund assets were less than $100 million in 2005 and were greater than $9 billion in

2014.   Except as so stated, FMI denies the allegations in paragraph 132 of the Complaint.

133.    This comparison further indicates that the Fund's current advisory fees and rates are excessive. While a 0.75% fee may have been appropriate a decade ago when the Fund was much smaller (less than $100 million of AUM, let alone $1 billion of AUM), that same rate, as detailed in Section VI.C below is inappropriate now – and produces fees extremely disproportionate to the advisory services now rendered – in light of the economies of scale in FMI's provision of advisory services to the now much-larger Fund.

**ANSWER:**    FMI denies the allegations in paragraph 133 of the Complaint, and specifically

denies that it has received advisory fees that are excessive or otherwise unlawful.

134.    In amending the ICA in 1970 to add Section 36(b), Congress, explicitly: (a) recognized that significant economies of scale exist in the provision of investment advisory services to mutual funds; and (b) intended that the benefits of such economies of scale be shared with mutual fund shareholders, through use of breakpoints and/or other advisory fee/rate reductions, rather than be monopolized by investment advisors. *See* Section VI.C.1, *infra*.

**ANSWER:**    Paragraph 134 of the Complaint alleges legal conclusions, to which no answer is

required.   To the extent that an answer may be required, FMI lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in paragraph 134, and therefore denies

those allegations.

135.    As detailed below (see Sections VI.C.2-3, *infra*), FMI retained and monopolized – rather than shared with the Fund – economy of scale benefits in its provision of investment advisory services to the Fund, yielding fees that (a) were (and remain) grossly disproportionate to the investment advisory services provided, (b) were (and remain) excessive, (c) could not have been the product of an arm's-length bargain, and (d) violate § 36(b). FMI's acceptance of such excessive fees was (and remains) a breach of its fiduciary and other duties to the Fund.

**ANSWER:** FMI denies the allegations in paragraph 135 of the Complaint, and specifically denies that it has received advisory fees that are excessive or otherwise unlawful.

136. Economies of scale in the provision of advisory services arise from the fact that as AUM increase, the marginal cost of providing advisory services for such AUM decreases. Although the particular differential costs may vary, the principle holds generally and arises from multiple factors.

      a.      For example, a simple example of economies of scale arises where AUM increases are due purely to market forces: *i.e.*, an increase in the *value* of a fund's assets, even as such assets remain constant in amount and kind (1,000 shares of stock rising in value from $10,000 to $20,000). In this event, the investment advisor services the additional AUM at *zero* additional variable cost – there is no change in the number or kind of securities held in the portfolio, or in the number of shareholders in the fund. Although no additional investment advisory services need be or are rendered in this event, the investment advisor takes in twice its original advisory fees.

      b.      Similarly, AUM can increase by virtue of existing fund holders purchasing more fund shares, which likewise produces no changes to the composition of the fund's portfolio or to the number of fund shareholders, and thus requires no additional provision of investment advisory services.

      c.      Additionally, AUM can increase when *new* investors purchase fund shares, but even in this event the additional *investment advisory costs* are *de minimis* as: (1) the additional dollars contributed by new shareholders are simply invested in the same core portfolio of securities already produced by prior investment advisory services; and (2) the additional *administrative* costs of adding new shareholders are borne by *other* parties (e.g., transfer agents) pursuant to other contracts.

      d.      Lastly and most basically, the work required to operate a mutual fund does not increase proportionately with the assets under management. While initial and fixed operating costs for provision of investment advisory services are substantial (*e.g.*, salaries for research, trading and portfolio management personnel sufficient to manage an entire portfolio; offices to house them; procurement of systems and information necessary to conduct research and manage the portfolio), the variable costs for provision of further investment advisory services for further AUM are much smaller, and often negligible or nonexistent.

**ANSWER:** FMI denies the allegations in paragraph 136 of the Complaint.

137. For these reasons, and put simply, it does not cost an investment advisor ten times as much to render services to a $2 billion fund as a $200 million fund. At some point (a point reached by the Fund, which during the course of the last decade rose from less than $100 million AUM in 2005 to more than $9 billion AUM by 2014), the additional cost to provide advisory

services to each additional dollar in the Fund (whether added by a rise in the value of the Funds' securities or additional contributions by current or new shareholders) approaches or equals zero.

**ANSWER:**    FMI lacks knowledge or information sufficient to form a belief as to the truth of

the allegations in the first sentence of paragraph 137 of the Complaint, and therefore denies those

allegations.  Except as so stated, FMI denies the allegations in paragraph 137 of the Complaint.

138.    The existence of economies of scale in the mutual fund industry has been confirmed by the SEC and the Governmental Accounting Office (the "GAO"), both of whom conducted in-depth studies of mutual fund fees and concluded that economies of scale exist in the provision of investment advisory services. *See SEC Division of Investment Management Report: Report on* Mutual *Fund Fees and Expenses* (Dec. 2000) ("SEC Report"), at 30-31; GAO, *Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials, and the Ranking Member, Committee on Commerce, House of Representatives* (2000) ("GAO Report"), at 9. These findings have been further confirmed by academic research, which also describes the existence of significant economies of scale in the mutual fund industry that are not passed on to shareholders. *See e.g.* John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 J. Corp. L. 610 (2001).

**ANSWER:**    FMI admits that the SEC issued a publication entitled "Division of Investment

Management:  Report on Mutual Fund Fees and Expenses," that the General Accounting Office

issued a publication entitled, "Report to the Chairman, Subcommittee on Finance and Hazardous

Materials; and the Ranking Member, Committee on Commerce, House of Representatives,

Mutual Fund Fees, Additional Disclosure Could Encourage Price Competition," and that John P.

Freeman and Stewart L. Brown published an article entitled "Mutual Fund Advisory Fees:  The

Cost of Conflicts of Interest," which speak for themselves as to the content thereof, discussing in

part matters pertaining to the mutual fund industry.  Except as so stated, FMI lacks knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 138 of the

Complaint, and therefore denies those allegations.

139.    Indeed, the legislative history of Section 36(b) recognizes that an investment advisor's failure to pass on economies of scale to the fund is a principal cause of excessive fees:

> It is noted…that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry. In some instances these economies of scale have not been shared with

investors. Recently there has been a desirable tendency on the part of some fund managers to reduce their effective charges as the fund grows in size. Accordingly, the best industry practice will provide a guide.

*See* Senate Report, at 4901-02.

**ANSWER**:   Paragraph 139 of the Complaint alleges legal conclusions, to which no answer is required.  To the extent that an answer may be required, FMI admits that the Senate Report, which speaks for itself as to the content thereof, includes in part language quoted in paragraph 139 of the Complaint.  FMI denies that the quoted passage supports the allegation in the first sentence of paragraph 139 of the Complaint.  Except as so stated, FMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 139 of the Complaint, and therefore denies those allegations.

140.   However, while mutual fund economies of scale are generated by (and therefore belong to) the mutual fund itself, mutual fund investment advisors can and often do monopolize the benefits of such economies of scale by continuing to charge high investment advisory fee rates on mutual fund assets even as a fund's asset base rises substantially. As such fees become increasingly untethered to the costs of providing such services, they become excessive.

**ANSWER**:   Paragraph 140 of the Complaint alleges legal conclusions as to which no answer is required.  To the extent that an answer may be required, FMI denies that economies of scale "belong" to mutual funds and denies that advisory fees "become excessive" under Section 36(b) whenever advisory fees remain unchanged as assets under management increase.  Except as so stated, FMI lacks knowledge of information sufficient to form a belief as to the truth of the allegations in paragraph 140 of the Complaint, and therefore denies those allegations.

141.   To address the matter, share economy of scale benefits, and avoid taking excessive fees, investment advisors now frequently employ a declining rate structure in which the percentage of AUM taken as an investment advisory fee declines at higher AUM levels. This is done by providing a schedule of AUM "breakpoints" (e.g., $500 million, $1 billion, $5 billion, etc.) at which investment advisory fee rates on AUM above such breakpoints decrease. For example, per the above breakpoint schedule, one rate (the highest) could be applied as the fee for all assets up to $500 million (*e.g.*, 0.75%); another, lower rate could be applied as the fee for assets between $500 million and $1 billion (*e.g.*, 0.60%); and a third rate, lower still, as the fee for assets

between $1 billion and $5 billion (*e.g.*, 0.50%). Such breakpoint-adjusted fee schedules reflect (but do not mirror) the cost efficiencies and economies of scale in the management of mutual fund portfolios as mutual funds' AUM grow.

**ANSWER:**    FMI admits that some mutual fund investment advisory fee schedules include

breakpoints, that paragraph 141 of the Complaint contains a hypothetical advisory fee schedule

containing breakpoints, and that breakpoints may reduce a mutual fund's advisory fee rate as

AUM increases.  Except as so stated, FMI lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 141 of the Complaint, and therefore denies

those allegations.

142.    Adoption of breakpoints can allow investment advisors to comply with the above-stated Congressional intent that investment advisors "reduce their effective charges as the fund grows in size."

**ANSWER:**    Paragraph 142 of the Complaint alleges legal conclusions, to which no answer is

required.  To the extent that an answer may be required, FMI admits that some mutual fund

investment advisory fee schedules include breakpoints and that breakpoints may reduce a mutual

fund's advisory fee rate as AUM increase.  FMI denies that the passage cited in paragraph 139 of

the Complaint reflects a Congressional intent, or that Section 36(b) requires that "investment

advisers 'reduce their effective charges as the fund grows in size.'"  Except as so stated, FMI

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in

paragraph 142 of the Complaint, and therefore denies those allegations.

143.    As Table 1 *supra* details, Fund net assets have skyrocketed over the course of the last decade, rising from $73.9 million in 2005 to more than $9.2 billion in 2015, a 125-fold increase.

**ANSWER:**    FMI admits that the Fund's total AUM as of fiscal year end 2005 was

approximately $73.9 million and that the Fund's total AUM as of March 31, 2015 was more than

$9.2 billion.  FMI further adopts and incorporates its answer to paragraph 39 of the Complaint as

if fully set forth herein. Except as so stated, FMI denies the allegations in paragraph 143 of the

Complaint.

144.    As a general matter, this very range – *i.e.*, a fund's transition from below $100 million of net assets to net assets measured in the *billions* of dollars – is exactly where significant economies of scale in the provision of advisory services begin to be generated.

**ANSWER:**    FMI denies the allegations in paragraph 144 of the Complaint.

145.    As a specific matter, FMI enjoyed significant economies of scale in providing the Fund with advisory services over the course of this period, as indicated by the following particularized facts.

**ANSWER:**    FMI denies the allegations in paragraph 145 of the Complaint.

146.    First, a substantial portion of the Fund's growth is the result of pure appreciation of asset values -- a factor that requires *zero* additional provision of investment advisory services. Specifically, of [*sic.*] September 30, 2014 (the end of the most recent fiscal year for which information is available), of the Fund's $9.217 billion in net assets, approximately $6.261 billion represented Fund shareholders' paid-in "capital stock", while approximately $2.956 billion represented "unrealized appreciation on investments" and "accumulate net realized gain[s]" from investing such paid-in capital. (As of March 31, 2015, the Fund's net assets stood at $9.549 billion, of which $6.84 billion represented Fund shareholder capital and $2.7 billion appreciation from investing such capital.) These figures indicate that between one-quarter and one-third of the Fund's current net asset value stemmed merely from market appreciation (specifically, 28.37% as of March 31, 2015, and 32.07% as of September 30, 2014).

**ANSWER:**    FMI admits that as of September 30, 2014, the Fund had approximately $9.217

billion in net assets, approximately $6.261 billion of which represented "Capital Stock," evincing

investment growth achieved by FMI for the benefit of the Fund and its shareholders. FMI admits

further that as March 31, 2015, the Fund had approximately $9.550 billion in net assets,

approximately $6.840 billion of which represented "Capital Stock", and approximately $2.691

billion of which represented "Net unrealized appreciation (depreciation) on investments" and

"Accumulated net realized gain," evincing investment growth achieved by FMI for the benefit of

the Fund and its shareholders. Except as so stated, FMI denies the allegations in paragraph 146

of the Complaint, and specifically denies that appreciation of asset values "requires *zero*

additional provision of investment advisory services."

96

147.    Second, while the $6+ billion of shareholder "capital" in 2014-2015 indicates that the Fund likely has many shareholders (and, likely, many more than in 2005), the additional services required to cope with such influx of shareholders and shareholder funds are by and large *not* investment advisory services – as further demonstrated immediately below – but rather various administrative and "back office" services provided by other service providers (e.g., transfer agents) for separate fees set through separate contracts. Moreover, as the Fund has been closed to new investors since June 2013, such costs have been capped at 2013 levels and have not continued to grow thereafter.

**ANSWER:**    FMI admits that the Fund has been closed to new investors, with limited

exceptions, since June 2013.  Except as so stated, FMI denies the allegations in paragraph 147 of

the Complaint.

148.    Third, as Table 10 below details, the number of investment positions in the Fund's portfolio has remained, at all times during the prior decade: (a) very small, never exceeding 30 different investments; and (b) quite constant, generally fluctuating between 24-28 positions (per the Fund' most recent public report, the Fund held 26 different positions as of June 30, 2015).

**Table 10**

**The Fund's Total Number
of Equity Holdings: 2005-2014**

| Fiscal Year | Number of Different Equity Investments Held* |
|:---:|:---:|
| 2014 | 25 |
| 2013 | 25 |
| 2012 | 27 |
| 2011 | 28 |
| 2010 | 27 |
| 2009 | 27 |
| 2008 | 24 |
| 2007 | 24 |
| 2006 | 20 |
| 2005 | 21 |

* Source: Fund Annual Reports on Form N-CSR

97

**ANSWER:** FMI admits that Table 10 in paragraph 148 of the Complaint reflects the number of equity investments held by the Fund as of September 30 of the fiscal years 2014, 2013, 2012, 2010, 2009, 2008, 2007, 2006, and 2005, and that the Fund reported 26 holdings as of June 30, 2015. Except as so stated, FMI denies the allegations in paragraph 148 of the Complaint.

149.    This was by fundamental design: the Fund's principal investment strategy at all relevant times has emphasized that the Fund shall only invest in "a limited number" of positions (which, as FMI has further specified, and consistent with the above data, generally means "20-30 stocks").

**ANSWER:** FMI admits that the Fund invests mainly in a limited number (which tends to range between 20-30) of large capitalization (namely, companies with more than $5 billion market capitalization at the time of initial purchase) value stocks of companies listed or traded on a national securities exchange or on a national securities association, including foreign securities traded on a national securities exchange or on a national securities association. Except as so stated, FMI denies the allegations in paragraph 149 of the Complaint.

150.    The Fund is not only limited to holding a small number of positions, but, furthermore, holds its positions for long periods of times and does not engage in frequent or active trading. Indeed, as stated in each of the Fund's Prospectuses throughout this period:

> The Fund's portfolio managers are patient investors. The Fund does not attempt to achieve its investment objectives by active and frequent trading of common stocks.

*See e.g.* Prospectus at 16.

**ANSWER:** FMI admits that the Fund's Prospectus, which speaks for itself as to the content thereof, includes language quoted in part in paragraph 150 of the Complaint, but denies that Plaintiff has quoted it accurately. Except as so stated, and as stated in the Prospectus, FMI denies the allegations in paragraph 150 of the Complaint.

151.    The small and constant number of positions held by the Fund – as well as their lengthy holding periods, infrequent changes, and the Fund's avoidance of active or frequent trading – all indicate that the amount of investment advisory services required and involved for the Fund (*i.e.*, the research, management and oversight associated with the Fund's positions): (a) did not require

many personnel to perform, and (b) was little changed even as Fund AUM grew dramatically. Both of these matters are further confirmed immediately below.

**ANSWER:** FMI denies the allegations in paragraph 151 of the Complaint.

152. Fourth, the number of FMI personnel responsible for managing the Fund has, over the course of the last decade, remained largely constant (notwithstanding changes in the manner in which such information was disclosed), fluctuating between six (6) and nine (9) persons at all times.

   a. First, as Table 11 below details, all times between fiscal 2008 and fiscal 2014, Fund Prospectuses identified between seven (7) and nine (9) FMI personnel as persons providing the Fund with investment advisory services:

**Table 11**

**FMI Personnel Providing the Fund with Advisory Services**

| Fiscal Year | | Number and Identity of FMI Individuals Identified as Providing Investment Advisory Services |
|---|---|---|
| 2014 | 9 | Patrick J. English , John S. Brandser, Andy P. Ramer, Jonathan T. Bloom, Matthew J. Goetzinger, Robert M. Helf , Karl T. Poehls , Daniel G. Sievers, Matthew T. Sullivan |
| 2013 | 9 | Patrick J. English , John S. Brandser, Andy P. Ramer, Jonathan T. Bloom, Matthew J. Goetzinger, Robert M. Helf , Karl T. Poehls , Daniel G. Sievers, Matthew T. Sullivan |
| 2012 | 8 | Patrick J. English , John S. Brandser, Andy P. Ramer, Jonathan T. Bloom, Matthew J. Goetzinger, Robert M. Helf , Karl T. Poehls, Daniel G. Sievers |
| 2011 | 9 | Ted D. Kellner, Patrick J. English , John S. Brandser, Andy P. Ramer, Jonathan T. Bloom, Matthew J. Goetzinger, Robert M. Helf , Karl T. Poehls , Daniel G. Sievers |
| 2010 | 9 | Ted D. Kellner, Patrick J. English , John S. Brandser, Andy P. Ramer, Jonathan T. Bloom, Matthew J. Goetzinger, Robert M. Helf , Karl T. Poehls , Daniel G. Sievers |
| 2009 | 8 | Ted D. Kellner, Patrick J. English , John S. Brandser, Andy P. Ramer, Jonathan T. Bloom, Matthew J. Goetzinger, Robert M. Helf , Karl T. Poehls , Daniel G. Sievers |
| 2008 | 7 | Ted D. Kellner, Patrick J. English , John S. Brandser, Andy P. Ramer, Matthew J. Goetzinger, Robert M. Helf , Karl T. Poehls |

   b. Second, between 2005 and 2008, the Fund's Prospectuses did not disclose the identities of *all* FMI personnel who performed advisory work for the Fund, but instead only the identities of the Fund's two co-portfolio managers: Ted D. Kellner and Patrick J. English. Notwithstanding this change in the *form* of disclosure, in *substance* it appears that at all times between 2005 and 2008, at least 6 FMI personnel performed advisory work for the Fund – namely, in

99

addition to Mr. Kellner and Mr. English, John S. Brandser, Andy P. Ramer, Matthew J. Goetzinger, Robert M. Helf.[14]

c.  Third, over the course of this period, the above-detailed sources of information (*i.e.*, Fund SEC filings and FMI's website) indicate that the only changes between 2005 and 2015 in the FMI personnel providing the Fund with advisory services were: (1) the loss of one senior person (Mr. Kellner) in 2012; and (3) the hires of four more junior personnel: Mr. Poehls in 2008; Mr. Sievers in 2009; Mr. Bloom in 2010; and Mr. Sullivan in 2013.

d.  Consequently, it appears that the most substantial of FMI's additional variable costs (*i.e.*, employee compensation) in providing the Fund with advisory services between 2005 and 2015, as the Fund grew from less than $100 million to more than $9 billion, was the addition of four junior investment advisory personnel (whose cost was at least partially offset by the more senior Mr. Kellner's departure from investment advisory duties in 2012).

**ANSWER:**  FMI admits that Table 11 in paragraph 152 of the Complaint reflects the members of the Portfolio Management Committee identified in the Fund's prospectus for the year 2011. FMI admits further that the Fund's prospectuses for the years 2008, 2007, and 2006 identify Mr. Kellner and Mr. English as the Fund's co-portfolio managers, and that the Fund's prospectus for 2005 identifies Mr. Kellner and Mr. English as the Fund's portfolio managers. FMI also admits that Mr. Kellner stepped down from his position on the Fund's Portfolio Management Committee in 2012 and that it has hired additional employees since 2005, including Mr. Poehls, Mr. Sievers, Mr. Bloom and Mr. Sullivan, and that Messrs. Brandser, Ramer, Helf and Goetzinger were employed through this time as well. Except as so stated, FMI denies the allegations in paragraph 152 of the Complaint.

153.  In sum, the above-detailed facts indicate substantial economies of scale produced over the course of the Fund's growth from less than $100 million in 2005 to more than $9 billion in 2014, as evidenced by the facts that: (a) the number of investment positions held by the Fund and managed by FMI remained very small and largely constant, and those positions were held for long periods of time rather than frequently traded; and (b) relatedly, the number of investment advisory personnel employed by FMI to provide the Fund with investment advisory services

---

[14] FMI's own descriptions of its "professional staff" on FMI's website indicate that each of these four additional FMI personnel was employed by FMI throughout this time: Mr. Brandser since 1995; Mr. Ramer since 2002; Mr. Helf since 1998; and Mr. Goetzinger since 2004. *See* **http://www.fiduciarymgt.com/about/staff/**.

likewise remained very small and grew only slightly (*e.g.*, the addition of four junior personnel, offset by the departure of one senior person).

**ANSWER:**     FMI denies the allegations in paragraph 153 of the Complaint.

154.   Most concretely, these facts indicate that neither the work required of FMI to provide the Fund with advisory services, nor FMI's costs to provide such services, grew in proportion to the growth in the Fund's assets – which increased 125-fold during this period.

**ANSWER:**     FMI denies the allegations in paragraph 154 of the Complaint.

155.   Notwithstanding the above indications that neither the investment advisory services provided by FMI nor FMI's costs to provide such services grew at rates anywhere approaching that of the Fund's asset growth, FMI's advisory fees from the Fund increased in proportion with – or even faster than – the increase in Fund assets.

**ANSWER:**     FMI denies the allegations in paragraph 155 of the Complaint.

156.   This was a direct function and result of two particular aspects of FMI's operative advisory fee rates during this period:

    a.    First, FMI's operative advisory fee rates remained *constant and unchanged* throughout the 2005-2015 period, at an annual rate of 0.75% of Fund assets (rather than, for example, being reduced so as to share with the Fund the benefits of the economies of scale provided by the Fund's sheer size).

    b.    Second FMI's operative advisory fee rates operated *without provision of any fee/rate breakpoints whatsoever*, so that advisory fees remained a constant 0.75% levied against all Fund assets (*i.e.*, the Fund's first dollar as well as the Fund's nine-billionth dollar) (rather than, for example, applying reduced rates to higher ranges of AUM [*e.g.*, 0.75% no the first $1 billion, 0.6% on $1-$5 billion AUM, 0.5% on $5-$10 billion AUM] so as to share with the Fund the benefits of the economies of scale provided by the Fund's sheer size).

**ANSWER:**     FMI admits that the annual investment advisory fee rate paid by the Company on

behalf of the Fund has been .75% of assets under management since the IAA was amended in

October 2004 to reduce said fee rate from 1.0% of assets under management, and that this fee

schedule does not feature breakpoints.   Except as so stated, FMI denies the allegations in

paragraph 156 of the Complaint.

157.   The absence of fee breakpoints is not only highly unusual among mutual funds of the Fund's size, but also stands in sharp contrast to the rate schedules operative for FMI's *non-captive, arm's-length* clients, which, as detailed above at Table 9: (a) did feature breakpoints,

which (b) operated to provide substantial fee reductions that reflected, and shared, FMI's economies of scale in providing advisory services. *See* ¶¶ 119-22, *supra*.

**ANSWER**: FMI admits that the standard fee schedules set forth in its Form ADV for investment management services it provides to clients other than the FMI Funds include breakpoints, that its fee rate for investment advisory and other services rendered to the Fund has been .75% of AUM since the IAA was amended in October 2004 to reduce the fee rate from 1.0% of assets under management, and that this fee schedule does not feature breakpoints. Except as so stated, FMI denies the allegations set forth in paragraph 157 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

158. For example, FMI's "standard" fee schedule for providing arm's-length institutional clients with the same investment strategy and investments provided to the Fund (*i.e.*, for clients of FMI's Large Cap Equity strategy), as well as the particular rate schedule operative for one particular FMI client (MSA, for the Northwestern Large Cap Blend portfolio), assessed fees at a 0.65% rate on the first $25 million, but then reduced rates to 0.55% on the next $25 million, 0.45% on the following $50 million, and 0.40% on all assets above $100 million. *See* Table 9, *supra*.

**ANSWER**: FMI admits that the standard fee schedule for clients invested in FMI's Large Cap Equity strategy and the fee schedule for its services as subadviser specifically to the Northwestern Large Cap Blend portfolio assess fees at a 0.65% rate on the first $25 million, 0.55% on the next $25 million, 0.45% on the following $50 million, and 0.40% on all assets above $100 million. Answering further, FMI adopts and incorporates its answer to paragraph 118 of the Complaint as if fully set forth herein. Except as so stated, FMI denies the allegations in paragraph 158 of the Complaint.

159. Such breakpoints – provided as a standard matter to FMI's non-captive, arm's length institutional clients – allowed for meaningful reductions to the blended advisory fee rates they paid, and functioned to share with such FMI clients FMI's economy of scale benefits. For example, through such breakpoints: (a) a $250 million client would pay a blended rate of 0.45%; (b) a $500 million client, a blended rate of 0.425%; (c) a $1 billion client, a blended rate of 0.4125%; and (d) a $9.2 billion dollar client, such as the Fund, a blended rate of 0.4014%. Consequently, for a client the size of the Fund, such breakpoints would function to reduce the advisory fee rate by 38.46% (from 0.65% to 0.40%).

102

**ANSWER:** FMI admits that breakpoints may reduce a client's advisory fee rate as AUM increase. FMI admits further that application of the fee schedule set forth in FMI's answer to paragraph 158 of the Complaint to a client with $250 million in assets under management would yield a blended advisory fee rate of .45%; that application of the fee schedule set forth in FMI's answer to paragraph 158 of the Complaint to a client with $500 million in assets under management would yield a blended advisory fee rate of .425%; that application of the fee schedule set forth in FMI's answer to paragraph 158 of the Complaint to a client with $1 billion in assets under management would yield a blended advisory fee rate of .4125%; and that application of the fee schedule set forth in FMI's answer to paragraph 158 of the Complaint to a client with $9.2 billion in assets under management would yield a blended advisory fee rate of approximately .4014%. Except as so stated, FMI denies the allegations in paragraph 159 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

160.    However, in the Fund's case, advisory fee rates, unreduced by any breakpoints, remained a constant 0.75% levied against all Fund assets. Because this constant rate was applied against all Fund assets at all times between 2005 and 2015, FMI's advisory fees grew over this period at exactly the same rate that the Fund's assets did.

**ANSWER:** FMI admits that the annual investment advisory fee rate to be paid by the Company on behalf of the Fund has been .75% of assets under management since the IAA was amended in October 2004 to reduce the fee rate from 1.0% of assets under management. FMI admits further that its investment advisory fee pursuant to the IAA is calculated as a percentage of the Fund's AUM and, therefore (in the absence of fee waivers), if AUM increases, the investment advisory fee increases by the amount of its advisory fee rate multiplied by the amount of the increase in AUM. Except as so stated, FMI denies the allegations in paragraph 160 of the Complaint.

161.    Indeed, and when viewed on a yearly basis, as Table 1 above shows, Fund net assets increased nearly 125-fold between fiscal 2005 ($73.9 million) and fiscal 2014 ($9.2 billion), but

103

FMI's advisory fees increased during the same period *at an even steeper rate* – rising nearly 250-fold from $270,000 in fiscal 2005 to $66.2 million in fiscal 2014.

**ANSWER:**     FMI adopts and incorporates its answer to paragraph 39 as if fully set forth herein.

Except as so stated, FMI denies the allegations in paragraph 161 of the Complaint.

162.     FMI's near 250-fold increase in fees between 2005 and 2014 was not the result of FMI providing 250 times as much advisory services in 2014 as in 2005, or that FMI's costs to provide such services were 250 times greater in 2014 as in 2005. To the contrary, and as detailed immediately above in Section VI.C.2, *supra*, neither the amount nor the cost of FMI's advisory services to the Fund grew substantially between 2005 and 2014, let alone at the rate of the Fund's assets (and fees). The increase in FMI's advisory fees during this period was not a function of any similar increase in services (or costs), but merely an artifact of FMI's operative fee rates under the IAA, which remained (a) exactly the same each year between 2005 and 2015, at 0.75% and (b) unreduced by any breakpoints.

**ANSWER:**     FMI admits that the amount of its advisory fee is determined by applying the advisory fee rate under the IAA to the Fund AUM, which, calculated on a monthly basis, is equal to 1/12 of 0.75% (0.75% per annum) of the Fund's average net assets, and is not based upon other factors.  FMI admits further that the annual investment advisory fee rate to be paid by the Company on behalf of the Fund has been .75% of assets under management since the IAA was amended in October 2004 to reduce the fee rate from 1.0% of assets under management.  Except as so stated, FMI denies the allegations in paragraph 162 of the Complaint.  Further answering, FMI states that Section 36(b) does not preclude an adviser-manager "from earning a profit on services provided by it to a fund, [and] that a 'cost-plus' type of contract is not required . . . ." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982) (citing S. Rep. No. 91-184 (1970), reprinted in 1970 U.S.C.C.A.N. 4897, 4902-03).

163.     That the growth in fees extracted far outstripped any growth in services provided (or the cost to provide such services) indicates both that the growth in the Fund's size generated significant economies of scale for FMI, and that FMI monopolized, rather than shared, the benefits flowing from such economies.

**ANSWER:**     FMI denies the allegations in paragraph 163 of the Complaint.

164. As detailed in Section V.B, *supra*, the particular services FMI provides to the Fund are the "investment advisory services" specified in the IAA, in exchange for which FMI is paid its investment advisory fees.

a. In their largest and core part, such services are Portfolio Selection Services: namely, researching potential investments, deciding which securities to purchase for or sell from the Fund's investment portfolio, and arranging for the execution of purchase and sale orders on behalf of the Fund. *See* Section V.B.1, *supra.*

b. The Other Services required of FMI, in addition to Portfolio Selection Services, are *de minimis*, consisting mainly of (a) maintaining books and records with respect to its provision of Portfolio Selection Services, and (b) periodic (quarterly) reporting on the Portfolio Selection Services provided. See Section V.B.2, *supra.*

**ANSWER:** FMI admits that the researching of potential investments, the selection of investments, deciding whether to retain or sell portfolio securities, and arranging for the execution of purchase and sale orders on behalf of the Fund are important components of the services it provides to the Fund and critical to the investment success that the Fund and its shareholders have enjoyed. Except as so stated, FMI denies the allegations in paragraph 164 of the Complaint.

165. All further services and expenses necessary to operate and maintain the Fund are provided by third parties pursuant to separate contracts with the Fund, or are separately paid for by the Fund. *See* Section V.B.3, *supra.*

**ANSWER:** FMI denies the allegations in paragraph 165 of the Complaint.

166. FMI's Portfolio Selection Services – *specifically* – are the primary metric on which FMI, Fund investors, and the Fund's Board judge FMI's performance of its IAA-specified duties, as Fund SEC filings and FMI's quarterly Shareholder Letters make clear (which lead off with discussion and analysis of the Fund's absolute and relative investment performance).

**ANSWER:** FMI admits that services it provides to the Fund in researching potential investments and determining which securities to purchase for or sell from the Fund's investment portfolio are an important metric on which Fund investors and the Fund's Board measure its performance and that Fund SEC filings and quarterly Shareholder Letters report Fund investment performance. Except as so stated, FMI lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 166 of the Complaint, and therefore denies those allegations.

167.    The quality of the Portfolio Selection Services provided by FMI to the Fund does not rise to the high level of the fees charged by FMI.

**ANSWER:**    FMI denies the allegations in paragraph 167 of the Complaint, and specifically denies that the advisory fee paid by the Fund is at a "high level."

168.    Like other mutual funds, the Fund reports its investment performance relative to benchmarks. At all relevant times, the Fund's benchmark has been the S&P 500 Index.

**ANSWER:**    FMI admits that the Fund has reported its performance relative to the performance of the S&P 500 Index as well as other sources of comparison.  Except as so stated, FMI denies the allegations in paragraph 168 of the Complaint.

169.    As shown in Table 12 below, the Fund's investment performance has fallen short of that of its benchmark, the S&P 500 Index, for each of the most recent 1-, 3- and 5-year periods:

**TABLE 12**
**Fund Performance vs. Benchmark**
**(returns through 8/5/2015)**

|  | 1 Year | 3 Year | 5 Year | 10 Year |
|---|---|---|---|---|
| **FMI Large Cap Fund** | 10.10% | 16.27% | 14.19% | 9.10% |
| **S&P 500 Index** | 11.63% | 17.18% | 15.70% | 7.77% |

Source: Morningstar

**ANSWER:**    FMI admits that Table 12 in paragraph 169 of the Complaint sets forth the 1 year, 3 year, 5 year and 10 year net returns of the Fund and the 1 year, 3 year, 5 year and 10 year performance of the S&P 500 Index as of August 5, 2015.  Except as so stated, FMI denies the allegations in paragraph 169 of the Complaint.

170.    Morningstar also reports Fund investment performance relative to that of other mutual funds that Morningstar has determined are comparable to the Fund. Morningstar categorizes the Fund as a "Large Blend" fund, and as demonstrated in Table 13 below, the Fund's investment performance is not meaningfully different from the average performance produced by comparable mutual funds for each of the most recent 1-, 3-, and 5-year periods: Case 2:

106

### TABLE 13
### Fund Performance vs. Benchmark
### (returns through 8/5/2015)

| | 1 Year | 3 Year | 5 Year | 10 Year |
|---|---|---|---|---|
| **FMI Large Cap Fund** | 10.10% | 16.27% | 14.19% | 9.10% |
| **Morningstar Large Blend Category** | 9.36% | 16.28% | 14.16% | 7.07% |

**ANSWER:** FMI admits that Morningstar categorizes the Fund as a "Large-Cap Blend" fund. FMI admits that Table 13 in paragraph 170 of the Complaint sets forth the 1 year, 3 year, 5 year and 10 year net returns of the Fund as of August 5, 2015. FMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations pertaining to the performance of funds categorized by Morningstar as "Large-Cap Blend" on August 5, 2015 specifically, and therefore denies those allegations. Except as so stated, FMI denies the allegations in paragraph 170 of the Complaint.

171.    In short, FMI's provision of advisory services to the Fund has been, as revealed by such benchmark and peer fund comparisons, of middling quality at all times during the most recent 5 years, while FMI's extraction of advisory fees from the Fund has been quite high.

**ANSWER:** FMI denies the allegations in paragraph 171 of the Complaint.

172.    FMI is a private-held company, and as such neither discloses its financial results of operations nor releases financial statements to the public. Consequently, information concerning FMI's overall profitability (i.e., overall revenues minus overall costs), and more particularly *FMI's profitability with respect to the Fund* (*i.e.*, revenues gained from the Fund minus the costs incurred by FMI in providing advisory services to the Fund), are within FMI's particular knowledge and exclusive control, and are not publicly available.

**ANSWER:** FMI admits that it is a privately-held company and that as such its financial statements reflecting its results of operations are not publicly disclosed. Except as so stated, FMI denies the allegations in paragraph 172 of the Complaint.

173.    However, as detailed below, and on the basis of all information that is publicly available, the Fund:

    a.    is the single largest driver of FMI's overall revenues, accounting for approximately 45.5% of estimated FMI total revenues; and

107

b. is also the single largest driver of FMI's profits, and account for (a) an even higher share of FMI's overall profits, although (b) the exact share cannot be determined from publicly available information.

**ANSWER:** FMI admits that the Fund comprises its largest account by AUM, and the investment advisory fees payable by the Fund for services rendered by FMI on the Fund's behalf, which are proportional to AUM, constitute the greatest source of FMI's revenue and make the greatest contribution to profit. FMI admits that as a privately-held company, its financial statements reflecting its results of operations are not publicly disclosed. Except as so stated, FMI denies the allegations in paragraph 173 of the Complaint.

174. Table 14 below, aggregating data as of March 31, 2015 from multiple FMI documents relating (a) to FMI's captive funds and (b) to FMI's provision of its four investment strategies to arm's-length clients, provides a substantially-detailed estimate of FMI's total advisory fee revenues (based on AUM/client data as of March 31, 2015), and of the sources of such revenue:

### Table 14
### FMI's Advisory Fee Revenues
### (based on asset/client data as of March 31, 2015)

| | AUM Under FMI Management* | Clients* | Fee Rate* | Annual Fees paid to FMI* | Average Account Size* | Average Per Client Fees* |
|---|---|---|---|---|---|---|
| **Captive Clients** | | | | | | |
| Large Cap Fund | $9,549,528,298 | 1 | 0.75% | $71,621,462 | n.a. | n.a. |
| Common Stock Fund | $1,420,890,800 | 1 | 1.00% | $14,208,908 | n.a. | n.a. |
| International Fund | $1,682,201,539 | 1 | 0.75% | $12,616,512 | n.a. | n.a. |
| subtotal | $12,652,620,637 | 3 | 0.78% | $98,446,882 | n.a. | n.a. |
| **Arm's Length Clients*** | | | | | | |
| Large Cap Equity | $6,514,871,702 | 725 | 0.65% | $42,346,666 | $8,986,030 | $58,409 |
| Small Cap Equity | $1,602,109,200 | 180 | 0.90% | $14,418,983 | $8,900,607 | $80,105 |
| International Equity | $0 | 0 | 0.75% | $0 | $0 | $0 |
| All Cap Equity | $284,500,000 | 43 | 0.75% | $2,133,750 | $6,616,279 | $49,622 |
| Other ** | $884,898,461 | ? | ? | ? | ? | ? |
| subtotal ** | $9,286,379,363 | 948 | 0.70% | $58,899,399 | $8,862,322 | $62,130 |
| **FMI TOTAL** | | | | | | |
| Total | $21,939,000,000 | 951 | 0.75% | $157,346,281 | $22,138,908 | $165,454 |

\* Data on arm's length clients was obtained from "Performance Examination Reports" (available from and labeled on FMI's website as "Performance & Disclosure Footnote[s]"), which listed, for each of FMI's offered strategies, the number of portfolios (*i.e.*, number of clients) and the total value of the assets so-managed. The advisory fee rates were (conservatively) inferred by:

(1) deriving the average account size from the above data; and (2) applying FMI's "standard" rates for such strategy at such size. This was conservative because, in all cases, the "average" account was of sufficiently small size (under $10 million AUM) so that no breakpoints were triggered (which occurs for AUM > $25 million), and so that fee rates were simply the initial and high rates that applied to clients' first $25 million of AUM. It is likely the case that notwithstanding this average, many FMI clients have larger amounts of AUM that trigger breakpoint fee reductions and consequently pay fees at lower rates.

** "Other" AUM represents the difference between (1) FMI's total AUM and (2) AUM managed for captive funds and arm's length clients, as disclosed in the above-identified Performance Examination Reports. The nature of such "Other" AUM, and the associated clients and fees, are unclear.

**ANSWER:** FMI admits that Table 14 in paragraph 174 of the Complaint sets forth the approximate amounts of assets under management and number of portfolios for the Fund, the Common Stock Fund, the International Fund, non-Fund clients invested in the Large Cap Equity strategy, non-Common Stock Fund clients invested in the Small Cap Equity strategy, non-International Fund clients invested in the International Equity strategy, and FMI's total assets under management; the investment advisory fee rate for the Fund, the Common Stock Fund, and the International Fund; and the investment advisory fee rate for assets under management of less than $25 million for other clients invested in the Large Cap Equity strategy, the Small Cap Equity Strategy, and the All Cap Equity strategy, all as of March 31, 2015. Except as so stated, FMI denies the allegations in paragraph 174 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

175.    As Table 14 indicates, based on asset/client data as of March 31, 2015, FMI's advisory fees from the Fund on an annualized basis ($71.6 million) account for approximately 45.5% of FMI's total revenues (i.e., total advisory fees of $157.3 million).[15]

---

[15] While Table 14's estimate of FMI's total advisory fees omits any fees flowing from the $885 million of "Other" AUM, as there is no publicly-available data indicating what such fees are, the estimate still appears to be substantially accurate because it also overestimates FMI's fees flowing from $9.286 billion of AUM managed for arm's-length clients (i.e., a set of AUM ten times larger than the $885 million of "Other" AUM). The omission of fees flowing from a smaller amount of AUM is, in effect, "balanced out" by a smaller overestimation of fee rates applicable to a much larger amount of AUM.

**ANSWER:**    FMI denies the allegations in paragraph 175 of the Complaint, and specifically

denies that the amounts listed as annual fees paid to FMI in Table 14 in paragraph 174 of the

Complaint reflect actual annual amounts paid to FMI.

176.    All available facts (FMI does not publicly disclose its costs, on either an aggregate or a fund- or client-specific basis) suggest that the Fund provides FMI with an even greater share of its profits than of its revenues. Were FMI to disclose investment advisory expenses in a manner that directly reflected the actual costs to provide each captive and arm's-length client with investment advisory services, the Fund would be revealed, on information and belief, to be by far the most profitable of all of FMI's clients/funds.

**ANSWER:**    FMI admits that as a privately-held company it does not publicly disclose its

financial statements.  Except as so stated, FMI denies the allegations in paragraph 176 of the

Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

177.    First, with $9.55 billion of net assets, the Fund is by far the largest single vehicle managed by FMI: (a) approximately 6 times larger than any of FMI's other captive funds ($1.68 billion and $1.42 billion); and (b) more than 100 times larger than FMI's average arm's-length client ($8.86 million). The Fund's large size produces substantial economy of scale benefits for FMI, as detailed in Section VI.C.2-3 supra, that far outweigh any (and all) economy of scale benefits generated by FMI's other and smaller clients. Consequently, the profit opportunity presented to FMI by the Fund is qualitatively as well as quantitatively unique.

**ANSWER:**    FMI admits that as of March 31, 2015, the Fund had net assets of approximately

$9.55 billion, making it the largest single client of FMI.  FMI also admits that as of March 31,

2015, the Common Stock Fund had net assets of approximately $1.42 billion, and the

International Fund had net assets of approximately $1.68 billion. FMI admits further that the

average size of the accounts of the FMI clients invested in the Large Cap Equity strategy is less

than $9.55 million.  Except as so stated, FMI denies the allegations in paragraph 177 of the

Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

178.    Second, at the same time that FMI enjoys uniquely high economies of scale from the Fund that function to reduce FMI's relative advisory costs, FMI extracts advisory fees from the Fund that not only do not reflect any such economies, but that are comparatively higher than the fees charged to most of FMI's other clients. For example, as indicated in Table 14, the Fund's 0.75% advisory fee is higher than the average advisory fees to FMI's arm's-length clients overall, as well as to those FMI arm's-length clients receiving effectively identical Portfolio

Selection Services as the Fund via purchase of FMI's Large Cap Equity investment strategy. Indeed, given Table 14's likely overestimation of average advisory fees charged to arm's-length clients, the actual disparity is in all likelihood greater than indicated in Table 14 (as detailed comparisons with the actual fee rates charged to the Subadvised Funds further confirms — see Section VI.B.1.b, supra).

**ANSWER:**  FMI adopts and incorporates its answer to paragraph 174 as if fully set forth herein.  Except as so stated, FMI denies the allegations in paragraph 178 of the Complaint.

179.    Third, relatedly, although the fees charged to the Fund equal the 0.75% fees charged to the FMI International Fund, FMI's profits from the Fund are far greater than from the FMI International Fund, for two reasons. First and most obviously, the Fund is approximately 6 times larger, thereby generating not only six times greater fees, but doing so while generating significant economies of scale for FMI. Second, on a dollar-for-dollar basis, the FMI International Fund is more expensive to operate than the Fund, because, inter alia: (a) the FMI International Fund holds a larger number of different positions than the Fund (e.g., as of March 31, 2015, 34 different equity investments versus the Fund's 24); (b) the FMI International Fund's wider geographical focus (the world outside of the U.S.) requires greater research efforts and expenditures to screen, evaluate and select investments; and (c) the FMI International Fund's holdings, denominated in multiple foreign currencies, also required FMI to perform further investment advisory services in order to hedge or otherwise mitigate such currency risks. Consequently, the advising the Fund is substantially more profitable for FMI than advising the FMI International Fund.

**ANSWER:**  FMI admits that the Fund and the International Fund have the same investment advisory fee rate, that the Fund holds more AUM than does the International Fund, and that the total investment advisory fees paid by the Fund are greater than the total investment advisory fees paid by the FMI International Fund.  Except as so stated, FMI denies the allegations in paragraph 179 of the Complaint.

180.    Fourth, FMI's profits from providing the Fund with advisory services are all the greater when the fall-out benefits that accrued to FMI by virtue of its relationship to the Fund are also considered (see Section VI.F, infra): namely, FMI's ability to provide copies of the Fund's portfolio, totaling $6.515 billion, to approximately 725 arm's-length clients, from whom FMI can extract an additional advisory fee stream of as much as $42.3 million (as per Table 14, supra).

**ANSWER:**  FMI denies the allegations in paragraph 180 of the Complaint, and specifically denies that advisory fees it derives from other clients invested in the Large Cap Equity strategy constitute fallout benefits from the services FMI provides to the Fund.

111

181. "Fall-out benefits" refer to income, profits or other benefits accruing to an investment advisor that would not have occurred but for the existence of its captive mutual fund(s). Where an investment manager gains substantial fall-out benefits (over and above direct investment advisory fees) by virtue of a fund or funds it manages, consideration of such benefits is also relevant for any determination as to whether investment advisory fees are excessive.

**ANSWER:** Paragraph 181 of the Complaint alleges legal conclusions, to which no answer is required. To the extent that an answer may be required, FMI admits that fall-out benefits generally refer to collateral benefits that accrue to the adviser because of its relationship with a mutual fund, and that such benefits may be considered by a court in evaluating whether an investment advisory fee is excessive under Section 36(b). Except as so stated, FMI denies the allegations in paragraph 181 of the Complaint.

182. Here, the FMI's relationship with the Fund afforded FMI substantial fall-out benefits.

**ANSWER:** FMI denies the allegations in paragraph 182 of the Complaint.

183. First, as detailed in Section VI.B.1 supra and as admitted by FMI itself, FMI employs the Fund as an original model that it copies for other clients, including the Subadvised Funds and other FMI clients who procure from FMI FMI's Large Cap Equity investment strategy. As FMI's own disclosures indicate and Table 14 supra details, FMI has provided approximately 725 arm's-length clients with copies of the Fund's portfolio totaling $6.515 billion — generating an additional advisory fee stream of as much as $42.3 million annually.

**ANSWER:** FMI denies the allegations in paragraph 183 of the Complaint.

184. FMI is thus able to capture for itself a sizeable additional fee stream — namely, the investment advisory fees paid by clients for whom FMI copied the advisory services originally developed and provided to the Fund — that would not have existed but for the Fund.

**ANSWER:** FMI denies the allegations in paragraph 184 of the Complaint.

185. FMI experiences these additional revenues as almost pure profit, because FMI incurs little or no additional investment advisory costs for such copies. All the infrastructure, research and personnel required to furnish investment advisory services to such clients were already provided and paid for by investment advisory fees extracted from the Fund itself. The Portfolio Selection Services that it provides to them are effectively without any additional cost, and much of the Other Services (e.g., quarterly reporting) are likewise copied from reports that FMI develops for the Fund.

112

**ANSWER:**    FMI admits that its costs of servicing its non-Fund clients are lower than its costs of servicing the Fund.  Except as so stated, FMI denies the allegations in paragraph 185 of the Complaint.

186.    Indeed, the fact that the Fund had already paid for the development of these investment advisory services allowed FMI to offer copies to arm's-length clients at rates far lower than those it charged to the Fund (as the marginal costs to FMI of providing such copied services were close to zero). The Fund thus not only made such services possible, but also made them marketable: more attractive to FMI's non-captive, arm's-length clients by virtue of the lower fees FMI was able to offer them.

**ANSWER:**    FMI denies the allegations in paragraph 186 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

187.    Mutual fund investment advisory fees are "set" (reviewed, evaluated and approved) by mutual funds' boards of directors on an annual basis.

**ANSWER:**    Paragraph 187 of the Complaint alleges legal conclusions, to which no answer is required.  To the extent that an answer may be required, FMI admits that Section 15 of the ICA, which speaks for itself as to the content thereof, provides for annual approval of contracts continuing in effect for more than two years pursuant to which an investment adviser serves or acts as an investment adviser of a registered investment company.  Except as so stated, FMI denies the allegations in paragraph 187 of the Complaint.

188.    In connection with this fee evaluation and approval process, the ICA *requires* (a) that the board request, obtain and evaluation "such information as may reasonably be necessary" for evaluation of the fee; and (b) that the investment adviser provide the board with such information:

> It shall be the duty of the directors of a registered investment company to request and evaluate, and the duty of an investment adviser to such company to furnish, such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such company.

*See* 15 U.S.C. 80a-15(c)

**ANSWER:**     Paragraph 188 of the Complaint alleges legal conclusions, to which no answer is required.  To the extent that an answer may be required, FMI admits that Section 15(c) of the ICA, which speaks for itself as to the content thereof, includes language quoted in part in paragraph 188 of the Complaint.

189.    Where a board's fee evaluation and approval *procedure* is deficient, a board's fee approval may lack adequate basis, and hence merits little judicial deference.

**ANSWER:**     Paragraph 189 of the Complaint alleges legal conclusions, to which no answer is required.  To the extent that an answer may be required, FMI admits that:

> Where a board's process for negotiating and reviewing investment adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process . . . .  Thus, if the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently.
>
> *         *         *
>
> In contrast, where the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome.

*Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 351 (2010).  Except as so stated, FMI denies the allegations in paragraph 189 of the Complaint.

190.    For example, the investment advisor may fail to provide the board with relevant, accurate and/or complete information, or, similarly, the board may fail to request, obtain and/or evaluate relevant, accurate and complete information necessary for reasonable evaluation of advisory fees. In such instances, fee approval is based on partial or inaccurate information, and hence: (a) merits little deference, and (b) itself constitutes *further* indication of excessive fees.

**ANSWER:**     Paragraph 190 of the Complaint alleges legal conclusions, to which no answer is required.  To the extent that an answer may be required, FMI denies the allegations in paragraph 190 of the Complaint and incorporates its answer to paragraph 189 of the complaint as if fully set forth herein.

191.    Likewise, where a board fails to exhibit adequate conscientiousness in considering and evaluating the information it receives (including the degree to which such information is accurate, sufficient and/or complete), the board's fee approval likewise may lack adequate basis, and may hence merit little deference and itself constitute further indication of excessive fees.

**ANSWER:**    Paragraph 191 of the Complaint alleges legal conclusions, to which no answer is required.  To the extent that an answer may be required, FMI denies the allegations in paragraph 191 of the Complaint and incorporates its answer to paragraph 189 of the complaint as if fully set forth herein.

192.    Additionally, a fee can be excessive *in substance*: (a) wholly apart from whether the procedure used in setting it was sufficient or defective; and (b) even where such procedure was in all appearances adequate.

**ANSWER:**    Paragraph 192 of the Complaint alleges legal conclusions, to which no answer is required.  To the extent that an answer may be required, FMI admits that an investment adviser's advisory fee may be found to be excessive under Section 36(b) only where the fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.  Except as so stated, FMI denies the allegations in paragraph 192 of the Complaint.

193.    Here, the procedure through which the Fund's Board "set" such fees was deficient, and additionally, irrespective of procedure, the Fund's investment advisory fees were excessive in substance.

**ANSWER:**    FMI denies the allegations in paragraph 193 of the Complaint.

194.    The Fund's Board of Director's (the "Board") consists of the following seven persons: John S. Brandser, Patrick J. English, Ted D. Kellner, Barry K. Allen, Robert C. Arzbaecher, Gordon H. Gunnlaugsson, and Paul S. Shain (collectively, the "Directors").

**ANSWER:**    FMI admits the allegations in paragraph 194 of the Complaint.

195.    The Board meets four times per year. *See* SAI at 26, 29 (compensation information for Directors indicates that Directors attended four meetings during fiscal year).

**ANSWER:** FMI admits that the Company's Board holds four formal, in-person meetings of the Board of Directors per fiscal year. Except as so stated, FMI denies the allegations in paragraph 195 of the Complaint.

196. All Directors, in addition to serving on the Fund's Board, also serve on the boards [*sic.*] all other captive funds in the FMI Fund Complex. The Board's four meetings per year concern not merely the Fund, but all of the funds in the FMI Fund Complex. In these four meetings, the Board approves investment advisory and other services contracts for each captive fund, and works to satisfy all other oversight responsibilities for all FMI captive funds.

**ANSWER:** FMI admits that the Company's Directors are Directors of the Fund as well as the Common Stock Fund and the International Fund, and that the Board conducts Board business, including approval of investment advisory and other service contracts and fund oversight, with respect to the three FMI Funds during its Board meetings. Except as so stated, FMI denies the allegations in paragraph 196 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

197. Once nominated and elected to the Board, Directors never stand for re-election, but instead enjoy "indefinite" terms. All current Directors, save Mr. Brandser, possess lengthy tenures on the Fund's Board, ranging from 8 years (Mr. Arzbaecher) to 14 years (Messrs. Gunnlaugsson and Shane) to nearly 20 years (Messrs. English, Kellner and Allen — when FMI first incorporated FMI Funds, Inc. to house FMI's captive funds).

**ANSWER:** FMI admits that the Fund's Directors are currently serving indefinite terms, that Mr. Brandser has been a Director of the Company since 2013, that Mr. Arzbaecher has been a Director since 2007, that Messrs. Gunnlaugsson and Shain have been Directors since 2001, that Mr. English has been a Director since 1997, and that Messrs. Kellner and Allen have been Directors since 1996. FMI admits further that the Company was incorporated in 1996. Except as so stated, FMI denies the allegations in paragraph 197 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

198. Only four of the seven Directors – specifically, Messrs. Allen, Arzbaecher, Gunnlaugsson, and Shain (the "Independent Directors") – qualify as "non-interested" or independent directors under the ICA. Each of the Independent Directors was also a member of

the Board's audit committee (made up solely of the Independent Directors), which meets once per year. *See* SAI at 26, 29. Each of the Independent Directors receives a fee of $5,500 for each Board meeting attended, and of $3,500 for each audit committee meeting attended. During fiscal 2014, each of the Independent Directors received $25,500 in compensation by virtue of attending four Board meetings and one audit committee meeting.

**ANSWER:** FMI admits that four of the Company's seven Directors, and specifically, Messrs. Allen, Arzbaecher, Gunnlaugsson, and Shain, qualify as non-interested or independent directors under the ICA (the "Independent Directors"). FMI admits that each of the Independent Directors is also a member of the Board's audit committee, that the Independent Directors are the only members of the Board's audit committee, and that the audit committee meets once per fiscal year. FMI admits further that the Independent Directors receive a fee of $5,500 for each Board meeting attended and $3,500 for each Board audit committee meeting attended. FMI admits that for the Fund's fiscal year ended September 30, 2014, the Independent Directors each attended all Board and audit committee meetings and, as a result, each received a total Director's fee of $25,500 for the fiscal year. Except as so stated, FMI denies the allegations in paragraph 198 of the Complaint.

199.     Three of the seven Directors — specifically, Messrs. Brandser, English and Kellner (the "Interested Directors') — are, under the ICA, "interested" (as opposed to independent) directors, as a result of their relationships to FMI.

      a.     Messrs. Brander [*sic.*] and English are currently FMI's senior-most officers: Mr. Brander [*sic.*] FMI's President and Chief Operating Officer; Mr. English FMI's Chief Executive Officer and Chief Investment Officer. Both Mr. Brandser and Mr. English serve on FMI's Portfolio Management Committee, which is directly and collectively responsible for providing advisory services to the Fund.

      b.     Mr. Kellner is FMI's founder. At all relevant times until 2012, Mr. Kellner served on FMI's Portfolio Management Committee, which is directly and collectively responsible for providing advisory services to the Fund; and in Fund-related SEC filings prior to 2008, Mr. Kellner was identified, together with Mr. English, as the Fund's co-portfolio manager.

**ANSWER:** FMI admits the allegations in paragraph 199 of the Complaint.

200.     Mr. Kellner also serves as President of FMI Funds, Inc., the vehicle in which FMI's captive mutual funds, including the Fund, are housed. Mr. Kellner's position, as FMI Funds, Inc.'s President, is the senior-most executive position maintained by FMI Funds, Inc.

**ANSWER:**     FMI admits that Mr. Kellner is President of the Company, which consists of three portfolios.  FMI admits further that President is the senior executive position maintained by the Company.  Except as so stated, FMI denies the allegations in paragraph 200 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

201.     The Board, split between its four independent and three interested Directors, features neither a Chairman nor a lead, independent director, but instead is presided over by Mr. Kellner:

> The Corporation does not have a Chairman of the Board, nor does the Corporation have a lead non-interested director. The President of the Corporation is the presiding officer at all Board meetings and sets the agenda for the Board meetings, with input from the other directors and officers of the Corporation. The Corporation has determined that its leadership structure is appropriate in light of, among other factors, the asset size and nature of the Funds, the arrangements for the conduct of the Funds' operations, the number of directors, and the Board's responsibilities.

*See* SAI at 28.

**ANSWER:**     FMI admits that the Fund's Board consists of four Independent Directors who qualify as non-interested or independent under the ICA, and three Directors deemed interested under the ICA.  FMI admits further that there is no Chairman of the Board or lead non-interested director, and that the President of FMI Funds, Inc., which currently is Mr. Kellner, is the presiding officer at Board meetings.  FMI admits that the SAI, which speaks for itself as to the content thereof, includes language quoted in part in paragraph 201 of the Complaint.  Except as so stated, FMI denies the allegations in the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

202.     The above-described composition and structure of the Board leave it unusually exposed to influence from its interested, non-independent directors.

118

a.    First, the Board's composition means that the four statutorily-independent Independent Directors enjoy only the narrowest possible majority over the three Interested Directors: *i.e.*, a single vote. In other words, the Independent Directors must be perfectly unanimous in order to overcome (should they wish to) the votes of the Interested Directors.

b.    Second, the absence of a lead independent director, and the Board's leadership by FMI's founder, Mr. Kellner, allow FMI to exert further influence over Board meetings and the Board.

**ANSWER:**    FMI denies the allegations contained in paragraph 202 of the Complaint.

203.    Matters of process or procedure aside, the investment advisory fees approved by the Board were excessive, in substance and result, for the reasons set forth in Sections VIA-F *supra*.

**ANSWER:**    FMI denies the allegations in paragraph 203 of the Complaint.

204.    Furthermore, as detailed below, the Board's approval of substantively excessive fees stemmed in part from a deficient process for the consideration, evaluation and approval of proposed and/or appropriate advisory fees for the Fund.

**ANSWER:**    FMI denies the allegations in paragraph 204 of the Complaint.

205.    Here, during the course of a single December 19, 2014 meeting, the Board approved for 2015 the FMI-proposed and currently operative investment advisory fee rates for the Fund and for all other captive funds in the FMI Fund Complex.

**ANSWER:**    FMI admits that the process of review and approval of the investment advisory agreements for the three FMI Funds was culminated during the December 19, 2014 Board meeting after due consideration by a majority of the Directors who are not interested persons of FMI, as well as by the full Board.  Except as so stated, FMI denies the allegations in paragraph 205 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

206.    The precise manner in which the Board evaluated and approved Fund fees ¬including the information FMI furnished to the Board; the information that the Board considered and evaluated; and the Board's conscientiousness in reviewing proffered, relevant and/or requisite information — is a matter within Defendant's particular knowledge and exclusive control.

**ANSWER:**    FMI denies the allegations in paragraph 206 of the Complaint.

207.    The only *publicly-available* information concerning the Board's evaluation and approval is the summary of such evaluation and approval, authored by Defendant, provided each year in FMI Funds, Inc.'s semi-annual report on Form N-CSRS filed with the SEC.

119

**ANSWER:** FMI admits that the Company's semiannual reports filed with the SEC on Form N-CSRS, which speak for themselves as to the content thereof, provide a publically-available description, in reasonable detail, of the material factors and the conclusions with respect thereto that formed the bases for the Board's approval of the investment advisory fees payable by each of the FMI Funds. FMI denies that description constitutes an exhaustive recitation of the Board's process for reviewing and approving the investment advisory agreements for each of the FMI Funds. Except as so stated, FMI denies the allegations in paragraph 207 of the Complaint.

208. The most recent such summary, concerning the Board's approval on December 19, 2014, for Fund fees for 2015, and provided in FMI Funds, Inc.'s Semi Annual Report filed with the SEC on April 21, 2005 (the "Fee Approval Summary"), is reproduced below:

> On December 19, 2014 the Board of Directors of FMI Funds Inc. (the "Directors") approved the continuation of the investment advisory agreements for the FMI Common Stock Fund, the FMI Large Cap Fund, and the FMI International Fund (collectively the "Funds", or the, "Fund") with the Adviser, Fiduciary Management, Inc. (the "Adviser") Prior to approving the continuation of the investment advisory agreements, the Directors considered:
>
> - the nature, extent and quality of the services provided by the Adviser
>
> - the investment performance of each of the Funds
>
> - the cost of the services to be provided and profits to be realized by the Adviser from its relationship with the Funds
>
> - the extent to which economies of scale would be realized as each Fund grew and whether fee levels reflect any economies of scale
>
> - the expense ratios of each of the Funds
>
> - the manner in which portfolio transactions for the Funds were conducted, including the use of soft dollars
>
> In considering the nature, extent, and quality of the services provided by the Adviser, the Directors reviewed a report

describing the portfolio management, shareholder communication and servicing, prospective shareholder assistance, and regulatory compliance services provided by the Adviser to the Funds. The Directors concluded that the Adviser was providing essential services to the Funds. In particular, the Directors concluded that the Adviser was preparing reports to shareholders in addition to those required by law, and was providing services to the Funds that were in addition to the services investment advisers typically provided to non-mutual fund clients.

The Directors compared the performance of each of the Funds to benchmark indices over various periods of time and concluded that the performance of each Fund warranted the continuation of the agreements.

In concluding that the advisory fees payable by each Fund were reasonable, the Directors reviewed a report that concluded that the Adviser was reimbursing the International Fund to maintain an expense ratio of 1.00% and that the profits the Adviser realized with respect to the Common Stock Fund and Large Cap Fund expressed as a percentage of pre-tax revenues were generally comparable to that of publicly traded investment advisers. The Directors also reviewed reports comparing each Fund's expense ratio and advisory fees paid by each Fund to those of other comparable mutual funds and concluded that the advisory fee paid by each Fund and each Fund's expense ratio were within the range of comparable mutual funds. The Directors noted that the investment advisory fee for each of the Common Stock Fund, Large Cap Fund and International Fund was not adjusted if the Funds grew, but did not consider that factor to be significant because of the other factors considered.

Finally, the Directors reviewed reports discussing the manner in which portfolio transactions for the Funds were conducted, including the use of soft dollars. Based on these reports, the Directors concluded that the research obtained was beneficial and that trades were executed in a manner designed to obtain best execution.

*See* Semi-Annual Report, at pp. 38-39.

**ANSWER:**    FMI admits that the Company's Semiannual Report, which speaks for itself as to

the content thereof, includes language quoted in part in paragraph 208 of the Complaint (the "Fee

Approval Summary").

209.     As detailed below, the Fee Approval Summary was not intended to be, and is not an accurate depiction of the Board's fee evaluation and approval process, and does not reflect Defendant's or the Board's efforts to engage in a good-faith process designed to guard against taking excessive investment advisory fees. Rather, and primarily, it reflects Defendant's efforts to shield, from legal challenge under §36(b), a deficient fee approval process that was designed and operated to ensure taking excessive investment advisory fees from the Fund.

**ANSWER:**     FMI admits that the Fee Approval Summary is not and does not purport to be an

exhaustive recitation of the Board's process for reviewing and approving the investment advisory

agreements for each of the FMI Funds, but rather is a description, in reasonable detail, of the

material factors and the conclusions with respect thereto that formed the bases for the Board's

approval of the investment advisory fees payable by each of the FMI Funds. Except as so stated,

FMI denies the allegations in paragraph 209 of the Complaint.

210.     Closely examined, the Fee Approval Summary is:

      a.      self-serving hearsay;

      b.      boilerplate;

      c.      indicative of a *deficient* fee approval procedure, insofar as it indicates that the Board's approval of Fund advisory fees was based on inaccurate and/or incomplete information, and that the Board lacked adequate conscientiousness in its evaluation of such information and in reaching the conclusions stated therein, which conclusions were without adequate basis and, frequently, counterfactual.

**ANSWER:**     FMI denies the allegations in paragraph 210 of the Complaint.

211.     First, the Fee Approval Summary communicates, in the first instance, the *authorial intent* to describe an adequate fee approval process in which relevant information with respect to each applicable *Gartenberg* factor was considered, but does not indicate that such description is in fact true, and in fact indicates that such description is not true.

      a.      The very first thing that the Fee Approval Summary asserts is that the Directors, "[p]rior to approving the continuation of the investment advisory agreements," considered information concerning each of the five remaining *Gartenberg* factors, which the Fee Approval Summary lists immediately thereafter in in bullet point form (*e.g.*, the nature and quality of the services provided; the profitability to the advisor; economies of scale; comparative fees; and fall-out benefits).

      b.      However, and as detailed below, the entire remainder of the Fee Approval Summary, although purporting to provide further detail to support these initial and

conclusory bullet-point assertions, does not actually provide any concrete or particularized support:

    i.      For example, as pointed out in "Second" below (¶¶ 212-14), although the remainder of the Fee Approval Summary purports to provide specifics of the fee approval process, the remainder of the Fee Approval Summary is in fact mere *boilerplate*, repeated annually and *verbatim* in FMI Funds, Inc.'s semi-annual reports every year during the prior decade.

    ii.     Likewise, as pointed out in "Third" below (¶ 215), although the remainder of the Fee Approval Summary purports to further detail the fee approval process, such further detail remains conclusory and devoid of any particularized facts. It thus does not provide or reveal any adequate basis for the Board's fee approval.

    iii.    Lastly, as pointed out in "Fourth" below (¶¶ 216-37), the remainder of the Fee Approval Summary primarily indicates that the Board's conclusions lacked adequate basis or were counterfactual — and therefore that the Board failed to consider, and/or FMI failed to furnish, adequate, accurate and complete information relevant to fee evaluation and approval.

    c.    Consequently, the Fee Approval Summary communicates little except its author's attempt to fashion a description of the Board's fee approval process that depicts such process to have fully complied with *Gartenberg*.

**<u>ANSWER</u>:**    FMI admits that the Fee Approval Summary, which speaks for itself as to the content thereof, includes language quoted in part in paragraph 211(a) of the Complaint. FMI further adopts and incorporates its answers to paragraphs 207 and 212 through 237 of the Complaint as if fully set forth herein. Except as so stated, FMI denies the allegations in paragraph 211 of the Complaint.

212.    Second, although the Fee Approval Summary, after asserting in declaratory bullet points the Board's purported consideration of information relating to each *Gartenberg* factor, purports to proffer more specific factual information concerning the information the Board reviewed, the remainder of the Fee Approval Summary is in fact mere boilerplate. Exactly the same description is repeated annually, and effectively verbatim, in FMI Funds Inc.'s semi-annual reports during the last decade. *See e.g.* FMI Funds, Inc. semi-annual reports on Form N-CSRS, filed with the SEC:

    a.    on April 16, 2014, at p. 36;

    b.    on April 30, 2013, at p. 19;

    c.    on May 3, 2012, at p. 14;

d.      on May 16, 2011, at p. 15;

e.      on May 12, 2010, at p. 15;

f.      on May 5, 2009, at p. 15;

g.      on April 29, 2008, at p. 14;

h.      on May 18, 2007, at p. 11;

i.      on May 16, 2006 (no page numbers provided in document).

**ANSWER:**      FMI admits FMI Funds, Inc.'s Semiannual Reports on Form N-CSRS filed with the SEC on or about April 16, 2014, April 30, 2013, May 3, 2012, May 16, 2011, May 12, 2010, May 5, 2009, April 29, 2008, May 18, 2007, and May 10, 2006, which speak for themselves as to the content thereof, include descriptions, in reasonable detail, of the material factors and the conclusions with respect thereto that formed the bases for the Board's approval of the investment advisory fees payable by each of the FMI Funds. FMI denies that the descriptions contained in those semiannual reports are or purport to be an exhaustive recitation of the Board's process for reviewing and approving the investment advisory agreements. Except as so stated, FMI denies the allegations in paragraph 212 of the Complaint.

213.    That a word-for-word identical Fee Approval Summary is provided in each semi¬annual report during the last decade is, at a minimum, a substantial indication that the Fee Approval Summary is *not* a particularized description of the Board's actual fee evaluation and approval process (unless such process is little more than a rubber-stamping), but rather a standard and wholly general form of disclosure used by Defendant year after year after year.

**ANSWER:**      FMI denies the allegations in paragraph 213 of the Complaint.

214.    Moreover, the very few and very minor differences in Fee Approval Summary wording during the prior decade only further support Plaintiff's claims. For example:

a.      **Profitability**. In the 2007 semi-annual report, FMI's profits from the Fund were described as "*small*" and "generally *less* than that of publicly traded investment advisers. (emphasis added). In all years subsequent to 2007, the Fee Approval Summaries *ceased* to include descriptions of FMI's profits as small — indicating that they were no longer small. Likewise, although the Fee Approval Summaries in 2008 and 2009 continued to assert that FMI's profits were "generally *less* than that of publicly traded investment advisers," (emphasis added), beginning in 2010

124

this description was altered by one words, so that it stated thereafter, and until the present, that FMI's profits are "generally *comparable* to that of publicly traded investment advisers." (emphasis added). Consequently, these wording changes indicate, consistent with the allegations here, that as the Fund's net assets grew significantly and generated substantial advisory fee growth for FMI, FMI reaped ever-more-sizeable profits due to economies of scale in its provision of advisory services to the Fund.

    b.    **Economies of Scale**. Similarly and relatedly, in the 2007 and 2008 semi-annual reports, the Fund noted that although "the investment advisory fee was not adjusted if economies of scale were realized as the Fund grew" (*i.e.*, the Fund's fee rates did not include any breakpoints), the Directors "did not consider that factor to be significant" (1) "in light of the other factors considered" and also (2) "based on the Fund's expected growth over the next year, was unlikely to realize economies of scale." Beginning in 2009 and continuing until the present day, the latter justification — *i.e.*, that the Fund's expected growth was not likely to generate economies of scale — was omitted from the Fee Approval Summary. This wording change is tacit indication that, consistent with Plaintiff's allegations, the Fund's expected growth was likely to generate economies of scale — which makes FMI's failure to share the resulting benefits through fee breakpoints all the more improper.

**ANSWER:**    FMI admits that the Fund's semiannual reports dated March 31, 2007, March 31, 2008, March 31, 2009 and March 31, 2010, which speak for themselves as to the content thereof, memorialize the Board's consideration of information regarding the profitability to FMI of the IAA and the extent to which the growth of total AUM in the Fund yielded any economies of scale in evaluating and approving the investment advisory fees payable by the Fund. Except as so stated, FMI denies the allegations in paragraph 214 of the Complaint.

215.    Third, while the Fee Approval Summary purports to further detail the fee approval process and the information the Board considered with respect to each *Gartenberg* factor, such further detail itself remains conclusory and devoid of any particularized facts, and thus fails to establish or communicate any adequate basis for the Board's fee approval.

    a.    For example, although the Fee Approval Summary asserted that FMI "was providing services to the Fund[] that were in addition to the services investment advisers typically provided to non-mutual fund clients" (which would purportedly mean that fee comparisons to non-mutual fund clients would be inapt, apples to oranges comparisons), the Fee Approval Summary *nowhere indicates a single such additional service provided to the Fund*. Indeed, and as further discussed in "Fourth" below, detailed factual allegations concerning the services FMI provided the Fund and arm's-length institutional clients suggest that the services provided

were substantially identical — exactly the opposite of the information provided to the Board.

    b.    Likewise, although the Fee Approval Summary asserts in declaratory fashion that the Board reviewed "the profits FMI realized with respect to the [] Fund" and found that FMI's profit margins "were generally comparable to that of publicly traded investment advisers," the Fee Approval Summary nowhere indicates: (a) how FMI's Fund-specific profits were calculated (specifically, how FMI's costs were allocated among its captive and non-captive clients);[16] (b) what FMI's Fund-specific profits actually were; or (c) the identities of the particular "publicly traded investment advisers" whose profit margins were purportedly "comparable." Indeed, the term "comparable" is so potentially broad to be nearly meaningless (any two items are "comparable'), and the Fee Approval Summary nowhere indicates the particular nature in which FMI's and other advisors' profits are comparable.

    c.    Similarly, the Fee Approval Summary also asserts that Fund fees were compared "to those of comparable mutual funds" and that on the basis of such comparison the Board concluded that the Fund's advisory fee was "within the range of comparable mutual funds " But the Fee Approval Summary never identifies the particular mutual funds deemed "comparable" and used for comparison, or the advisory fees charged to such mutual funds, or, for that matter, the precise manner in which the Fund's advisory fee was "within the range." Indeed, and as further discussed in "Fourth" below as well, the systematic mutual fund comparison conducted here likewise could be described as showing that the Fund's fees were "within the range" charged to comparable mutual funds — notwithstanding that, more precisely, that comparison shows that the Fund's fees are near the very *top* of such range.

**ANSWER:**    FMI admits that the Fee Approval Summary, which speaks for itself as to the content thereof, memorializes the Board's consideration of, among other things, information regarding the nature and extent of services provided by FMI to the Fund, FMI's profit margins relating to the Fund, and the fees paid by comparable mutual funds for investment advisory services in evaluating and approving the investment advisory fees payable by the Fund.  Except as so stated, FMI denies the allegations in paragraph 215 of the Complaint, and specifically

---

[16] Specifically, such purported profit calculations allocate costs pro-rata by client AUM: so that, for example, the Fund, which makes up 45% of FMI's total AUM, would be allocated the same percentage of its total costs. But this cost allocation method is artificial, violates economy of scale principles, and does not reflect how FMI actually incurs costs. For example, and as discussed above, detailed facts here indicate that FMI's costs to advise the Fund were far lower, on a dollar for dollar basis, than its costs to advise its other two captive funds (which, among other things, invested in more diverse and complex portfolios than did the Fund). *See* ¶¶ 178-79.

denies that the Fee Approval Summary is or purports to be an exhaustive recitation of the Board's process for reviewing and approving the IAA for each of the FMI Funds and that the FMI Funds are "captive" to FMI.

216.    Fourth and lastly, the Fee Approval Summary affirmatively indicates that the Board failed to consider, and/or FMI failed to furnish, adequate, accurate and complete information relevant to fee evaluation and approval, and/or that the Board lacked adequate conscientiousness in evaluating the information it did and in approving the Fund's advisory fees.

**ANSWER:**    FMI denies the allegations in paragraph 216 of the Complaint.

217.    Such indications arise where the Board's evaluation and/or conclusions, as described in the Fee Approval Summary, appear to be without factual basis, flawed, or even counterfactual. For example:

**ANSWER:**    FMI denies the allegations in paragraph 217 of the Complaint.

218.    **Fee Comparisons**. Although the Fee Approval Summary asserts that Board considered certain information comparing Fund advisory fees with advisory fees paid by others for comparable services, it also indicates that the fee comparison information reviewed by the Board was materially inaccurate and incomplete, and that the Board's evaluation and conclusions with respect to comparative fees were without adequate basis, flawed and in fact counterfactual.

**ANSWER:**    FMI admits that the Fee Approval Summary memorializes the Board's consideration of information comparing the advisory fees paid by the Fund to those paid by other comparable mutual funds.  Except as so stated, FMI denies the allegations in paragraph 218 of the Complaint, and specifically denies that the information reviewed by the Board was inaccurate or incomplete and that the Board's review and approval of the investment advisory agreement for the Fund was counterfactual, without adequate basis or foundation or based on flawed, misleading or inaccurate information.

219.    Specifically, the Board, having "reviewed a report" describing the services provided by FMI to the Fund, and having consequently concluded that such services exceeded "the services investment advisers typically provided to non-mutual fund clients," failed to conduct any analysis of the advisory fees paid by non-mutual fund clients to investment advisers (and more particularly, to the fees paid by FMI's institutional clients to FMI), and instead based its fee comparison evaluation solely and entirely on comparison to the fees paid by unidentified "other comparable mutual funds," on which basis the Board concluded that the Fund's fees were "within the range of comparable mutual funds."

**ANSWER:**    FMI denies the allegations in paragraph 219 of the Complaint.

220.    The Board's conclusion, and the entire above-described process of consideration and evaluation that led to it, suffers from the following and substantial flaws.

    a.    First, the report on which the Board relied overstated the investment advisory services provided to the Fund by FMI. For example, the report described "prospective shareholder assistance and regulatory compliance services provided by FMI to the Funds:"

        i.    However, as the Fund has been closed to new investors since June 30, 2013, FMI has not provided any "prospective shareholder assistance" for at least two years, as there are no longer any prospective shareholders.

        ii.    Moreover, even were there prospective shareholders to assist, the entity that would provide them with assistance would *not* be FMI, but rather USBFS, as USBFS' contractual duties, and the Fund's own SEC filings, make clear. *See* Section V.C, *supra*.

        iii.    Additionally, notwithstanding the report's assertion that FMI provides the Fund with regulatory compliance services, the Fund's own documents make clear: (a) that the Fund *separately* compensates FMI for certain regulatory compliance services that FMI provides (*i.e.*, FMI's captive funds pay the salary and expenses of FMI's chief compliance officer — *see* ¶ 53, *supra*); and (b) that *other* service providers, including USBFS and legal counsel, provide the bulk of the Fund's requisite regulatory compliance services (*see* Section V.C, *supra*).

    b.    Second, the report does not appear to have included any analysis of "the services investment advisers typically provided to non-mutual fund clients," let alone the investment advisory services that FMI provided to its arm's-length, non-captive clients, and hence provides no basis for the Board's conclusion that the services provided by FMI to the Fund exceed — and hence, are not comparable to — the services provided to non-fund clients.

    c.    Third, because the Board's conclusion that the services provided to the Fund differed from and exceeded those provided to non-fund clients was without basis, the Board's failure to consider fee comparisons relating to the investment advisory fees paid by such non-fund clients was, in equal measure, without basis.

    d.    Fourth, the Board's conclusion was not merely without basis, but appears — in light of particularized and extensive factual allegations herein concerning the services FMI provided to arm's-length, non-captive fund clients — to be counterfactual. In fact, and as detailed above at Section VI.B.1, *supra*, the services that FMI provided to arm's-length, non-captive fund clients were substantially identical to those FMI provided to the Fund.

e.   Fifth, the remaining and sole basis for the Board's conclusion that Fund fees were comparatively reasonable — namely, that they were "within the range" of the advisory fees paid by "comparable mutual funds" — lacks adequate foundation, and appears premised on incomplete and/or misleading information. As detailed above at Section VI.B.2, *supra*, a *systematic* comparison to all comparable mutual funds (*i.e.*, all funds sharing similar investment foci and portfolio size) reveals that Fund fees were not merely "within the range" of advisory fees paid by similar funds, but rather and more precisely, were near the very top of that range.

**ANSWER:**   FMI denies the allegations in paragraph 220 of the Complaint, and specifically denies that the information reviewed by the Board was inaccurate or incomplete, that the Board's review and approval of the IAA for the Fund was counterfactual, flawed, without adequate basis or foundation or based on misleading or inaccurate information, and that the FMI Funds are "captive" to FMI.

221.   In sum, the Fee Approval Summary indicates that the Board displayed inadequate conscientiousness in its evaluation of, and conclusions respecting, comparative fees, by uncritically accepting the incomplete, inaccurate and/or biased information with which it was presented concerning the services provided to non-fund clients and the fees paid by other comparable mutual funds, and by failing to obtain accurate, unbiased and/or complete information with respect to these matters.

**ANSWER:**   FMI denies the allegations in paragraph 221 of the Complaint.

222.   **Nature and Quality of Services**. Although the Fee Approval Summary asserts that Board considered certain information concerning the nature and quality of the services provided by FMI to the Fund, it also indicates that information reviewed by the Board was materially inaccurate, and that the Board's evaluation and conclusions with respect to this matter were flawed and counterfactual.

**ANSWER:**   FMI admits that the Fee Approval Summary, which speaks for itself as to the content thereof, memorializes the fact that the Board considered the nature and quality of the services provided by FMI to the Fund.  Except as so stated, FMI denies the allegations in paragraph 222 of the Complaint, and specifically denies that the information reviewed by the Board was materially inaccurate and that the Board's evaluation and approval of the advisory fees payable by the Fund was flawed or counterfactual.

223.    Specifically, the Board, "[i]n considering the nature, extent and quality of the services provided by FMI, [] reviewed a report describing the portfolio management, shareholder communication and servicing, prospective shareholder assistance and regulatory compliance services provided by FMI to the Funds," and concluded: (a) that "FMI was providing essential services to the Funds;" (b) that "[i]n particular, [] FIE was preparing reports to shareholders in addition to those required by law;" and (c) that FMI "was providing services to the Funds that were in addition to the services investment advisers typically provided to non-mutual fund clients."

**ANSWER:**    FMI admits that the Fee Approval Summary, which speaks for itself as to the content thereof, includes language quoted in part in paragraph 223 of the Complaint. FMI denies that the Fee Approval Summary is or purports to be an exhaustive recitation of the Board's process for reviewing and evaluating the investment advisory agreements for the FMI Funds. Except as so stated, FMI denies the allegations in paragraph 223 of the Complaint.

224.    However, the Board's conclusions with respect to FMI's services, and the above-described information on which they were based, suffer from the following and substantial flaws.

    a.    First, and as already partially indicated immediately above (*see* ¶ 220, *supra*), the report provided to the Board — and upon which the Board based its conclusions concerning FMI's services — inflated the services actually provided by FMI to the Fund, and was therefore substantially misleading.

        i.    For example, as already indicated immediately above, the reports assertions concerning the "prospective shareholder assistance and regulatory compliance services provided by FMI to the Funds" were misleading and/or counterfactual, as the Fund required no "prospective shareholder assistance" services at all (and even it if did, such services would be provided by the Fund's transfer agent, not FMI), and as " regulatory compliance services" were in largest part provided by entities other than FMI (*i.e.*, the Fund's transfer agent and legal counsel), and to the extent provided by FMI, FMI was *separately* compensated by the Fund for such services. *See* ¶ 220(a), *supra*.

        ii.    Likewise, notwithstanding the report's assertion that FMI provided "shareholder [] servicing" services to the Fund, in reality such shareholder servicing was provided by the UBFS [*sic.*], not FMI, as detailed at length in Section V.C, supra.

    b.    Second, consequently, the only services described in the report that FMI actually provided to the Fund were: (1) "portfolio management" (*i.e.*, Portfolio Selection Services; and (2) "shareholder communication" (*i.e.*, Other Services). However, while these were "essential services," the Board's conclusions with respect to

these services inflated the quality and amount of the services FMI provided, and were counterfactual.

i.     For example, as already indicated immediately above (*see* 220, *supra*), the Board's conclusion that FMI "was providing services to the Funds that were in addition to the services investment advisers typically provided to non-mutual fund clients," was without basis and counterfactual, as the services FMI provided to its arm's-length, non captive clients were substantially identical to the services it provided to the Fund.

ii.    Similarly, while the Board was correct in concluding that the shareholder communications that FMI provided to the Fund exceeded "those required by law," the excess was not great (quarterly rather bi-annual reporting of performance), and may have been a mere artifact of the *greater* shareholder communication requirements demanded by FMI's arm's-length clients (quarterly reporting). Because FMI's arm's-length clients and FMI's captive fund clients received identical Portfolio Selection Services, the quarterly reports provided to arm's-length clients could easily be reproduced and provided to FMI's captive funds, including the Funds. Indeed, the quarterly reports provided to these two sets of clients were substantially identical. *See* ¶¶ 93-95, *supra*.

**ANSWER:**    FMI admits that it provided quarterly reports to Fund shareholders and to other clients invested in FMI's Large Cap Equity strategy, which speak for themselves as to the content thereof.  Except as so stated, FMI denies the allegations in paragraph 224 of the Complaint, and specifically denies that the information reviewed by the Board was inaccurate or incomplete, that the Board's review and approval of the IAA for the Fund was flawed, without adequate basis or foundation or based on misleading or inaccurate information, and that the FMI Funds are "captive" to FMI.

225.    In sum, the Fee Approval Summary indicates that the Board displayed inadequate conscientiousness in its evaluation of, and conclusions respecting, the nature, extent and quality of FMI's services, by uncritically accepting the inaccurate and/or biased information with which it was presented concerning the services purportedly provided to the Fund by FMI, and by failing to obtain accurate, unbiased and/or complete information with respect to FMI's provision of services to the Fund and to FMI's arm's-length clients.

**ANSWER:**    FMI denies the allegations in paragraph 225 of the Complaint.

226.    **Profitability**. Although the Fee Approval Summary asserts that Board considered certain information indicating that FMI's profit margins, purportedly from its investment advisory

operations relating to the Fund, were in line with those disclosed by publicly-traded investment advisors, it also indicates that the profitability information reviewed by the Board was materially inaccurate and incomplete, and that the Board's evaluation and conclusion with respect to profitability were without adequate basis, flawed and/or counterfactual.

**ANSWER:**   FMI admits that the Fee Approval Summary, which speaks for itself as to the content thereof, memorializes the Board's review of FMI's profit margins relating to the Fund and the Board's determination that FMI's profit margins relating to the Fund were in line with those disclosed by publicly-traded investment advisers.  Except as so stated, FMI denies the allegations in paragraph 226 of the Complaint.

227.   Specifically, "[i]n concluding that the advisory fees payable by [the] Fund were reasonable," the Board "reviewed a report" purporting to indicate "that the profits FMI realized with respect to the Common Stock Fund and Large Cap Fund expressed as a percentage of revenues were generally comparable to that of publicly traded investment advisers."

**ANSWER:**   FMI admits that the Fee Approval Summary, which speaks for itself as to the content thereof, includes language quoted in part in paragraph 227 of the Complaint.  FMI denies that the Fee Approval Summary is or purports to be an exhaustive recitation of the Board's process for reviewing and approving the investment advisory agreements for the FMI Funds. Except as so stated, FMI denies the allegations in paragraph 227 of the Complaint.

228.   However, the Board's conclusion concerning FMI's profitability, and the above-described information on which it was based, suffer from the following and substantial flaws:

   a.   First, as detailed above at ¶ 214(a), the profitability discussions in the Fund's annual Fee Approval Summaries have undergone minute, but highly telling, alterations over the course of the prior decade: prior references to FMI's "small" profits have been omitted; and prior assertions that FMI's profit margins are "generally *less* than that of publicly traded investment advisers" (emphasis added) have been changed to "generally *comparable* to that of publicly traded investment advisers" (emphasis added). These changes indicate that FMI's profits are no longer small (*i.e.*, they are large), and no longer less than those of other investment advisers (*i.e.*, more than other investment advisers).

   b.   Second, the profitability comparison described in the Fee Approval Summary is, at a minimum, imprecise throughout — at both ends (*i.e.*, FMI's profitability and the profitability of unidentified publicly traded investment advisers) as well as in

132

the middle (the vague assertion that the levels of profitability are "comparable") — and, at a maximum, misleading and/or counterfactual.

i.     For example, the conclusion that FMI's profit margins and those of other investment advisors are "comparable" is so vague as to be meaningless: any one thing is equally "comparable" to any other (no matter whether the first is smaller than, equal to, or larger than the second). The only matter that is certain, given the changing profitability language described above, is that FMI's profits, while "comparable" to those of other investment advisors, are more precisely not "less than" those of investment advisors.

ii.    Similarly, and as detailed above in ¶ 220(e), *supra*, given the usage elsewhere in the Fee Approval Summary of neutral and vague terminology to mask particularly-lopsided realities (particularly, describing Fund advisory fees to be "within the range" charged to comparable mutual funds, notwithstanding that systematic analysis of all comparable mutual funds indicates more precisely that Fund advisory fees are located near the *very top* of such range), the usage of the term "comparable" here likely operates in similar fashion to hide the more precise reality that FMI's profits from the Fund are significantly *higher* than those enjoyed on average by other investment advisors.

iii.    Furthermore, the publicly-disclosed financial statements of publicly-traded investment managers provide insight only as to such managers' *overall* profitability from all of their operations. Such managers do not disclose any fund-specific measures of profitability (*i.e.*, the profits they derive from advising particular mutual funds). Consequently, the only comparison possible is to such advisors' *overall* profit margins.

iv.    Relatedly, the Fee Approval Summary does not make clear whether such overall profit margins of other investment advisors are being compared to either (1) FMI's overall profit margins, or (2) FMI's Fund-specific profit margins ¬and, if the latter, how FMI's costs are allocated among its captive funds and other clients. To the extent the comparison is apples to apples and relates to FMI's overall profit margins, such comparison is irrelevant and/or misleading, given above-detailed indications that FMI's *Fund-specific profit margins* are much higher than its overall profit margins. And even if the comparison is to FMI's Fund-specific profit margins, the comparison may still be misleading, depending on the (undisclosed) manner in which FMI's advisory costs were allocated (*see e.g. ¶* 215(b) n. 16, *supra*).

**ANSWER:**    FMI admits that the Fee Approval Summary, which speaks for itself as to the content thereof, describes, in reasonable detail, the material factors and the conclusions with respect thereto that formed the bases for the Board's approval of the investment advisory fees

payable by each of the FMI Funds, and that the Fee Approval Summary in the Semiannual Report varies in content from the fee approval summaries contained in prior years' semiannual reports. FMI denies that the Fee Approval Summary is or purports to be an exhaustive recitation of the Board's process for reviewing and approving the investment advisory agreements for the FMI Funds. Except as so stated, FMI denies the allegations in paragraph 228 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

229.    In sum, the Fee Approval Summary in no way indicates that the Board, during the course of evaluating and approving the Fund's advisory fee, exhibited adequate conscientiousness by reviewing relevant, complete and/or accurate information concerning FMI's Fund-specific profitability. Indeed, given (1) the detailed allegations herein (Section VI.E, *supra*) indicating that FMI's Fund-specific profitability was higher than FMI's overall profitability and higher than the Fund's share of FMI's revenues (which, at 45.5%, was itself quite high), and (2) the absence of such specificity in the Fee Approval Summary, the Fee Approval Summary, if anything, indicates that the Board displayed inadequate conscientiousness in its evaluation of, and conclusions respecting, FMI's profitability, relied on inaccurate or misleading information concerning FMI's profits and profit margins, as well as those of unidentified "publicly traded investment managers, and/or failed to obtain accurate and objective information with respect to these matters.

**ANSWER**:    FMI admits that the Fee Approval Summary is not and does not purport to be an exhaustive recitation of the Board's process for reviewing and approving the investment advisory agreement for the Fund. Except as so stated, FMI denies the allegations in paragraph 229 of the Complaint.

230.    **Fallout Benefits**. The Fee Approval Summary contains representations purporting to indicate that [*sic.*] Board considered information concerning fall out benefits enjoyed by FMI as a result of its relationship with the Fund, but these very representations indicate that information reviewed by the Board was materially incomplete, and that the Board's evaluation and conclusions with respect to this matter were flawed and lacked adequate basis.

**ANSWER**:    FMI admits that the Fee Approval Summary, which speaks for itself as to the content thereof, memorializes the Board's consideration of information concerning fall out benefits experienced by FMI as a result of its relationship with the Fund in reviewing and approving the investment advisory agreement for the Fund. Except as so stated, FMI denies the

allegations in paragraph 230 of the Complaint, and specifically denies that the information reviewed by the Board was inaccurate or incomplete and that the Board's review and approval of the IAA for the Fund was counterfactual, flawed, without adequate basis or foundation or based on misleading or inaccurate information.

231.    Specifically, in reviewing and approving the Fund's fees, the Board "reviewed reports discussing the manner in which portfolio transactions for the Funds were conducted, including the use of soft dollars," and concluded that the benefits FMI obtained through such soft dollar payments also benefited the Fund.

**ANSWER:**    FMI admits that the Fee Approval Summary, which speaks for itself as to the content thereof, memorializes the Board's consideration of reports discussing the manner in which portfolio transactions were conducted and the use of soft dollars in reviewing and approving the IAA for the Fund.  FMI admits further that the Fee Approval Summary includes language quoted in part in paragraph 231 of the Complaint.  FMI denies that the Fee Approval Summary is or purports to be an exhaustive recitation of the Board's process for reviewing and approving the investment advisory agreement for the Fund.  Except as so stated, FMI denies the allegations in paragraph 231 of the Complaint.

232.    Soft dollar arrangements have frequently been identified as fall-out benefits that accrue to investment advisors by virtue of their relationship to the mutual funds they advise. The term "soft dollars" refers to a practice in the mutual fund industry where a fund's investment advisor, in order to obtain research from broker-dealers that the investment advisor would otherwise have to pay for out of its own pocket (with "hard" dollars), instead obtains such research by agreeing to direct certain amounts of mutual fund portfolio transactions for completion through the broker-dealer, thus providing the broker-dealer with a stream of commissions expensed to the mutual fund. The adviser thus obtains the research it wishes, while the mutual fund pays for such research (expensed to fund shareholders).

**ANSWER:**    Paragraph 232 of the Complaint alleges legal conclusions, to which no answer is required.  To the extent that an answer may be required, FMI admits that the term "soft dollars" may be used to refer to the benefits provided to an investment adviser by a broker-dealer, such as investment research, as a result of commissions generated by the broker-dealer on financial

transactions executed by the broker-dealer for client accounts or funds managed by the investment adviser. FMI admits further that courts may consider soft dollar arrangements to be fall-out benefits accruing to an investment adviser by virtue of the adviser's relationship to a fund. Except as so stated, FMI denies the allegations in paragraph 232 of the Complaint.

233.    However, the Board's conclusion with respect to FMI's fall-out benefits, and the above-described information on which it was based, relates solely to the matter of soft dollar arrangements.

**ANSWER**:    FMI denies the allegations in paragraph 233 of the Complaint.

234.    Here, however, detailed allegations indicate the existence of *further and much more substantial fall-out benefits*: namely, FMI's advisory stream of as much as $42.3 [*sic.*] per year derived from providing copies of the Fund's portfolio to arm's-length, non-captive clients. *See* ¶¶ 174-86 and Table 14, *supra*. The Fee Approval Summary contains no indication that the Board considered such fall-out benefits. To the contrary, their absence from the Fee Approval Summary, coupled with the presence of the far more inconsequential soft-dollar arrangements, is strong indication that the Board failed to consider the fall-out benefits identified here, and consequently that the Board's evaluation and conclusions with respect to fall-out benefits lacked adequate basis.

**ANSWER**:    FMI denies the allegations in paragraph 234 of the Complaint, and specifically denies that investment advisory fees derived by FMI from other clients invested in the Large Cap Equity strategy constitute fallout benefits attributable to FMI's relationship with the Fund and that and specifically denies that the FMI Funds are "captive" to FMI.

235.    **Economies of Scale**. Although the Fee Approval Summary asserts that Board considered information concerning FMI's realization of economies of scale as the Fund grew, and whether advisory fee levels reflected such economies, it also indicates that the information reviewed by the Board was incomplete, and that the Board lacked adequate conscientiousness in its evaluation and conclusions with respect to these matters.

**ANSWER**:    FMI admits that the Fee Approval Summary, which speaks for itself as to the content thereof, memorializes the Board's consideration of information concerning the potential for realizing economies of scale as the Fund grew. Except as so stated, FMI denies the allegations in paragraph 235 of the Complaint.

136

236.    Specifically, in approving FMI's advisory fees and "concluding that the advisory fees payable by [the] Fund were reasonable," the Board: (a) "considered ... the extent to which economies of scale would be realized as each Fund grew and whether fee levels reflect any economies of scale;" and (13) "also noted" that while FMI's advisory fee rates for the Fund (and FMI's other captive funds) did not feature any breakpoints ("the investment advisory fee for each of the Funds was not adjusted if the Funds grew"), the Board "did not consider that factor [*i.e.*, the absence of breakpoints] to be significant because of the other factors considered."

**ANSWER:**    FMI admits that the Fee Approval Summary, which speaks for itself as to the content thereof, memorializes the Board's consideration of information concerning the potential for realizing economies of scale as the Fund grew.  FMI admits further that the Fee Approval Summary includes language quoted in part in paragraph 236 of the Complaint.  Except as so stated, FMI denies the allegations in paragraph 236 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

237.    However, the Board's conclusions with respect to FMI's economies of scale in providing the Fund with advisory services and to whether FMI's advisory fees reflected such economies, and the above-described information on which they were based, suffer from the following and substantial flaws.

   a.    First, although the Fee Approval Summary does not indicate any actual information or data reviewed by the Board concerning matters related to FMI's economies of scale in providing the Fund with advisory services, close examination suggests that it concedes the existence of such economies.

      i.    For example, and as detailed above at ¶ 214(13), whereas in certain prior years (for example, 2007 and 2008) the Fee Approval Summaries contained explicit assertions that economies of scale were *not* generated, such explicit assertions were thereafter excised from all subsequent Fee Approval Summaries even as all other language remained identical (*i.e.*, from 2009 until the present day). This particular and minute change in the Fee Approval Summary's wording over time is tacit, but strong, indication that economies of scale *do* exist.

      ii.    Similarly, the current language and logic of the Fee Approval Summary likewise contains an embedded, and tacit, concession that such economies exist. Specifically, although the Board "noted" that the FMI's captive fund advisory fee rates featured no breakpoints (which reduce rates as fund size grows to reflect economy of scale benefits), the Board concluded the absence of breakpoints was not "significant" in light of "the other factors considered." (*i.e.*, in the Board's purported estimation, FMI's fees, even without breakpoints, appeared reasonable from the perspective of fee

comparisons, the nature and quality of the services provided, FMI's profitability and fall-out benefits). If economies of scale did not exist, the absence of breakpoints would not need justification by "other factors," but would be justified in and of itself: the absence of breakpoints would be reasonable in light of the absence of economies of scale. *A fortiori*, the fact that justification of the absence of breakpoints relied on such "other factors" indicates *that it was not justifiable on its own terms: i.e.*, that economies of scale did in fact exist.

b.    Second, the Fee Approval Summary's wholly conclusory assertion that the Board reviewed information relating to economies of scale provides no indication of any actual information the Board reviewed, let alone whether such information was accurate, complete and/or provided the Board with a sufficient basis to make a determination concerning FMI's advisory fees in light of FMI's economies of scale.

c.    Third, the substantial and particularized factual allegations here indicate: (1) that such information was inaccurate, incomplete or otherwise insufficient for the Board to make an adequate evaluation of FMI's fees in light of FMI's economies of scale; and/or (2) that the Board failed to apply adequate conscientiousness in its consideration of the these matters.

   i.    As detailed above, particularized factual allegations indicate that the FMI enjoyed tremendous economies of scale in providing the Fund with advisory services: as the Fund grew more than 100-fold in size, from less than $100 million to over $9 billion, the services provided, and the cost to FMI to provide such services, barely grew. *See* Section VI.C.2, *supra*.

   ii.   If the Board did not consider this information (because FMI failed to furnish it, and/or the Board failed to request it), the Board's consideration and conclusions lack adequate basis.

   iii.  If the Board did consider this information, the Board's consideration lacked adequate conscientiousness, in light of the fact that the Board found FMI's advisory fee rates, which featured no breakpoints whatsoever, reasonable notwithstanding such economies.

d.    Fourth and finally, the sole justification provided by the Board for approving FMI's advisory fees — notwithstanding the Board's explicit recognition that that the fees featured no breakpoints, and tacit recognition that economies of scale were present — was that, purportedly, the Board's consideration of "the other factors" indicated to the Board that FMI's advisory fees were reasonable. However, as detailed immediately above, the Board's evaluations and conclusions with respect to each of these other factors was itself substantially flawed, and did not constitute an adequate basis for the Board's conclusion here. *See* ¶¶ 218-34, *supra*.

138

**ANSWER:** FMI admits that the Fee Approval Summary, which speaks for itself as to the content thereof, memorializes various aspects of the Board's process for reviewing and approving the investment advisory agreement for the Fund. FMI admits that the Fee Approval Summary in the Semiannual Report varies from the fee approval summaries contained in prior years' semiannual reports. FMI admits that the Fee Approval Summary is not and does not purport to be an exhaustive recitation of the Board's process for reviewing and approving the investment advisory agreement for the Fund. FMI admits that the total AUM of the Fund currently exceeds $9 billion, and that roughly one decade ago, the total AUM of the Fund was less than $100 million. Except as so stated, FMI denies the allegations in paragraph 237 of the Complaint, and specifically denies that the information reviewed by the Board was inaccurate, incomplete or otherwise insufficient, that the Board's evaluation and approval of the advisory fees payable by the Fund lacked adequate conscientiousness or was without adequate basis or flawed, and that the Fund is "captive" to FMI.

238. None of the above-detailed information relevant to evaluation of advisory fees is particularly new, or confronted the Board with new facts.

    a.    FMI's advisory fee rates have stayed exactly the same, at a flat 0.75% levied against all Fund assets, and without any breakpoints, since 2005, as have the nature of the advisory services that FMI has provided.

    b.    As Fund assets rose to above $500 million in 2007, above $1 billion in 2008, $2 billion in 2009, $3 billion in 2010, $4 billion in 2011, etc., economies of scale have long been present — and, given FMI's constant and breakpoint-free fee schedule, monopolized by FMI. These, in turn, caused FMI's profitability, both from Fund-related operations specifically and overall, to boom.

    c.    Similarly, the fall-out benefits alleged here -- arising from FMI's provision to arm's-length clients, at discounted fee rates, of copies of the Fund and of the advisory services developed and paid for by the Fund — began to be realized as soon as the Fund was first formed. Between 2005 and 2008, the total sum of such

copies grew from approximately $100 million to $800 million, and reached $1.8 billion by 2009, $2.16 billion by 2010, $4.4 billion by 2011, etc. [17]

**ANSWER**: FMI admits that the investment advisory fee rate payable by the Fund has been .75% of assets under management since the IAA was amended in October 2004 to reduce the fee rate from 1.0% of assets under management. FMI admits that Fund assets exceeded $500 million in 2007, $1 billion in 2008, $2 billion in 2009, $3 billion in 2010 and $4 billion in 2011. Except as so stated, FMI denies the allegations in paragraph 238 of the Complaint and specifically denies that fees it received from other clients invested in FMI's Large Cap Equity strategy constitute fall-out benefits arising from FMI's relationship with the Fund.

239. Notwithstanding the long and continuing existence of the above facts and factors, the Board has continued to approve the advisory fees proposed by FMI, not just in in December 2014, but in prior years as well, when the same facts and factors were present. Indeed, as detailed above (*see* ¶¶ 212-14, *supra*), the Fee Approval Summaries describing the Board's consideration and conclusions with respect to these factors have been, each year during the prior decade, word-for-word identical to each other.

**ANSWER**: FMI admits that the terms of the IAA were and have in prior years been approved after due consideration by the vote of a majority of the Directors who are not interested persons of FMI, as well as by the full Board. Answering further, FMI adopts and incorporates its answers to paragraphs 212-214 of the Complaint as if fully set forth herein. Except as so stated, FMI denies the allegations in paragraph 239 of the Complaint.

240. Consequently, there is no indication that the Board has taken any action, either in the most recent fiscal year or in any of the preceding ones, to reject the advisory fees proposed by FMI, or to act in any way to reduce or alter such investment advisory fees.

**ANSWER**: FMI denies the allegations in paragraph 240 of the Complaint.

---

[17] These figures are derived from yearly comparison of (1) the total assets under FMI management invested in FMI's Large Cap Equity investment strategy; and (2) the Fund's total assets. As the Fund was part of the assets so managed (indeed, generally, the single largest part), the difference between the two represents the total value of portfolios identical to the Fund's that FMI provided to arm's-length clients.

241.    In effect, therefore, FMI has itself determined the investment advisory fees to which the Fund is subject, by proposing fees each year which the Board, in effect, has rubber-stamped with its own approval.

**ANSWER:**    FMI denies the allegations in paragraph 241 of the Complaint.

242.    There is no indication that the Board did anything other than rubber-stamp the investment advisory fees that FMI proposed. There is no indication that the Board ever rejected advisory fees proposed by FMI, or negotiated for or demanded lower advisory fees, or negotiated a "most favored nation" provision into the IAA (which would require that the fee rate paid by the Fund be at least as favorable as the lowest rate other clients pay for the same or substantially the same investment advisory services).

**ANSWER:**    FMI denies the allegations in paragraph 242 of the Complaint.

243.    In all the above respects, the Board's "captive" behavior with respect to FMI differs diametrically from the behavior exhibited by FMI's non-captive, arm's-length clients.

   a.    First, as both a "standard" matter and with respect to each of the particular arm's-length FMI clients identified herein, FMI's arm's-length clients for FMI's Large Cap Equity investment advisory services received substantially identical services from FMI but paid substantially lower investment advisory fees for such services. *See* Section VI.B.1 and Table 9, *supra* (And to the extent the Other Services received by the Fund and FMI's arm's-length clients differed (Portfolio Selection Services differed not at all), the actual contracts governing the services indicate that FMI's arm's-length clients negotiated to receive more extensive services than the Fund. *See* ¶¶ 109 and 117, *supra*.)

   b.    Second and relatedly, all such arm's-length clients, as both a "standard" matter and with respect to each of the particular arm's-length FMI clients identified herein, achieved the lower fees they did *by ensuring that FMI's advisory fee rates featured breakpoints* (unlike the Fund's advisory fee rate, which did not). *See* Table 9, *supra*. For example, Northwestern paid FMI 0.65% on the first $25 million of AUM, 0.55% on the next $25 million, 0.45% on the next $50 million, and 0.40% on all AUM above $100 million (*i.e.*, FMI's "standard" breakpoint schedule for its arm's-length institutional clients), while Vantagepoint paid FMI 0.32% on the first $100 million, and 0.28% on all AUM above $100 million. *Id.*

   c.    Third, notwithstanding that FMI's stated "standard" advisory fee rates for its institutional arm's-length clients (*i.e.*, the fee rates described immediately above that Northwestern paid to FMI) were themselves far lower than the Fund's, further particularized facts indicate that certain FMI arm's-length clients managed to negotiate for and receive rates even lower than FMI's purported arm's-length standard. *See* Table 9, *supra*. For example, Vantagepoint negotiated FMI's standard fee rates downward by at least 30% (to 0.32% on the first $100 million, and 028% on all AUM above $100 million). *Id.*

141

d.   Fourth, FMI's arm's length clients in fact negotiated "most favored nation" clauses into their contracts with FMI. For example, Northwestern's contract with FMI contained a clause that forced FMI, in the event it provided similar services to other similar or smaller clients at lower rates, to offer such rates to Northwestern as well:

> [FMI] will not agree to a lower effective fee rate with any other comparable client, as defined hereinafter, without simultaneously offering the same effective fee rate to [Northwestern], pursuant to this Agreement. For purposes of this provision, the term "comparable client" shall mean any person or entity, excluding clients whose fees are based on performance and clients who invest in commingled funds, that (1) enters into an investment management agreement with [FMI] after the date hereof (that is not a renewal, extension of or an amendment of an existing agreement) for the management of an account that is comparable or smaller in size (either alone or together with other accounts of it and its affiliates) to the Portfolio and (2) receives similar investment management services to those provided to the Portfolio, including without limitation, having comparable investment guidelines, restrictions and objectives. The determination of the applicability of this provision to any comparable client shall be made at the time of [FMI's] agreement to an effective fee rate.

*See* Northwestern Subsadvisory Contract at paragraph 5(c).

**ANSWER:**   FMI admits that the investment advisory fee rate payable to FMI by the Fund was greater than the amount of the investment advisory fee rates payable by its other clients invested in the Large Cap Equity strategy, which received fewer services from FMI than did the Fund. FMI admits further that the investment advisory fee schedules for the accounts of certain of its other clients invested in the Large Cap Equity strategy include breakpoints. FMI admits further that the Northwestern Subsadvisory Agreement, which speaks for itself as to the content thereof, includes language quoted in part in subpart (d) of paragraph 243 of the Complaint, but denies that Plaintiff has quoted such agreement accurately. Except as so stated, FMI denies the allegations in paragraph 243 of the Complaint, and specifically denies that the investment advisory and other services FMI provides to the Fund may fairly and properly be characterized

142

as substantially similar to the investment advisory services FMI provides to its other clients invested in the Large Cap Equity strategy and that the Board's behavior is or has been "captive."

244.    FMI's arm's-length clients were able to secure superior rates (and services) from FMI precisely because they were obtained through true arm's-length negotiations between independent and non-captive counterparties. For example, the Subadvised Funds' advisors, MSA and VIA, select subadvisors such as FMI through a competitive selection process, with multiple candidates submitting proposals, and through negotiations that include exchanges of proposals and counterproposals — all of which result in reductions to the fee rates paid by FMI's arm's-length counterparties. By negotiating lower fees with FMI, the Subadvised Funds' advisors were able to increase the amount of their retained profits.

**ANSWER:**    FMI denies the allegations in the first sentence of paragraph 244 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.  Except as so stated, FMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 244 of the Complaint, and therefore denies those allegations.

245.    The Fund, as a captive fund and with a Board exhibiting captive behavior, does not engage in any similar such process. No other proposals from other investment advisors were solicited, submitted or evaluated, and FMI's sole fee proposals are approved in rubber-stamp fashion without reductions achieved through negotiations or counterproposals.

**ANSWER:**    FMI denies that either the Fund or its Board are "captive" or demonstrate "captive behavior."  FMI denies further that the Board's approval of the IAA, after due consideration by the vote of a majority of Directors who are not interested persons of FMI, as well as by the full Board, may properly or fairly be characterized as approval "in rubber-stamp fashion."  Except as so stated, FMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 245 of the Complaint, and therefore denies those allegations.

246.    The Board's rubber-stamping has allowed FMI to continue to maintain and enjoy excessive investment advisory fees from the Fund for many years. Indeed, and as detailed above, the investment advisory fee rates that FMI extracts from the Fund have remained exactly the same every year during the prior decade, notwithstanding that, in light of the Fund's growth (and the consequent growth in FMI's economy of scale benefits, profits and fall-out benefits), such fees are every year, increasingly, excessive and disproportionate to the services rendered.

**ANSWER:**    FMI admits that the investment advisory fee rate payable by the Fund has been .75% of assets under management since the IAA was amended in October 2004 to reduce the fee from 1.0% of assets under management.  Except as so stated, FMI denies the allegations in paragraph 246 of the Complaint, and further specifically denies that it has received investment advisory fees that are excessive or disproportionate to the services rendered.

247.    The Board's captive behavior and/or lack of adequate conscientiousness in evaluating and approving the Fund's advisory stems, at least in part, from the fact that the information received by the Board, and the "reports" considered by the Board as mentioned in the Fee Approval Summaries, are packaged and presented by Defendant.

**ANSWER:**    FMI admits that the Fund, the Independent Directors of the Board and the full Board requested and evaluated, and FMI furnished, information reasonably necessary to evaluate the terms of the IAA in connection with the Board's consideration of the renewal of the IAA. Except as so stated FMI denies the allegations in paragraph 247 of the Complaint, and further specifically denies that the Board's approval of the IAA, after due consideration by the vote of a majority of Directors who are not interested persons of FMI, as well as by the full Board, may properly or fairly be characterized as exhibiting or resulting from captive behavior or a lack of adequate conscientiousness.

248.    FMI did not provide the Board with sufficient, complete, and/or accurate information needed to fulfill its obligations, with the result that the fee-setting process lacked good faith and integrity.

**ANSWER:**    FMI denies the allegations in paragraph 248 of the Complaint.

249.    In approving the IAA, the Board relied on information and analyses prepared by FMI and designed to support FMI's rationalizations for the fees charged to the Fund. For example and as detailed above, the Fee Approval Summaries indicate that FMI has not provided, and the Board has not considered, adequate information regarding, among other things: the advisory fees charged and services provided by FMI to its arm's-length clients; the economies of scale enjoyed and fall-out benefits received by FMI; and the profitability of the Fund to FMI (and how to evaluate the profitability data in light of economies of scale).

144

**ANSWER:**     FMI admits that in reviewing and determining whether to approve the IAA for the Fund, the Independent Directors of the Board and the full Board requested and evaluated, and FMI furnished, information reasonably necessary to evaluate the terms of the IAA.  FMI admits further that some of such information was prepared by FMI at the request of the Board.  Further answering, FMI states that in reviewing and determining whether to approve the IAA for the Fund, the Independent Directors of the Board and the full Board also had access to and considered information supplied by independent third parties.  Except as so stated, FMI denies the allegations in paragraph 249 of the Complaint.

250.     The Board has not considered information or analyses reflecting the interests of the Fund or its shareholders with respect to FMI's investment advisory fees, and has not critically assessed FMI's rationalization for those fees. For example, and as the Fee Approval Summaries indicate, it appears that (1) FMI has made misleading representations to the Fund Trustees, including representations regarding the services FMI provides to the Fund as compared to arm's-length clients, FMI's economies of scale in providing services to the Fund, and FMI's profitability, and (2) the Board rarely, if ever, questions any information provided by FMI.

**ANSWER:**     FMI denies the allegations in paragraph 250 of the Complaint.

251.     In particular, the Board has uncritically accepted FMI's representations that the lower fees paid by arm's-length, non-captive fund clients reflect differences in the services provided to those clients. The Board has not appropriately examined whether the investment advisory services provided to those clients are materially different from the services provided to the Fund under the IAA, or the extent of any such differences. Nor has the Board considered appropriate information about the cost of providing any additional services required by the IAA (notwithstanding that the IAA, on its face, appears to require fewer rather than more extensive services) to assess whether the difference in fees is warranted by any such differences in the services provided.

**ANSWER:**     FMI denies the allegations in paragraph 251 of the Complaint, and specifically denies that the FMI Funds are "captive" to FMI.

252.     Investment advisory fees are paid to Defendant out of the Fund's assets. Each dollar in fees paid by the Fund directly reduces the value of the Fund's investment portfolio by like amount.

**ANSWER:** FMI admits that the investment advisory fees payable to FMI pursuant to the IAA are paid from the Fund's assets. Except as so stated, FMI denies the allegations in paragraph 252 of the Complaint.

253. Additionally, the payment of excessive investment advisory fees to Defendant harms the Fund on a going forward basis because the Fund loses investment returns and profits that it could have earned on the amounts paid out as fees to Defendant.

**ANSWER:** FMI denies the allegations in paragraph 253 of the Complaint, and specifically denies that it has received excessive investment advisory fees.

254. The Fund has sustained millions of dollars in damages due to the excessive investment advisory fees paid to Defendant.

**ANSWER:** FMI denies the allegations in paragraph 254 of the Complaint.

255. During the Fund's most recent complete fiscal year, ended September 30, 2014, the Fund paid to Defendant $66,171,584 in investment advisory fees. Additionally, during the subsequent six-month period ended March 31, 2015, the Fund paid to Defendant a further $35,708,912 in investment advisory fees. No information is currently available concerning any investment advisory fees paid to FMI by the Fund during any periods subsequent to March 31, 2015.

**ANSWER:** FMI admits that pursuant to the IAA, FMI was paid, on behalf of the Fund, a net amount of approximately $66,171,584 for investment advisory and other services during the fiscal year ended September 30, 2014, and a net amount of approximately $35,708,912 for investment advisory and other services during the six month period ending March 31, 2015. Except as so stated, FMI denies the allegations in paragraph 255 of the Complaint.

256. Foregoing factual allegations indicate that a substantial portion of the investment advisory fees are excessive fees. Specifically, apt fee comparisons variously indicate that 21%-63% of Defendant's current investment advisory fees are excessive. *See* Sections VI.B.1-2 and ¶¶ 98-101, 118-22 and 126-30, *supra*.

**ANSWER:** FMI denies the allegations in paragraph 256 of the Complaint.

## COUNT I

## ICA SECTION 36(b) BREACH OF FIDUCIARY DUTY
## (EXCESSIVE INVESTMENT ADVISORY FEES)

257.    Plaintiff repeats and realleges all of the foregoing allegations as if fully set forth herein.

**ANSWER:**    FMI repeats and incorporates by reference its answers to all of the foregoing allegations as if fully set forth herein.

258.    Plaintiff asserts this count, on behalf of and for the benefit of the Fund, against Defendant FMI.

**ANSWER:**    FMI admits that Plaintiff purports to assert Count I on behalf of and for the benefit of the Fund.  Except as so stated, FMI denies the allegations in paragraph 258 the Complaint.

259.    Defendant is the investment adviser to the Fund.

**ANSWER:**    FMI admits the allegations in paragraph 259 of the Complaint.

260.    Under Section 36(b), Defendant owes a fiduciary duty to the Fund with respect to its receipt of investment advisory fees and other compensation from the Fund.

**ANSWER:**    FMI admits that pursuant to Section 36(b), it is deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by the Fund to FMI.  Except as so stated, FMI denies the allegations in paragraph 260 of the Complaint.

261.    Defendant breached its fiduciary duty under Section 36(b) by charging investment advisory fees to the Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendant and could not have been the product of arm's-length bargaining.

**ANSWER:**    FMI denies the allegations in paragraph 261 of the Complaint.

262.    Defendant has received and continues to receive excessive investment advisory fees attributable to Defendant's retention and monopolization of substantial economies of scale benefits — and further "fall-out" benefits — in connection with Defendant's provision of investment advisory services to the Fund, and has not shared any such benefits with the Fund and/or Fund shareholders.

147

**ANSWER:** FMI denies the allegations in paragraph 262 of the Complaint.

263. The investment advisory fees charged by Defendant to the Fund are and have been grossly excessive in light of the true cost of providing those services to the Fund.

**ANSWER:** FMI denies the allegations in paragraph 263 of the Complaint.

264. In charging and receiving such excessive fees and failing to put the interests of the Fund and/or Fund shareholders such as Plaintiff ahead of its own interests, Defendant has breached its statutory fiduciary duties to the Fund and/or Fund shareholders.

**ANSWER:** FMI denies the allegations in paragraph 264 of the Complaint.

265. As a direct, proximate, and foreseeable result of Defendant's breach of its fiduciary duty under Section 36(b), the Fund has sustained millions of dollars in damages.

**ANSWER:** FMI denies the allegations in paragraph 265 of the Complaint.

266. Pursuant to Section 36(b)(3), Plaintiff seeks to recover, on behalf of and for the benefit of the Fund, the actual damages resulting from Defendant's breach of its fiduciary duty, including the excessive investment advisory fees paid by the Fund to Defendant and investment returns that would have accrued to the Fund had those fees remained in the portfolio and available for investment.

**ANSWER:** FMI admits that Plaintiff purports to seek the relief described in paragraph 266 of the Complaint. Except as so stated, FMI denies the allegations in paragraph 266 of the Complaint, and specifically denies that it has violated Section 36(b), that it has received excessive or unlawful investment advisory fees, and that its conduct has caused damages of any kind to the Fund.

267. Alternatively, under Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), Plaintiff seeks rescission of the IAA and restitution of all excessive investment advisory fees paid by the Fund pursuant to the IAA.

**ANSWER:** FMI admits that Plaintiff purports to seek rescission of the IAA for the Fund and restitution of purportedly excessive investment advisory fees paid by the Fund. Except as so stated, FMI denies the allegations of paragraph 267 of the Complaint, and specifically denies that it has violated Section 36(b), that it has received excessive or unlawful investment advisory fees, and that its conduct has caused damages of any kind to the Fund. FMI further denies that

148

rescission is a remedy available for purported violations of Section 36(b), and that Plaintiff has standing to seek rescission of the IAA for or on behalf of the Fund.

## RESPONSE TO JURY DEMAND

FMI objects to Plaintiff's jury demand on the ground that there is no right to a trial by jury on claims brought pursuant to Section 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b).

## AFFIRMATIVE DEFENSES

FMI asserts the following Affirmative Defenses to the Complaint, reserving the right to timely raise such additional affirmative defenses as may be appropriate in light of developments in this action:

### FIRST AFFIRMATIVE DEFENSE
(Failure to State a Claim)

The Complaint fails to state a claim upon which relief can be granted against FMI.

### SECOND AFFIRMATIVE DEFENSE
(Standing)

If and to the extent Plaintiff purports to assert a claim on behalf of the Fund (or on behalf of any other share series of FMI Funds, Inc.) and it does not hold and has not continuously held shares in the Fund (or any such other share series) throughout the duration of the litigation, Plaintiff lacks standing to assert such a claim.

### THIRD AFFIRMATIVE DEFENSE
(Limitation on Time for Recovery – General)

Plaintiff's claims are barred, in whole or in part, by the limitation on the time for recovery imposed by 15 U.S.C. § 80a-35(b).

## FOURTH AFFIRMATIVE DEFENSE
### (No Rescission)

Plaintiff may not obtain rescission under Section 47(b) of the 1940 Act, 15 U.S.C. § 80a-46(b), because rescission is not available as a remedy for purported violations of Section 36(b). Furthermore, Section 47(b) provides that a contract violative of the 1940 Act is "unenforceable by either *party*" (emphasis supplied), and Plaintiff, as a nonparty to the IAA, has no standing to pursue a request for rescission. Moreover, the Complaint contains none of the allegations that would be required under Fed. R. Civ. P. 23.1 and applicable state or federal law in order to assert a claim for rescission on behalf of the Fund. Consequently, Plaintiff's claim for rescission is barred.

## FIFTH AFFIRMATIVE DEFENSE
### (Laches, Waiver, Estoppel, Unclean Hands, Ratification, Disclosure and/or Consent)

Plaintiff, by virtue of its decision to purchase and its continued ownership of shares in the Fund, and consequent receipt of information concerning the performance, fee schedules and total expense ratios of the Fund over the course of time, has been fully informed, and had the duty to be informed, of all material facts pertaining to FMI's receipt of compensation paid on behalf of the Fund for services provided to the Fund. While thus fully informed, Plaintiff expressed its satisfaction with its investment by retaining its shares in the Fund. Plaintiff's claims therefore are barred, in whole or in part, by the doctrines of laches, waiver, estoppel, unclean hands, ratification, disclosure and/or consent.

## SIXTH AFFIRMATIVE DEFENSE
### (No Disaggregation of Fees or Services under Section 36(b))

In order to establish that an investment advisory fee is excessive under 15 U.S.C. § 80a-35(b), a plaintiff must prove that the investment advisory fee as a whole is so disproportionately large that it bears no reasonable relationship to the value of the services provided and could not

have been the product of arm's-length bargaining, and it is insufficient to challenge as excessive only a portion of the investment advisory fee paid for a particular portion of the services provided. Plaintiff's claim is barred because as a whole, the investment advisory fee for the Fund is not so disproportionately large that it bears no reasonable relationship to the value of the services provided by FMI and could not have been the product of arm's-length bargaining.

## PRAYER FOR RELIEF

WHEREFORE, Defendant Fiduciary Management, Inc., prays:

(1) that judgment dismissing this action be entered in favor of FMI;

(2) that Plaintiff take nothing by this action;

(3) that the Court award FMI its costs and expenses, including attorneys' fees; and

(4) that the Court award FMI such other and further relief as the Court deems just and proper.

Dated: November 30, 2015                    Respectfully submitted,

                                            FIDUCIARY MANAGEMENT, INC.


                                    By:  ____/s/ John W. Rotunno____
                                         John W. Rotunno (SBN IL/02405342)
                                         john.rotunno@klgates.com
                                         Stephen J. O'Neil (SBN IL/3127564)
                                         stephen.oneil@klgates.com
                                         Paul J. Walsen (SBN IL/6226318)
                                         paul.walsen@klgates.com
                                         Joseph C. Wylie (SBN IL/6270852)
                                         joseph.wylie@klgates.com
                                         Dawn J. Johnson (SBN IL/6275206)
                                         dawn.johnson@klgates.com
                                         K&L Gates LLP
                                         70 West Madison Street
                                         Suite 3100
                                         Chicago, Illinois 60602
                                         Telephone: 312.807.4244
                                         Facsimile: 312.827.1278

                                         Daniel T. Flaherty (SBN/1011357)
                                         dflaherty@gklaw.com
                                         Brian C. Spahn (SBN/1060080)
                                         bspahn@gklaw.com
                                         Godfrey & Kahn, S.C.
                                         780 North Water Street
                                         Milwaukee, WI 53202
                                         Telephone: 414.273.3500
                                         Facsimile: 414.273.5198

                                         ***Attorneys for Defendant Fiduciary
                                         Management, Inc.***

152

## <u>CERTIFICATE OF SERVICE</u>

       The undersigned, an attorney, certifies that on November 30, 2015, the foregoing **Answer and Affirmative Defenses to Complaint** was served upon the following counsel of record via email:

James P. Allen, Sr.
jamesallen@allenbrotherspllc.com
Allen Brothers PLLC
400 Monroe Street, Suite 220
Detroit, Michigan  48226
Phone:  313.962.7777
Facsimile:  313.962.0581

Peter Linden
plinden@kmllp.com
Ira Press
ipress@kmllp.com
Kirby McInerney LLP
825 Third Avenue, 16th Floor
New York, New York  10022
Phone:  212.371.6600
Facsimile:  212.751.2540

                                    _____/s/ John W. Rotunno_____